# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THE UNITED STATES OF AMERICA and COMMODITY FUTURES TRADING COMMISSION,<br><br>*Plaintiffs*,<br><br>v.<br><br>STATE OF NEW YORK; KATHLEEN HOCHUL, in her official capacity as Governor of New York; LETITIA JAMES, in her official capacity as Attorney General of New York; NEW YORK STATE GAMING COMMISSION; ROBERT WILLIAMS, in his official capacity as Executive Director of the New York State Gaming Commission; BRIAN O'DWYER, in his official capacity as Chair and Commissioner of the New York State Gaming Commission; JOHN A. CROTTY, in his official capacity as Commissioner of the New York State Gaming Commission;  SYLVIA B. HAMER, in her official capacity as Commissioner of the New York State Gaming Commission; MARTIN J. MACK, in his official capacity as Commissioner of the New York State Gaming Commission; PETER J. MOSCHETTI, JR., in his official capacity as Commissioner of the New York State Gaming Commission; MARISSA SHORENSTEIN, in her official capacity as Commissioner of the New York State Gaming Commission; and JERRY SKURNIK, in his official capacity as Commissioner of the New York State Gaming Commission,<br><br>*Defendants*. | Case No. 1:26-cv-3404<br><br>**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF** |

**COMPLAINT**

Plaintiffs, the United States of America and the Commodity Futures Trading Commission ("CFTC" or "Commission"), by and through their undersigned counsel, bring this civil action for declaratory and injunctive relief, and allege as follows:

## I.   INTRODUCTION

1.    The Commodity Exchange Act ("CEA" or the "Act"), 7 U.S.C. §1, *et seq.*, provides a comprehensive framework for the regulation of commodity derivatives transactions in the United States.  This federal law designates the CFTC as the federal agency with "exclusive jurisdiction" over the regulation of commodity futures, options, and swaps traded on federally regulated exchanges.  7 U.S.C. § 2(a)(1)(A).  Plaintiffs bring this action to halt defendants' efforts to apply and enforce preempted state laws to national markets that are governed by federal law.

2.    In October 2025, the New York State Gaming Commission sent a CFTC-regulated entity, KalshiEX, LLC ("Kalshi"), a cease-and-desist letter.  *See KalshiEX, LLC v. Williams, et al.*, No. 1:25-cv-08846-AT (S.D.N.Y.), ECF No. 1 ¶ 48.  The cease-and desist letter asserted that "offering events contracts based on sporting events 'within New York State' without a sports gaming licensed violated New York law" and demanded that Kalshi "cease and desist immediately from illegally advertising, promoting, administering, managing, or otherwise making available sports wagering and/or a mobile sports wagering platform in New York." *Id.*

3.    On April 21, 2026, the State of New York filed civil enforcement actions against Coinbase Financial Markets, Inc. ("Coinbase"), and Gemini Titan, LLC ("Gemini"), two entities offering event contracts on CFTC-regulated national markets.  These lawsuits allege that Coinbase and Gemini are engaged in illegal gambling activities in violation of New York Racing, Pari-Mutuel Wagering and Breeding Law ("Racing Law") § 1367 and Penal Law § 225.  New York

2

seeks: (a) permanent injunctions prohibiting Coinbase and Gemini from offering contracts related to sports, entertainment, elections, and other events without a New York license, (2) restitution for customers who have used the entities' platforms, and (3) penalties and damages.

4.      In a press release announcing the lawsuits, Attorney General Letitia James claimed that Coinbase and Gemini are "illegally running gambling operations in New York" because they "have failed to obtain a license from the New York State Gaming Commission."[1]  New York Governor Kathleen Hochul echoed these statements in a press release issued on April 22, 2026, referencing the Gaming Commission's October 2025 cease and desist letter to Kalshi and stating that "New York State is … taking action" against "predictive market platforms that engage in unlicensed and unlawful gambling operations."[2]

5.      Defendants assert that New York law permits defendants to regulate and even criminalize markets over which Congress has granted "exclusive jurisdiction" to regulate to the CFTC.  Defendants seek to prohibit CFTC-regulated Designated Contract Markets ("DCMs") from operating in New York and offering New York customers access to event contracts—a type of derivative instrument regulated by federal law that, absent certain narrow exceptions, can be traded only on CFTC-regulated exchanges in transactions facilitated by CFTC-regulated markets and intermediaries.

6.      New York's attempt to shut down federally regulated markets intrudes on the exclusive federal scheme Congress designed to oversee national swaps markets.  Prompted by the

---

[1] Press Release, Letitia James, Att'y Gen. of N.Y., Attorney General James Sues Coinbase and Gemini for Running Illegal Gambling Platforms in New York (Apr. 21, 2026), https://ag.ny.gov/press-release/2026/attorney-general-james-sues-coinbase-and-gemini-running-illegal-gambling.

[2] Press Release, Kathleen Hochul, Gov. of N.Y., Governor Hochul Signs Nation-leading Executive Order Banning State Employees From Insider Trading on Prediction Markets (Apr. 22, 2026), https://www.governor.ny.gov/news/governor-hochul-signs-nation-leading-executive-order-banning-state-employees-insider-trading.

evolution of national financial markets and repeated conflicts with state law, Congress enacted the CEA, granting the CFTC exclusive jurisdiction to regulate those markets and enacting a comprehensive federal regulatory framework that preempts state laws that attempt to regulate the operation of, or transactions on, CFTC-regulated exchanges.  This comprehensive federal regulatory scheme preempts New York law as applied to event contracts traded on federally regulated exchanges.

7.     Event contracts are derivative instruments that enable parties to trade on their predictions about whether a future event will occur.  When structured as "swaps" or futures contracts as defined by the CEA, and traded on CFTC-regulated exchanges, they are subject to the exclusive jurisdiction of the CFTC.

8.     As of the date of filing of this complaint, at least eight CFTC-regulated DCMs have collectively self-certified with the CFTC more than 3,000 event contracts pursuant to CFTC Rule 17 C.F.R. § 40.2.

9.     Defendants have made clear that they believe event contracts, including sports-related event contracts listed on CFTC-regulated markets, are wagers, rather than swaps, and so may be offered only by firms that have obtained a license from the New York State Gaming Commission.

10.    Defendants misapprehend both the nature of these contracts offered on CFTC-regulated markets and the federal regulatory framework.  Event contracts, including sports-related or political event contracts that are listed on CFTC-regulated DCMs, are covered by the CEA, and the CEA prohibits States from invading the CFTC's exclusive jurisdiction over event contract transactions offered by and executed on federally regulated DCMs.  The defendants prohibit these DCMs from operating in New York without a license or by conditioning their operation on

4

compliance with state laws and regulations. Defendants' actions thus assert regulatory authority over DCMs directly in conflict with the CEA and rules promulgated by the CFTC under the CEA, and those actions must be preempted. This Court should put an end to the ongoing efforts by defendants to undermine the uniform application of federal law by declaring that New York gambling and wagering laws or regulations are preempted by federal law as applied to event contract swaps listed for trading on CFTC-regulated DCMs and are thus unlawful.

11.    Unless restrained and enjoined by the Court, defendants are likely to continue their attempts to subvert federal law and the exclusive jurisdiction to regulate event contract swaps conferred on the CFTC by Congress.

12.    Defendants' aggressive enforcement of their preempted state laws causes irreparable harm to the federal plaintiffs because it is disrupting the operation of federally regulated markets and impairing the CFTC's ability to apply and enforce its own regulations and the federal CEA. Absent an injunction, the United States and the CFTC will suffer irreparable harm.

## II.    JURISDICTION AND VENUE

13.    This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1345 (district courts have original jurisdiction over civil actions commenced by the United States or by any agency expressly authorized to sue by Act of Congress). This action presents a federal question under the laws and Constitution of the United States because it concerns whether the CEA, 7 U.S.C. §§ 1, *et seq.*, preempts New York's gambling laws insofar as they purport to regulate transactions on a CFTC-regulated DCM.

14.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because at least one defendant resides in this district and all defendants are residents of the State.

### III.    PARTIES

15.    Plaintiff the United States of America regulates U.S. financial markets, and it enforces federal commodity derivatives laws, through its executive agency, the CFTC.

16.    Plaintiff CFTC is an agency of the United States Government that administers and enforces the CEA.  The CEA grants the CFTC authority to represent itself through its General Counsel.  7 U.S.C. § 2(a)(4).

17.    Defendant State of New York is a state of the United States.

18.    Defendant Kathleen Hochul is the Governor of New York and is sued in her official capacity.  Under the New York Constitution, the Governor of New York "shall take care that the laws are faithfully executed." N.Y. Const. art. IV, § 3.

19.    Defendant Letitia James is the Attorney General of New York and is sued in her official capacity. The Attorney General of New York is the state's chief legal officer.  The New York Attorney General has an office location within the Southern District of New York.

20.    Defendant New York State Gaming Commission is the New York state agency that regulates gambling in the State of New York.  The New York State Gaming Commission oversees licensing, regulating, investigating and penalizing casino operators, management companies, holding companies, key employees, casino gaming employees, and gaming-related vendors in New York.

21.    Defendant Robert Williams is the Executive Director of the New York State Gaming Commission and is sued in his official capacity.

22.    Defendant Brian O'Dwyer is the Chair and Commissioner of the New York State Gaming Commission and is sued in his official capacity.

23.     Defendants John A. Crotty, Sylvia B. Hamer, Martin J. Mack, Peter J. Moschetti,

6

Jr., Marissa Shorenstein, and Jerry Skurnik are Commissioners of the New York State Gaming Commission and are sued in their official capacities.

## IV.    OTHER RELEVANT ENTITIES

24.    Coinbase Financial Markets, Inc. is registered with the CFTC as a Futures Commission Merchant ("FCM"). Coinbase entered a partnership with Kalshi that allows Coinbase's customers to use its platform to trade event contracts listed on Kalshi's exchange. Kalshi obtained CFTC designation as a Contract Market on November 3, 2020.  As a CFTC-registered FCM, Coinbase is an intermediary for customers trading regulated derivatives on DCMs, including event contracts listed on Kalshi's exchange.

25.    Gemini is a CFTC DCM.  Gemini obtained CFTC designation as a Contract Market on December 10, 2025.  Gemini does business in the United States and offers products and transactions including event contract swaps through its website, www.gemini.com.

## V.    FEDERAL LAW GOVERNING COMMODITY DERIVATES MARKET
### A. Congress Vested the CFTC with Exclusive Regulatory Authority Over U.S. Commodity Derivates Markets

26.    The Constitution empowers Congress to "regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes," U.S. Const. art. I, § 8, cl. 3.  The Constitution also vests the President of the United States with the "executive Power," U.S. Const. art. II, § 1, and authorizes the President to "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3.

27.    Based on its enumerated constitutional and sovereign powers to regulate interstate commerce, the United States has broad authority to regulate futures and derivatives markets.  That authority includes the power to enforce the supremacy of federal law regulating futures and derivatives markets.

28.     The United States has well-established, comprehensive, and preemptive authority to regulate U.S. financial markets.  The CEA is the federal statute that provides a comprehensive federal framework for the regulation of commodity derivatives transactions in the United States.

29.     The CFTC is the federal executive agency charged with administering and enforcing the CEA.  Congress created the CFTC in 1974 to establish a uniform national system for regulating futures trading after concluding that the then-existing patchwork of state-by-state regulation had impaired the development and functioning of national commodity derivatives markets.  *See* H.R. Rep. No. 93-975, at 51 (1974); S. Rep. No. 93-1131, at 36 (1974), *reprinted in* 1974 U.S.C.C.A.N. 5843, 5885.

30.     Derivatives are financial instruments such as futures, options, or swaps that derive their value from something else, like a benchmark or a physical commodity.  In general, market participants use derivatives to hedge risks or speculate on commodity price movements.

31.     The CEA requires that, subject to certain exemptions or exceptions, commodity derivative transactions must be conducted on exchanges designated by, or registered with, the CFTC.  For example, trading of commodity futures contracts must be conducted on a board of trade designated by the CFTC as a contract market or a registered foreign board of trade (*see* 7 U.S.C. § 6 and 17 C.F.R. § 48.3); no person may operate a facility for the trading or processing of swaps unless the facility is registered as a swap execution facility or designated as a contract market (*see* 7 U.S.C. § 7b-3(a) and 17 C.F.R. § 37.3); commodity options must likewise be conducted on a board of trade designated as a contract market (*see* 7 U.S.C. § 6c(b) and 17 C.F.R. § 32.2).

32.     The purpose of the CEA is to "serve the public interests . . . through a system of effective self-regulation of trading facilities, clearing systems, market participants and market

professionals under the oversight of the Commission," as well as "to deter and prevent price manipulation or any other disruptions to market integrity; to ensure the financial integrity of all transactions subject to [the Act] and the avoidance of systemic risk; to protect all market participants from fraudulent or other abusive sales practices and misuses of customer assets; and to promote responsible innovation and fair competition among boards of trade, other markets and market participants." 7 U.S.C. § 5(b).

33.     DCMs are boards of trade or exchanges that operate under the regulatory oversight of the CFTC pursuant to Section 5 of the CEA, 7 U.S.C. § 7. The CFTC designates a board of trade as a contract market through a formal application process through which an applicant board of trade must demonstrate its ability to comply with detailed statutory requirements called "core principles." 7 U.S.C. § 7(d). These core principles require, among other things, that DCMs:

a. "[E]stablish, monitor, and enforce compliance with the rules of the contract market, including—(i) access requirements; (ii) the terms and conditions of any contracts to be traded on the contract market; and (iii) rules prohibiting abusive trade practices on the contract market." 7 U.S.C. § 7(d)(2)(A).

b. "[H]ave the capacity to detect, investigate, and apply appropriate sanctions to any person that violates any rule of the contract market." 7 U.S.C. § 7(d)(2)(B).

c. "[L]ist on the contract market only contracts that are not readily susceptible to manipulation." 7 U.S.C. § 7(d)(3).

d. "[H]ave the capacity and responsibility to prevent manipulation, price distortion, and disruptions of the delivery or cash-settlement process through market surveillance, compliance, and enforcement practices and procedures, including—(A) methods for conducting real-time monitoring of trading; and (B) comprehensive and accurate trade reconstructions." 7 U.S.C. § 7(d)(4).

e. "[P]rovide a competitive, open, and efficient market and mechanism for executing transactions that protects the price discovery process…." 7 U.S.C. § 7(d)(9).

f. "[M]aintain rules and procedures to provide for the recording and safe storage of all identifying trade information in a manner that enables the contract market to use the information—(A) to assist in the prevention of customer and market abuses; and (B) to provide evidence of any violations of the rules of the contract market." 7 U.S.C. § 7(d)(10).

9

g. "[E]stablish and enforce—(A) rules and procedures for ensuring the financial integrity of transactions…and (B)…(ii) the protection of customer funds." 7 U.S.C. § 7(d)(11)

h. "[E]stablish and enforce rules—(A) to protect markets and market participants from abusive practices committed by any party…and (B) to promote fair and equitable trading on the contract market." 7 U.S.C. § 7(d)(12).

34. The CFTC has enacted detailed rules governing the process through which a board of trade can achieve designation as a contract market, and detailed rules governing the operations of the contract market once that designation is in place. 17 C.F.R. § 38, *et seq.* DCMs may list for trading commodity futures, options, or swaps as permitted by Part 38 of the CFTC's regulations, 17 C.F.R. § 38, *et seq.*

35. Event contracts listed on CFTC-regulated DCMs are a type of "swap" as defined by the CEA. Section 1a(47) of the CEA, 7 U.S.C. § 1a(47), broadly defines "swap" to include "any agreement, contract, or transaction"—

(i) that is a put, call, cap, floor, collar, or similar option of any kind that is for the purchase or sale, or based on the value, of 1 or more interest or other rates, currencies, commodities, securities, instruments of indebtedness, indices, quantitative measures, or other financial or economic interests or property of any kind;

(ii) that provides for any purchase, sale, payment, or delivery (other than a dividend on an equity security) that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence; . . .

(iv) that is an agreement, contract, or transaction that is, or in the future becomes, commonly known to the trade as a swap . . . [or,]

(vi) that is any combination or permutation of, or option on, any agreement, contract, or transaction described in any of [these clauses].

36. The CEA and CFTC Regulations establish important protections for derivatives markets, market participants, and the general public by creating uniform regulations of a nationwide—and often international—market. For example, DCMs must conform to core principles that are designed to achieve the prevention of market abuse (7 U.S.C. § 7(d)(12)(A));

ensure their financial stability (7 U.S.C. § 7(d)(21)); protect their information security (17 C.F.R. § 38.1051(a)(2)); and safeguard their systems in the event of a disaster (17 C.F.R. § 38.1051(a)(3)). Further, DCMs must ensure that the contracts that they list for trading are "not readily susceptible to manipulation" (7 U.S.C. § 7(d)(3)); DCMs must "prevent market disruption" (7 U.S.C. § 7(d)(4)); DCMs must impose position limits designed to reduce the potential threat of market manipulation or congestion (7 U.S.C. § 7(d)(5)); DCMs must establish and enforce rules to minimize conflicts of interest (7 U.S.C. § 7(d)(16)); DCMs must provide impartial access to traders (17 C.F.R. § 38.151); and DCMs must maintain and retain important records and provide them to the Commission (7 U.S.C. § 7(d)(18)). And the CEA conferred on the CEA enforcement authority to "bring an action in . . . [a] district court . . . to enjoin . . . or to enforce compliance with [the CEA]" if "it shall appear to the Commission" that any "person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of this chapter or any rule, regulation, or order thereunder, or is restraining trading in any commodity for future delivery or any swap." 7 U.S.C. § 13a-1(a).

37. Today there are 25 exchanges in the United States have active designations from the CFTC to operate as a contract market. These DCMs include Kalshi and Gemini.

### B. State Attempts to Shut Down National Markets Drives Early Derivatives Regulation

38. By the mid-nineteenth century, commodity exchanges in major trading hubs like New York and Chicago had organized trading to facilitate price discovery (information exchange), risk management (hedging), and speculation. But States and courts impeded these new markets, often failing to distinguish between futures trading and "gambling" or "wagering," with many states even prohibiting futures trading as a form of gambling. *See, e.g., Irwin v. Williar*, 110 U.S. 499, 508-09 (1884) (describing futures contracts as "nothing more than a wager"); *see also*

11

*Cothran v. Ellis*, 16 N.E. 646, 647 (Ill. 1888) (describing futures as "gambling in grain").

39. Indeed, some States, including New York, criminalized futures contracts. *See, e.g., People ex rel. Collins v. McLaughlin*, 128 A.D. 599, 608 (N.Y. App. Div. 1908) (quoting Penal Law § 343). In 1889, the New York Penal Law criminalized the use of a room "for making any wagers or bets made to depend upon . . . the future price of stocks, bonds, securities, commodities or property of any description whatever." *Id.*

40. Nevertheless, the Supreme Court and Congress acknowledged that futures markets served a valuable economic function and should be given room to develop. As Justice Holmes and the Supreme Court noted in *Bd. of Trade of Chi. v. Christie Grain & Stock Co.*, 198 U.S. 236, 247-48 (1905):

> People will endeavor to forecast the future, and to make agreements according to their prophecy. Speculation of this kind by competent men is the self-adjustment of society to the probable. Its value [is] well known as a means of avoiding or mitigating catastrophes, equalizing prices, and providing for periods of want. It is true that the success of the strong induces imitation by the weak, and that incompetent persons bring themselves to ruin by undertaking to speculate in their turn. But legislatures and courts generally have recognized that the natural evolutions of a complex society are to be touched only with a very cautious hand, and that such coarse attempts at a remedy for the waste incident to every social function as a simple prohibition and laws to stop its being are harmful and vain.

41. Congress, recognizing the value of these new markets and the negative effects of a patchwork of state regulation, centralized the oversight and regulation of futures trading on federally regulated contract markets. The first federal legislation designed to create a comprehensive federal regulatory framework for futures markets was the Future Trading Act of 1921, Pub. L. No. 67-66, 42 Stat. 187 (1921) ("21 Act"), followed by the Grain Futures Act of 1922, Pub. L. No. 67-331, 42 Stat. 998 (1922) ("22 Act"). In passing these laws, Congress recognized the importance of uniform federal regulation of futures markets, even over objections that the new legislation would displace some States' regulations. *Cf.* H.R. Rep. No. 67-1095, at 5

(1922) (Conf. Rep.) (objecting that the bill was "designed to . . . more or less eliminate some of the most important police powers of several sovereign States").

42.    Congress expanded federal oversight of futures markets in 1936 with the Commodity Exchange Act, Pub. L. No. 74-675, 49 Stat. 1491 (1936).  But even as market participants expanded futures markets beyond their agricultural origins, those market participants continued to face the persistent threat of state prosecution through a patchwork of state laws and regulations.

### C.  Congress Gave the CFTC "Exclusive" Jurisdiction over Futures Trading in 1974

43.    In 1973, futures exchanges recommended that "federal policy . . . be uniform throughout the United States" and not "subject to the vagaries" of different obligations in "different jurisdictions."  Review of Commodity Exch. Act and Discussion of Possible Change: Hearings Before the H. Comm. on Agric., 93d Cong., 1st Sess. 121 (1973).  Congress quickly responded, explicitly addressing the issue the following year when it passed the Commodity Futures Trading Commission Act of 1974, Pub. L. 93-463, 88 Stat. 1389 (1974) ("CFTC Act of 1974").

44.    With the passage of the CFTC Act of 1974, Congress amended the CEA to explicitly give the CFTC "exclusive jurisdiction" over commodity derivatives transactions including futures, options, and swaps traded on federally regulated exchanges.  7 U.S.C. § 2(a)(1)(A).  The CFTC Act of 1974 amendments to the CEA worked a sea change in the regulation of U.S. derivatives markets in three critical ways.  First, Congress established the CFTC, vesting in this federal executive agency the authority to administer the CEA.  Second, Congress expanded the scope of the CEA to cover "all commodities."  Third, Congress expressly gave the CFTC "exclusive jurisdiction" over U.S. commodity futures and options markets.

45.    The CFTC Act of 1974 amended Section 2 of the CEA to provide that "the

13

Commission shall have exclusive jurisdiction with respect to accounts, agreements (including any transaction which is of the character of, or is commonly known to the trade as, an 'option' . . . , and transactions involving contracts of sale of a commodity for future delivery, traded or executed on a contract market designated pursuant to section 5 of this Act or any other board of trade, exchange, or market." CFTC Act of 1974, Section 201(b), 88 Stat. at 1395 (codified at 7 U.S.C. § 2(a)(1)).

46.    Preemption was an express goal of the CFTC Act of 1974. Congress recognized the need for uniform, nationwide regulation of futures and options markets because concurrent regulation by the states or other federal regulators such as the Securities and Exchange Commission could lead to "total chaos." See Commodity Futures Trading Act of 1974: Hearings Before the S. Comm. on Agric. & Forestry on S. 2485, S. 2578, S. 2837, H.R. 13113, 93d Cong., 2d Sess. 685 (1974) (statement of Sen. Clark). Potentially limiting language was stricken from the statute "to assure that Federal preemption is complete." 120 Cong. Rec. S 30458, 30464 (daily ed. Sept. 9, 1974) (Statement of Sen. Curtis). The CFTC Act of 1974 "preempt[ed] the field insofar as futures regulation is concerned" such that "if any substantive State law regulating futures trading was contrary to or inconsistent with Federal law, the Federal law would govern." H.R. Rep. No. 93-1383 (1974) (Conf. Rep.), *reprinted in* 1974 U.S.C.C.A.N. 5894, 5897.

### D. Congress Reinforced and Clarified the CFTC's Exclusive Jurisdiction After 1974

47.    Amendments to the CEA between 1978 and 2010 repeatedly reinforced and clarified the CFTC's exclusive jurisdiction over futures and options.

48.    In the Futures Trading Act of 1978 ("78 Act"), Congress preserved the CFTC's exclusive authority over futures transactions on CFTC-regulated DCMs while clarifying the states' ability to pursue certain violations of the CEA against actors other than federally regulated

exchanges. The 78 Act added a section to the CEA authorizing states to bring actions for injunctive or monetary relief for specified violations of the CEA and to enforce their "general civil or criminal antifraud" statutes. *See* 78 Act, Pub. L. 95-405, § 15(7), 92 Stat. 865, 873 (1978). Other than this explicit authorization of state authority, the CEA retained the broad preemption of state laws put in place in 1974. Proposals to carve off pieces of the CFTC's "exclusive" jurisdiction were rejected, because "[t]he nature of the underlying commodity is not an adequate basis to divide regulatory authority." S. Rep. No. 95-850, at 111-12 (1978), *reprinted in* 1978 U.S.C.C.A.N. 2087, 2110-11. That "a futures contract market does not fit into the traditional mold where there are both hedging and price-discovery functions should not be the determining factor in whether the contract is to be regulated by the CFTC." *Id.* Congress also further added to the list of justifications supporting the CFTC's exclusive jurisdiction over commodity derivatives, citing concerns over "costly duplication and possible conflict of regulation or over-regulation." *Id.*

49.    The Futures Trading Act of 1982 (the "82 Act") further clarified the scope of the CEA's preemption of other federal and state laws and the role of the States in pursuing illegal or fraudulent off-exchange transactions, while still recognizing "the CFTC['s] exclusive jurisdiction to regulate futures trading and enforce the provisions of the Act, thereby preempting any State regulatory laws." H.R. Rep. No. 97-565, at 44-45 & 102-03 (1982), *reprinted in* 1982 U.S.C.C.A.N. 3871, 3893-94 & 3951-52. First, the 82 Act clarified the procedures for States to pursue violations of the CEA's anti-fraud provisions in state court. Second, the 82 Act clarified the role of states with respect to off-exchange futures transactions. Language was added to permit "criminal prosecution under any federal criminal statute" and the application of federal or state laws to off-exchange transactions or unregistered market participants. 82 Act, Pub. L. 97-444, § 229, 96 Stat. 2294, 2318 (1982). Other state laws that could arguably apply to DCMs and market

participants registered with the CFTC remained preempted.  See H.R. Rep. No. 97-565, at 44-45 & 102-103, 1982 U.S.C.C.A.N. at 3893-94, 3951-52.  Congress explained that it "continue[d] to support the idea of a single unified program of regulation and exclusive CFTC jurisdiction over exchange-traded futures," "recogniz[ing] the somewhat esoteric nature of the commodity futures markets and the desire to have knowledgeable and uniform enforcement of the Act." *Id.*

50.     In 1992, Congress again adjusted its regulatory framework to capture a new type of derivative financial product: swaps.  In the Futures Trading Practices Act of 1992 ("92 Act"), Pub. L. 102-546, 106 Stat. 3590 (1992), Congress gave the CFTC authority to "exempt" certain off-exchange ("over-the-counter" or "OTC") swap transactions from the CEA's mandatory exchange trading regime for futures and options.  The 92 Act added language to CEA Section 12(e), 7 U.S.C. § 16(e), expressly "supersed[ing] and preempt[ing] the application of any State or local" gambling or bucket shop laws as applied to OTC derivatives (swaps) transactions that the CFTC had exempted pursuant to its new authority in CEA Section 4(c), 7 U.S.C. § 6(c).  While the 82 Act reserved to the States some authority to apply state and local laws to off-exchange futures transactions, the 92 Act cut back state authority for off-exchange swaps that received an exemption from the CFTC.  Congress's goal was, again, to provide "legal certainty under both the Act and state gaming and bucket shop laws for transactions covered by the terms of an exemption."  H.R. Rep. No. 102-978, at 80 (1992) (Conf. Rep.), *reprinted in* 1992 U.S.C.C.A.N. 3179, 3212.

51.     Congress again limited the authority of States to regulate derivatives transactions in 2000 with the passage of the Commodity Futures Modernization Act of 2000 ("CFMA"), Pub. L. No. 106-554, Appendix E & § 103, 114 Stat. 2763A-365, 2763A-377 (2000).  The CFMA exempted or excluded swap transactions from the CEA's exchange trading requirements while also preempting the application of state and local laws to those "excluded" swap transactions.  The

16

existing preemption of state and local laws as to on-exchange transactions therefore remained in place, and the preemption of state and local laws as to off-exchange transactions (exempt or excluded swaps) was expanded.

### E.  Congress Embraced Preemption for Swaps Transactions in the Dodd Frank Act

52.    In the wake of the 2008 financial crisis, Congress reworked the regulatory structure for the swaps market, creating a framework within the CEA for the on-exchange execution, clearing and reporting of vast portions of those swaps.  The 2010 Dodd-Frank Act expressly extended the CFTC's "exclusive jurisdiction" to encompass "transactions involving swaps," eliminating the remaining concurrent jurisdiction of States as to off-exchange swap transactions. *See* Pub. L. No. 111-203, 124 Stat. 1376 (2010); 7 U.S.C. § 2(a)(1)(A).  After Dodd-Frank, Congress had removed all authority for States to regulate swaps of any kind, creating a complete framework for the CFTC's exclusive jurisdiction and occupying the regulatory field.

53.    In the Dodd-Frank Act, Congress made clear that the CFTC has exclusive jurisdiction over event contracts.  In CEA § 5c(c)(5)(C) (codified at 7 U.S.C. § 7a-2(c)(5)(C)), Congress provided the CFTC with specific oversight and prohibitory authority over event contracts.  Under § 5c(c)(5)(C), the CFTC "may determine" that event contracts involving certain categories "are contrary to the public interest" and may not be listed on CFTC-regulated markets.  7 U.S.C. § 7a-2(c)(5)(C)(i)-(ii).

54.    By creating a specific public interest review process, Congress signaled that these contracts belong within the CFTC's exclusive regulatory purview, not the States'.

### F.  The CFTC Uses Its Authority to Carry Out Congress's Directives

55.    The CEA confers on the CFTC the authority to make rules governing swaps and other futures and derivatives contracts.  See, *e.g.*, 7 U.S.C. §§ 2, 6, 6s, 7.  Pursuant to that authority,

17

the CFTC has for decades promulgated rules that regulate a large, nationwide industry and which seek to provide clarity to the industry, market participants, and the public. See 17 C.F.R. § 1.1, *et seq*.

56.     Part of the CFTC's responsibilities include issuing guidance and promulgating new rules to provide certainty when markets change and innovate. The CFTC already has extensive rules on what a DCM must do to become certified with the Commission, see 17 C.F.R. Part 38, and what a DCM must do to either self-certify a contract before listing, see 17 C.F.R. § 40.2, or to submit a contract for the CFTC to approve, see 17 C.F.R. § 40.3.

57.     Since 2000, DCMs have been required to certify to the CFTC that a contract complies with the CEA before it can be listed for trading. In 2010, through the Dodd-Frank Act, Congress created Section 5c(c)(5)(C) of the CEA authorizing the CFTC to prohibit DCMs from offering event contracts that are contrary to the public interest. Section 5c(c)(5)(C) of the CEA is commonly known as the "Special Rule."

58.     Rule 40.11 implements the Special Rule by prohibiting DCMs from offering event contracts "that involve[ ], relate[ ] to, or reference[ ] terrorism, assassination, war, gaming, or an activity that is unlawful under any State or Federal law." 17 C.F.R. § 40.11(a)(1). The CFTC is empowered by Congress to prohibit DCMs from offering event contracts that it determines "to be contrary to the public interest." *Id.* § 40.11(a)(2).

59.     The CEA's layered oversight approach also requires DCMs to serve as the first line of defense in policing their markets. Before listing an event contract for trade, a DCM must provide the CFTC with information including the contract's rules, "a concise explanation and analysis" of the contract's "terms and conditions," and "a certification . . . that the product to be listed complies with the [CEA] and [CFTC] regulations." 17 C.F.R. § 40.2(a)(3). The CFTC can

also require DCMs to turn over "evidence, information or data" proving compliance with the CEA. *Id.* § 40.2 (b). If a DCM fails to provide this information or offers a "false certification," the CFTC "may stay the listing of a contract." *Id.* § 40.2 (c). And DCMs are required to deploy safeguards throughout their platforms to ensure compliance with CFTC regulations.[3]

60.     With respect to event contracts, the CFTC recently published an advisory letter to DCMs on prediction markets and event contracts, Prediction Markets Advisory, CFTC Letter No. 26-08 (Mar. 12, 2026) (see CFTC Prediction Markets Advisory Press Release, https://www.cftc.gov/PressRoom/PressReleases/ 9193-26 (last visited 3/18/2026)).

61.     To provide additional clarity in the marketplace, the CFTC is in the process of writing and revising its rules applicable to event contracts and prediction markets. On March 16, 2026, the CFTC published in the Federal Register an advance notice of proposed rulemaking soliciting public comments on prediction markets, 91 Fed. Reg. 12516 (Mar. 16, 2026).

## VI.    NEW YORK PURSUES CIVIL ENFORCEMENT ACTIONS AGAINST CFTC-DESIGNATED CONTRACT MARKET

62.     On October 24, 2025, the New York State Gaming Commission issued a cease-and-desist letter to Kashi. The letter accuses Kalshi of "offering event contracts based on sporting events 'within New York State' and without a sports gaming license" in violation of state law. *KalshiEX v. Williams, et al.*, No. 1:25-cv-08846-AT (S.D.N.Y.), Dkt. No. 1 ¶ 48. The New York State Gaming Commission ordered Kalshi to "cease and desist immediately from illegally advertising, promoting, administering, managing, or otherwise making available sports wagering and/or a mobile sports wagering platform in New York." *Id.*

63.     On April 21, 2026, the New York State Attorney General filed a civil enforcement

---

[3] *See, e.g.,* Jasper Ward, *Kalshi suspends three US congressional candidates for 'political insider trading'*, REUTERS, Apr. 22, 2026, https://www.reuters.com/world/us/kalshi-suspends-three-us-congressional-candidates-political-insider-trading-2026-04-22/.

action against Gemini in New York State Supreme Court. *See New York v. Gemini Titan, LLC*, No. 451603/2026 (N.Y. Sup. Ct.). The Attorney General alleges that Gemini is engaged in illegal and unlicensed gambling in violation of New York Racing Law Section 1367 and New York Penal Law Section 225.20. The Attorney General seeks: (1) a permanent injunction prohibiting Gemini from offering events contracts without a New York license, (2) restitution for customers who have used Gemini's platform, and (3) penalties and damages.

64.    On April 21, 2026, the New York State Attorney General also filed a civil enforcement action against Coinbase in New York State Supreme Court. *New York v. Coinbase Financial Markets, Inc.*, No. 451604/2026 (N.Y. Sup. Ct.). The Attorney General alleges that Coinbase is engaged in illegal and unlicensed gambling in violation of New York Racing Law Section 1367 and New York Penal Law Section 225.20. The Attorney General seeks: (1) a permanent injunction prohibiting Coinbase from offering events contracts without a New York license, (2) restitution for customers who have used Coinbase's platform, and (3) penalties and damages.

65.    Gemini, Kalshi, and DCMs like them provide event contracts available for trades, as regulated under the CEA and supervised by the CFTC. Each of these companies has been designated as a contract market under 17 C.F.R. Part 38 and lists these event contracts through the self-certification process outlined in 17 C.F.R. § 40.2 or the submission process outlined in 17 C.F.R. § 40.3.

66.    Defendants' attempt to regulate and seek civil injunctions and penalties against DCMs and FCMs, like Coinbase, that offer events contracts listed on DCMs interferes with Plaintiffs' exclusive authority to uniformly regulate and monitor this congressionally defined market. The entire point of the CEA is to create a uniform and predictable nationwide market for

20

futures trading, and the CFTC oversees that market via its certification process of DCMs and its requirements for DCMs to comply with the self-certification or submission certification requirements before listing event contracts. Defendants' prosecutions and threatened regulatory action undermines that uniformity, thwarts Congress's scheme, and intrudes on Plaintiffs' exclusive jurisdiction. Defendants' approach makes it much more difficult for the CFTC to regulate, advise, and enforce its authority over the DCMs, wasting resources and subverting CFTC's congressionally mandated authority.

67. The defendants directly violate and undermine the CFTC's regulation requiring "impartial access" to all eligible participants nationwide. 17 C.F.R. § 38.151(b). The defendants' disruption of this regulatory authority constitutes a cognizable injury.

68. Every step the defendants take toward enforcing preempted state regulations against the CFTC's regulated entities causes additional disruption to the markets exclusively regulated by the CFTC and thus causes irreparable harm to the CFTC's exclusive jurisdiction, authority, and operations. Incremental enforcement steps send mixed signals to this interconnected market, disrupting their operations. DCMs are forced to guess whether they are held to the standards of the CFTC and CEA, state regulators, or both. Civil enforcement suits and criminal investigations launched by States discourage DCM participation in the market by obfuscating the proper regulatory framework, improperly altering their risk tolerance, and causing unnecessary expense to both DCMs and the CFTC.

69. Because Congress granted the CFTC "exclusive authority" over DCMs, it is not equipped to manage markets that are subject both to the CEA and to a patchwork of state regulations. As a result, defendants' actions undermine CFTC's authority and require additional agency resources to engage in regulatory oversight of these DCMs.

21

## VII.    THE CHALLENGED NEW YORK STATUTES ARE PREEMPTED AS APPLIED TO COMMODITIES DERIVATIVES CONTRACTS

70.    The Constitution's Supremacy Clause mandates that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."  U.S. Const. art. VI, cl. 2.

71.    The CEA, as continuously refined over more than a century, gives the CFTC "exclusive jurisdiction" over futures and swaps traded on a DCM.  7 U.S.C. § 2(a)(1)(A). The CEA "preempts the application of state law." *Leist v. Simplot*, 638 F.2d 283, 322 (2d Cir. 1980). "[P]reemption is appropriate '[w]hen application of state law would directly affect trading on or the operation of a futures market.'" *Effex Cap., LLC v. Nat'l Futures Ass'n*, 933 F.3d 882, 894 (7th Cir. 2019) (quoting *Am. Ag. Movement v. Bd. of Trade of Chi.*, 977 F.2d 1147, 1156-57 (7th Cir. 1992)).

72.    "[U]nder the Supremacy Clause, from which our pre-emption doctrine is derived, any state law, however clearly within a State's acknowledged power, which interferes with or is contrary to federal law, must yield." *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 108 (1992) (internal citation omitted); *see Maryland v. Louisiana*, 451 U.S. 725, 746 (1981) (Under the Supremacy Clause, state laws that conflict with federal law are "without effect."); *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992) (same); *Time Warner Cable v. Doyle*, 66 F.3d 867, 874 (7th Cir. 1995) ("Congress, in the exercise of the legislative authority granted to it by the Constitution, may preempt state law.")  (citation omitted). "A federal law may preempt a state law expressly, impliedly through the doctrine of conflict preemption, or through the doctrine of field (also known as complete) preemption." *Boomer v. AT & T Corp.*, 309 F.3d 404, 417 (7th Cir. 2002).

22

73. "Express preemption occurs when a federal statute explicitly states that it overrides state or local law." *Hoagland v. Town of Clear Lake,* 415 F.3d 693, 696 (7th Cir. 2005). Congress explicitly preempted state regulation of commodity derivatives transactions, vesting the Commission with "exclusive jurisdiction," except as otherwise expressly provided by Congress, over all "accounts, agreements . . . , and transactions involving swaps or contracts of sale of a commodity for future delivery." 7 U.S.C. § 2(a)(1)(A). And Congress has repeatedly expanded the CFTC's "exclusive jurisdiction" through continual amendments, most recently to include "transactions involving swaps." *Id.* Congress therefore preempted state regulation of transactions subject to the CFTC's "exclusive jurisdiction," including swaps, and the DCMs that list them.

74. Even without the express language of the CEA preempting state regulation, any state interference in DCM regulation is preempted because Congress "occupied the field" via the CEA and the CFTC and because any attempt at state regulation conflicts with federal law. *See Boomer,* 309 F.3d at 417. In general, state law must give way if "Congress, acting within its proper authority, has determined must be regulated by its exclusive governance" or where "the challenged state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Arizona v. United States*, 567 U.S. 387, 399 (2012) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)).

75. The scope of the CEA and the long history of Congress's amendments to ensure federal law captured the evolving futures and derivatives markets makes clear that Congress intended to occupy the field. A field is preempted from state regulation "if the scope of the statute indicates that Congress intended federal law to occupy the legislative field." *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76 (2008). Such is the case here. CEA § 2(a)(1)(A) makes plain that Congress intended the CEA to occupy the field of "accounts, agreements . . . and transactions involving

23

swaps or contracts of sale of a commodity for future delivery . . . traded or executed on a contract market . . . or any other board of trade, exchange, or market." When an instrument is trading on a CFTC-regulated market as a "swap" or "future," state gambling laws do not apply.

76.    Offering event contracts on a DCM cannot, in and of itself, be an activity that is unlawful under any state law because such an application of state law would conflict with the CEA. "Congress's intent was to provide the CFTC with exclusive jurisdiction to regulate commodities" and "[s]uch exclusive jurisdiction precludes states from exercising supplementary regulatory authority over commodity transactions." *Stuber v. Hill*, 170 F. Supp. 2d 1146, 1151 (D. Kan. 2001).

77.    A State applying local gambling laws to federally regulated DCMs also "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona*, 567 U.S. at 399 (internal citation omitted). To the extent state laws could apply to federally regulated swaps and derivatives, those laws are preempted as applied to those transactions and market participants because complying with both state and federal law would be an impossibility, and because those state laws, as applied, obstruct Congress's clear intent.

78.    Complying with both state regulations and the CEA is impossible because a DCM is required by federal law to provide "impartial access" to all eligible participants nationwide. 17 C.F.R. § 38.151(b). If a state bans the contract, the DCM cannot fulfill its federal mandate to provide impartial national access. Other state-imposed restrictions on access to markets would similarly make it impossible for the regulated DCMs to comply with federal regulations. The CEA reflects Congress's understanding that commodity derivatives markets require nationally uniform rules governing the listing, trading, clearing, settlement, and surveillance of financial instruments traded in these markets to prevent the type of fragmented oversight at risk in this case. Complying

24

with fractured state regulations would derail that goal.

79.    State gambling regulations, as applied to DCMs, also "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona*, 567 U.S. at 399 (internal citation omitted).  State gambling laws often require local licensing, fees, enforcement, and specific hardware.  Applying state-by-state local requirements to national commodity exchanges would create the very "patchwork" that Congress set out to prevent.  Indeed, the history of the CEA demonstrates repeated efforts by Congress to protect nationwide markets under uniform federal regulation as those markets evolve and as states attempt to limit them.

80.    In enacting the CEA and expanding it over time to provide the framework for commodity derivatives markets in the United States, Congress found that commodity derivatives transactions "are entered into regularly in interstate and international commerce and are affected with a national public interest by providing a means for managing and assuming price risks, discovery prices, or disseminating pricing information through trading in liquid, fair and financially secure trading facilities."  7 U.S.C. § 5(a).

81.    The CEA "preempts state laws that directly interfere with swaps traded on DCMs." *KalshiEX, LLC v. Flaherty*, No. 25-1922, 2026 WL 924004, at *2 (3d Cir. Apr. 6, 2026). "[S]ports-related event contracts" are defined as "swaps" under the CEA.  *Id.*  Thus, "the CFTC has exclusive jurisdiction" over "sports-related contracts…traded on a CFTC-licensed DCM."  *Id.*

82.    Therefore, the federal Commodity Exchange Act which provides the CFTC with "exclusive jurisdiction" over transactions on CFTC Designated Contract Markets, 7 U.S.C. § 2, preempts New York statutes that purport to prohibit, limit, or condition the listing or trading of event contract swaps on CFTC-Designated Contract Markets.

## VIII.   CLAIMS FOR RELIEF

### A. COUNT I — NEW YORK RACING LAW § 1367 (SPORTS WAGERING) VIOLATES THE SUPREMACY CLAUSE AS APPLIED TO TRANSACTIONS ON CFTC DESIGNATED CONTRACT MARKETS

83.   The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference.

84.   Article 13, Title B, Section 1367 of the New York Racing, Pari-Mutuel Wagering and Breeding Law (Chapter 47-A of the Consolidated Laws of New York) sets out a state regulatory scheme for sports wagering in New York.

85.   "Sports wagering" is defined as "wagering on sporting events or any portion thereof, or on the individual performance statistics of athletes participating in a sporting event, or combination of sporting events, by any system or method of wagering, including, but not limited to, in-person communication and electronic communication through internet websites accessed via a mobile device or computer, and mobile device applications; provided however that sports wagers shall include, but are not limited to, single-game bets, teaser bets, parlays, over-under bets, money line, pools, in-game wagering, in-play bets, proposition bets, and straight bets." Racing Law § 1367(1)(x). The law defines "sports wager" as "cash or cash equivalent that is paid by an authorized sports bettor to a casino or a mobile sports wagering licensee to participate in sports wagering offered by such casino or mobile sports wagering licensee." *Id.* § 1367(1)(w)

86.   Among other things, New York sports wagering law states that the New York State Gaming Commission, "shall have the authority to regulate…the conduct of sports wagering…to the same extent that the commission regulates other gaming." Racing Law § 1367(4).

87.   Racing Law § 1367, as applied to transactions listed, offered, or executed on DCMs, is field preempted by Congress's grant of broad regulatory authority over this market to the CFTC in the Commodity Exchange Act, see generally, 7 U.S.C. § 2.

26

88.     Racing Law § 1367, as applied to transactions listed, offered, or executed on CFTC-Designated Contract Markets, is expressly preempted by the Commodity Exchange Act, 7 U.S.C. §§ 2(a)(1)(A), 16(e).

89.     Racing Law § 1367, as applied to transactions listed, offered, or executed on CFTC-Designated Contract Markets, are implicitly preempted because they make it impossible for regulated DCMs to comply with federal law and are obstacle preempted because they thwart Congress's purpose in granting the CFTC exclusive regulatory authority over this market.

### B.  COUNT II—PENAL LAW § 225 (GAMBLING OFFENSES) VIOLATES THE SUPREMACY CLAUSE (PREEMPTION) AS APPLIED TO TRANSACTIONS ON CFTC DESIGNATED CONTRACT MARKETS

90.     The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference.

91.     New York Penal Law § 225.00(2) defines "gambling" as "stakes or risks [of] something of value upon the outcome of a contest of chance or a future contingent event not under [a person's] control or influence, upon an agreement or understanding that [the person] will receive something of value in the event of a certain outcome."

92.     New York Penal Law § 225.05 makes it an offense for a person to "knowingly advance[] or profit[] from unlawful gambling activity."

93.     New York Penal Law § 225.10 makes it an offense for a person to engage in "unlawful gambling activity" through "receiv[ing] or accept[ing] in any one day more than five bets totaling more than five thousand dollars."

94.     New York Penal Law § 225.20 makes it an offense for a person to possess any records "used in the operation or promotion of a bookmaking scheme or enterprise, and constituting, reflecting or representing more than five bets totaling more than five thousand

27

dollars."

95.     These prohibitions are broad enough to encompass and criminalize as "gambling" many agreements, contracts and transactions offered on CFTC-Designated Contract Markets, including event contract swaps, even though these agreements, contracts and transactions are expressly permitted under the federal Commodity Exchange Act.

96.     The New York Penal Law as applied to transactions listed, offered, or executed on DCMs, is field preempted by Congress's grant of broad regulatory authority over this market to the CFTC in the Commodity Exchange Act, see generally, 7 U.S.C. § 2.

97.     The New York Penal Law, as applied to transactions listed, offered, or executed on CFTC-Designated Contract Markets, is expressly preempted by the Commodity Exchange Act, 7 U.S.C. §§ 2(a)(1)(A), 16(e).

98.     The New York Penal Law, as applied to transactions listed, offered, or executed on DCMs, is implicitly preempted because it makes it impossible for regulated DCMs to comply with federal law and is obstacle preempted because it thwarts Congress purpose in granting the CFTC exclusive regulatory authority over this market.

## IX.     RELIEF REQUESTED

WHEREFORE, Plaintiffs respectfully request the following relief:

1.  That this Court enter a judgment declaring that the challenged provisions, or any other state laws pertaining to gambling or wagering, as applied to transactions listed, offered, or executed on CFTC-Designated Contract Markets, violate the Supremacy Clause and are therefore preempted, unconstitutional and invalid;

2.  That this Court issue a permanent injunction that prohibits defendants as well as their successors, agents, and employees, from investigating for or enforcing the challenged

28

provisions or any other state laws pertaining to gambling or wagering, as applied to transactions listed, offered, or executed on CFTC-Designated Contract Markets;

3. That this Court award Plaintiffs their costs and fees in this action; and

4. That this Court award any other relief it deems just and proper.

Dated: April 24, 2026                                    Respectfully submitted,

By: */s/ Alexandra McTague*
Alexandra McTague
Senior Litigation Counsel
U.S. Department of Justice Civil Division
Enforcement & Affirmative Litigation Branch
450 5th Street, NW, Suite 6400-South
Washington, D.C. 20530
Tel. 202-718-0483
Alexandra.mctague2@usdoj.gov

*Attorneys for the United States of America*

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

YAAKOV M. ROTH
Principal Deputy Assistant Attorney General

TIBERIUS DAVIS
Counsel to the Assistant Attorney General
450 5th St NW,
Washington, DC 20001
Tiberius.davis@usdoj.gov
202-860-8970

ALEXANDRA McTAGUE
Senior Litigation Counsel
Alexandra.mctague2@usdoj.gov
202-718-0483

*Attorneys for the Commodity Futures Trading Commission*

Tyler S. Badgley
        General Counsel
M. Jordan Minot
        Deputy General Counsel
Anne Stukes
        Senior Assistant General Counsel
Carlin Metzger
        Senior Assistant General Counsel
Andrew J. Weisberg
        Senior Assistant General Counsel

U.S. Commodity Futures Trading Commission
Three Lafayette Center
1155 21st Street, NW
Washington, DC 20581
Tel:  (202) 209-1087
Fax:  (202) 418-5567
tbadgley@cftc.gov
jminot@cftc.gov
astukes@cftc.gov
cmetzger@cftc.gov
aweisberg@cftc.gov

29