**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

THE UNITED STATES OF AMERICA and
COMMODITY FUTURES TRADING
COMMISSION,

                        Plaintiffs,

                        v.

STATE OF NEW YORK, *et al.*,

                        Defendants.

Case No. 1:26-cv-3404

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'**
**MOTION FOR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT................................................................................................1

BACKGROUND .................................................................................................................3

I.     The Commodity Exchange Act provides the regulatory framework for commodity
       derivatives markets in the United States, including event contract markets.........................3

II.    New York unlawfully attempts to apply state gambling laws to CFTC-regulated
       derivatives markets ...................................................................................................7

LEGAL STANDARD ..........................................................................................................7

ARGUMENT ....................................................................................................................8

I.     Plaintiffs have standing.............................................................................................8

II.    Plaintiffs are likely to succeed in establishing that federal law preempts state law
       as to commodity derivatives transactions on CFTC-regulated DCMs ..............................10

       A.     Event contracts are "swaps" under the CEA....................................................12

       B.     The CEA expressly preempts state law...........................................................14

       C.     The CEA occupies the field of derivatives trading regulation, preempting
              application of state law ..................................................................................16

       D.     New York's application of its state laws conflicts with the CEA ..............................18

III.   The remaining factors favor granting preliminary relief .....................................................19

CONCLUSION...............................................................................................................22

# TABLE OF AUTHORITIES

Cases

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez,*
  458 U.S. 592 (1982 ..............................................................................................................8

*Altria Group, Inc. v. Good,*
  555 U.S. 70 (2008) .........................................................................................................17, 19

*American Insurance Association v. Garamendi,*
  539 U.S. 396 (2003) ............................................................................................................21

*American Trucking Associations, Inc. v. City of Los Angeles.,*
  559 F.3d 1046 (9th Cir.2009) .............................................................................................21

*Arizona v. United States,*
  567 U.S. 387 (2012) .......................................................................................9, 10, 16, 18

*Arizona v. Yellen,*
  34 F.4th 841 (9th Cir. 2022) .................................................................................................8

*Armstrong v. Exceptional Child Center, Inc.,*
  575 U.S. 320 (2015) ............................................................................................................20

*Boomer v. AT & T Corp.,*
  309 F.3d 404 (7th Cir. 2002) ..............................................................................................16

*Care One, LLC v. NLRB,*
  166 F.4th 335 (2d Cir. 2026) ................................................................................................8

*Chamber of Com. of U.S. v. Edmondson,*
  594 F.3d 742 (10th Cir. 2010) ............................................................................................21

*Cothran v. Ellis,*
  16 N.E. 646 (Ill. 1888) .......................................................................................................15

*Crosby v. National Foreign Trade Council,*
  530 U.S. 363 (2000) .......................................................................................................20, 21

*Federal Trade Commission v. Vyera Pharmaceutical*, No. 20-cv-00706,
  2021 WL 4392481 (S.D.N.Y. Sept. 24, 2021) ..................................................................20

*Goldie's Bookstore, Inc. v. Superior Ct. of State of Cal.,*
  739 F.2d 466 (9th Cir. 1984) ..............................................................................................19

*Hines v. Davidowitz,*
  312 U.S. 52 (1941) ..............................................................................................................16

*Hoagland v. Town of Clear Lake,*
  415 F.3d 693 (7th Cir. 2005) ...................................................................................14

*Illinois v. City of Chicago*,
  137 F.3d 474 (7th Cir. 1998) .....................................................................................8

*In re Debs*,
  158 U.S. 564 (1895)....................................................................................................8

*Irwin v. Williar*,
  110 U.S. 499, (1884)..................................................................................................15

*KalshiEX, LLC v. Flaherty*, No. 25-1922,
  2026 WL 924004 (3d Cir. Apr. 6, 2026) ...........................................2, 12, 13, 16, 18, 21

*KalshiEX LLC v. Johnson*, No. CV-26-01715,
  2026 WL 976055 (D. Ariz. Apr. 10, 2026) ...........................................................2, 12

*KalshiEX, LLC v. Williams,*
  No. 1:25-cv-08846-AT (S.D.N.Y.) ......................................................................1, 7, 20

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992)....................................................................................................8

*McCulloch v. Maryland*,
  17 U.S. (4 Wheat.) 316 (1819)....................................................................................9

*Merrill Lynch, Pierce, Ferner & Smith, Inc. v. Curran*,
  456 U.S. 353 (1982)..................................................................................................18

*Morales v. Trans World Airlines, Inc.*,
  504 U.S. 374 (1992)..................................................................................................20

*New York v. Coinbase*,
  No. 1:26-cv-03300 (S.D.N.Y.)..............................................................................1, 7

*New York v. United States Department of Homeland Security*,
  969 F.3d 42 (2d Cir. 2020).........................................................................................7

*New York v. Gemini Titan, LLC*,
  No. 1:26-cv-03318 (S.D.N.Y.).............................................................................1, 7, 11

*Rice v. Santa Fe Elevator Corp.*,
  331 U.S. 218 (1947)..................................................................................................19

*S.E.C. v. Gaspar*, No. 83 Civ. 3037,
  1985 WL 521 (S.D.N.Y. Apr. 16, 1985)......................................................................9

*Spokeo, Inc. v. Robins*,
  578 U.S. 330 (2016)....................................................................................................8

*Stuber v. Hill*,
  170 F. Supp. 2d 1146 (D. Kan. 2001) .....................................................................18

iii

*United States v. Alabama,*
  691 F.3d 1269 (11th Cir. 2012) ................................................................9, 20, 21

*United States v. Gear,*
  9 F.4th 1040 (9th Cir. 2021) ...............................................................................12

*United States v. Missouri,*
  114 F.4th 980 (8th Cir. 2024) ...............................................................................9

*United States v. South Carolina,*
  720 F.3d 518 (4th Cir. 2013) ................................................................................9

*Vermont Agency of Nat. Res. v. United States ex rel. Stevens,*
  529 U.S. 765 (2000)................................................................................................8

*Winter v. Natural Resource Defense Council, Inc.,*
  555 U.S. 7 (2008)....................................................................................................7

*Wisconsin Department of Industry v. Gould Inc.,*
  475 U.S. 282 (1986)..............................................................................................10

Statutes

7 U.S.C. § 1, *et seq.*, CEA § 1, *et seq.* .....................................................................2

7 U.S.C. § 1a(47)(A)(i), CEA § 1a(47)(A)(i) .....................................................3, 13

7 U.S.C. § 1a(47)(A)(ii), CEA § 1a(47)(A)(ii) .............................................3, 12, 13

7 U.S.C. § 1a(47)(A)(iv), CEA § 1a(47)(A)(iv) .....................................................13

7 U.S.C. § 1a(47)(A)(vi), CEA § 1a(47)(A)(vi) .....................................................13

7 U.S.C. § 2(a)(1), CEA § 2(a)(1)......................................................................15, 16

7 U.S.C. § 2(a)(1)(A), CEA § 2(a)(1)(A) ...............................2, 9, 11, 14, 15, 17

7 U.S.C. § 2(e), CEA § 2(e)........................................................................................5

7 U.S.C. § 5, CEA § 3 ................................................................................................5

7 U.S.C. § 5(b), CEA § 3(b)......................................................................................4

7 U.S.C. § 6, CEA § 4 ................................................................................................5

7 U.S.C. § 6c(b), CEA § 4c(b) ..................................................................................5

7 U.S.C. § 7, CEA § 5 ................................................................................................5

7 U.S.C. § 7(d), CEA § 5(d)......................................................................................5

7 U.S.C. § 7a-2(c)(5)(C), CEA § 5c(c)(5)(C) .......................................................15

iv

7 U.S.C. § 7a-2(c)(5)(C)(i)-(ii), CEA § 5c(c)(5)(C)(i)-(ii) ................................................15

7 U.S.C. § 7b-3(a), CEA § 5h ..............................................................................................5

7 U.S.C. § 13a-1(a), CEA § 6c(a) .....................................................................................3, 9

Future Trading Act of 1921,
    Pub. L. No. 67-66, 42 Stat. 187 (1921)......................................................................19

Grain Futures Act of 1922,
    Pub. L. No. 67-331, 42 Stat. 998 (1922).....................................................................19

Commodity Futures Trading Commission Act of 1974,
    Pub. L. 93-463, 88 Stat. 1389 (1974)..........................................................................14

Dodd-Frank Wall Street Reform and Consumer Protection Act,
    Pub. L. No. 111-203, 124 Stat. 1376 (2010)...............................................................15

N.Y. Rac. Pari-Mut. Wag. & Breed. § 1367 .......................................................................7

N.Y. Penal § 225.20 .............................................................................................................7

Regulations

17 C.F.R. § 32.2 ...................................................................................................................5

17 C.F.R. § 35.550 ...............................................................................................................6

17 C.F.R. § 37.3 ...................................................................................................................5

17 C.F.R. § 38.150(a)...........................................................................................................6

17 C.F.R. § 38.150(b)...........................................................................................................6

17 C.F.R. § 38.151(b)....................................................................................................10, 18

17 C.F.R. § 38.200 ...............................................................................................................6

17 C.F.R. § 38.250 ...............................................................................................................6

17 C.F.R. § 38.500 ...............................................................................................................6

17 C.F.R. § 40.2 ...................................................................................................................4

17 C.F.R. § 40.11 .................................................................................................................16

17 C.F.R. § 40.11(a)(1) ........................................................................................................16

17 C.F.R. § 40.11(a)(2) ........................................................................................................16

17 C.F.R. § 48.3 ...................................................................................................................5

Comments for Proposed Rule 91 Fed. Reg. 12,516, Prediction Markets,
https://comments.cftc.gov/PublicComments/CommentList.aspx ?id=7654 ...................................1

Legislative Materials

120 Cong. Rec. S 30458, 30464 (daily ed. Sept. 9, 1974)
  (Statement of Sen. Curtis)......................................................................................................15

Commodity Futures Trading Act of 1974: Hearings Before the S. Comm. on
  Agric. & Forestry on S. 2485, S. 2578, S. 2837, H.R. 13113, 93d Cong.,
  2d Sess. 685 (1974) (statement of Sen. Clark).....................................................................15

H.R. Rep. No. 67-1095, at 5 (1922) (Conf. Rep.)............................................................................19

H.R. Rep. No. 93-1383 (1974) (Conf. Rep.),
  *reprinted in* 1974 U.S.C.C.A.N. 5894, 5897 .....................................................................16

S. Rep. No. 95-850, at 111-12 (1978),
  *reprinted in* 1978 U.S.C.C.A.N. 2087, 2110-11 ...............................................................17

H.R. Rep. No. 97-565, at 44-45 & 102-103 (1982),
  *reprinted in* 1982 U.S.C.C.A.N. 3871, 3893-94, 3951-52..................................................17

Other Authorities

CFTC Designated Contact Market Products, *available at*
  https;//www.cftc.gov/IndustryOversight/IndustryFilings/TradingOrganization
  Products?Organization=CM (last visited February 13, 2026) ..........................................4

CFTC, Futures Glossary: A Guide to the Language of the Futures In*dustry*,
  https://www.cftc.gov/LearnAndProtect/AdvisoriesAndArticles/
  CFTCGlossary/index.htm ..............................................................................................3, 13

N.Y. State Gaming Comm'n, 2024 Annual Report,
  https://gaming.ny.gov/annual-reports ..............................................................................14

N.Y. State Gaming Comm'n, 2023 Annual Report,
  https://gaming.ny.gov/annual-reports ..............................................................................14

## PRELIMINARY STATEMENT

Plaintiffs United States of America ("USA") and Commodity Futures Trading Commission ("CFTC"), a federal executive agency, seek a preliminary injunction from this Court to halt Defendants' ongoing attempts to assert jurisdiction over federally regulated interstate commodity derivatives markets, thus unconstitutionally intruding on the CFTC's exclusive regulatory jurisdiction and disrupting federally regulated markets.  Defendants ("State" or "New York") first issued a cease-and-desist letter to CFTC-regulated "designated contract market" ("DCM") KalshiEX ("Kalshi") in October 2025 demanding that Kalshi stop operating in New York because "offering events contracts based on sporting events [within the state] without a sports gaming license violated [state] law."  See *KalshiEX, LLC v. Williams, et al.*, No. 1:25-cv-08846-AT (S.D.N.Y.), Dkt. No. 1 ¶ 48.  New York proceeded to file two civil enforcement actions against Futures Commission Merchant ("FCM") Coinbase Financial Markets, Inc. ("Coinbase") and DCM Gemini Titan, LLC ("Gemini").  *See New York v. Coinbase*, No. 1:26-cv-03300 (S.D.N.Y.); *New York v. Gemini Titan, LLC*, No. 1:26-cv-03318 (S.D.N.Y.). [1]

New York is one of a small handful of States that has sought to assert jurisdiction over federally regulated markets by filing lawsuits against the regulated entities, seeking huge penalties for those companies' compliance with federal law.  New York has not sought clarity from the CFTC—it has sought no agency guidance, has submitted no comments on the agency's ongoing rulemaking, and has not filed a lawsuit against the agency. [2]  Instead, New York has used ever-escalating action against CFTC-regulated DCMs and FCMs that are engaging in federally

---

[1] The cases were initially filed as *New York v. Coinbase Financial Markets, Inc.*, No. 451604/2026 (N.Y. Sup. Ct.) and *New York v. Gemini Titan, LLC*, No. 451603/2026 (N.Y. Sup. Ct.), respectively, before being removed to federal court.

[2] *See* Comments for Proposed Rule 91 Fed. Reg. 12,516, Prediction Markets, https://comments.cftc.gov/PublicComments/CommentList.aspx ?id=7654.

regulated activity; those actions violate the Supremacy Clause. This Court should follow the lead of the only other federal court to address a State's effort to assert regulatory authority over these companies via lawsuit by enjoining New York from acting further. *See KalshiEX LLC v. Johnson*, No. CV-26-01715, 2026 WL 976055, at *2 (D. Ariz. Apr. 10, 2026) (granting motion by the United States and CFTC and "temporarily enjoin[ing] and restrain[ing] [Arizona] from enforcing Arizona's gambling laws . . . through any criminal or civil enforcement actions related to event contracts listed on CFTC-regulated DCMs").

The Commodity Exchange Act ("CEA" or the "Act"), 7 U.S.C. §1, *et seq.*, expressly and implicitly preempts state gambling laws as applied to CFTC-regulated markets and market participants. The CEA provides a comprehensive framework for the regulation of derivatives transactions in the United States and designates the CFTC as the federal agency with "exclusive jurisdiction" over the regulation of commodity futures, options, and swaps traded on federally regulated exchanges. 7 U.S.C. § 2(a)(1)(A). And the event contracts offered directly by CFTC-regulated DCMs such as Gemini or through FCMs such as Coinbase—including event contracts where the underlying event relates to sports or politics—are "swaps" under the plain meaning of the CEA. See *KalshiEX, LLC v. Flaherty*, No. 25-1922, 2026 WL 924004, at *3 (3d Cir. Apr. 6, 2026) ("Because Kalshi's sports-related event contracts are traded on a CFTC-licensed DCM and depend on event outcomes associated with economic consequences, they fit within the Act's definition of 'swaps' subject to the CFTC's jurisdiction.").

Subjecting CFTC-regulated markets to a patchwork of 50 state regulations is precisely what Congress sought to avoid with the CEA, including with decades of amendments to the Act that enhanced the CEA's preemptive effect. New York's broad assertion of its authority to regulate swap transactions as gambling lacks any limiting principle—New York, by its logic, could regulate

2

not just sports event contracts, but event contracts that have long been traded uncontroversially on CFTC-regulated DCMs, like contracts on the weather or agricultural production.  Because the CEA preempts the application of New York gambling laws to CFTC-regulated markets and market participants, this Court should halt New York's increasingly aggressive enforcement of its inapplicable laws against DCMs by entering a preliminary injunction.

## BACKGROUND

### I.   The Commodity Exchange Act provides the regulatory framework for commodity derivatives markets in the United States, including event contract markets

The CEA provides a comprehensive framework that governs transactions in United States commodity derivatives markets.  The CFTC is the federal executive agency that administers the CEA, enforces its provisions in federal courts,[3] and regulates derivatives markets.  A "derivative" is a financial instrument, such as a future, option, or swap, for which the price is directly dependent upon—that is, "derived from"—the value of something else, such as an agricultural or financial commodity.[4]  An "event contract" is a type of swap that provides for payment that is "dependent on the occurrence, non-occurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii).[5]  For example, an event contract might be based on the occurrence, nonoccurrence,

---

[3] The CFTC has statutory authority to "bring an action in . . . [a] district court . . . to enjoin . . . or enforce compliance with [the CEA]" if "it shall appear to the Commission" that any "person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of this chapter or any rule, regulation, or order thereunder, or is restraining trading in any commodity for future delivery or any swap."  7 U.S.C. § 13a-1(a).

[4] CFTC, Futures Glossary: A Guide to the Language of the Futures Industry, https://www.cftc.gov/LearnAndProtect/AdvisoriesAndArticles/CFTCGlossary/index.htm.

[5] Depending on their structure, event contracts may also satisfy other prongs of the swap definition—for example, as "option[s] of any kind" that are "based on the value" of an index, quantitative measure, or other financial or economic interest.  7 U.S.C. § 1a(47)(A)(i).

or extent of an occurrence of a weather event such as snowfall or rainfall, a Federal Reserve Board rate increase, a particular election result, or the result of a sports event.

At least eight DCMs have collectively self-certified more than 3,000 event based contracts with the CFTC pursuant to CFTC Rule 17 C.F.R. § 40.2, with a notable increase in such filings during the last two years.[6]  Importantly, many of these contracts are tied to non-sport outcomes involving measurable commodity indicators, including cryptocurrency price levels and related indices, GDP releases, benchmark interest-rate decisions, election outcomes, temperature forecasts, electricity usage, and the price movements of precious metals.  *Id*.  These event contracts rest on objectively measurable outcomes no less than sports event contracts.

The CEA and CFTC regulations establish important protections for derivatives markets, market participants, and the public by creating uniform regulations of nationwide—and often international—markets.  The CEA's purpose is to "serve the public interests . . . through a system of effective self-regulation of trading facilities, clearing systems, market participants and market professionals under the oversight of the Commission," as well as "to deter and prevent price manipulation or any other disruptions to market integrity; to ensure the financial integrity of all transactions subject to [the Act] and the avoidance of systemic risk; to protect all market participants from fraudulent or other abusive sales practices and misuses of customer assets; and to promote responsible innovation and fair competition among boards of trade, other markets and market participants."  7 U.S.C. § 5(b).

Transactions subject to the CEA "are affected with a national public interest by providing a means for managing and assuming price risks, discovering prices, or disseminating pricing

---

[6]  See CFTC Designated Contact Market Products, available at https;//www.cftc.gov/IndustryOversight/Industry Filings/TradingOrganizationProducts?Organization=CM (last visited February 13, 2026).

information through trading in liquid, fair and financially secure trading facilities." 7 U.S.C. § 5. In other words, Congress specifically identified a public interest in federal regulation of derivatives markets because those markets provide a means to "hedge" economic risks. "Hedging" is generally understood to be the use of derivatives to manage the various price risks incidental to commercial activity.[7] Like securities markets, the commodities derivatives markets also include "speculators" who trade to profit from price movements. Speculators are important because they help ensure that hedgers can find counterparties with whom to trade.

Many derivatives are required to be traded on a designated contract market, or DCM, the statutory term for a derivatives exchange registered with, and regulated by, the CFTC. Futures contracts must be traded on a DCM or a registered foreign board of trade (see 7 U.S.C. § 6 and 17 C.F.R. § 48.3); many swaps must be traded on a registered swap execution facility or a DCM (see 7 U.S.C. §§ 2(e), 7b-3(a), and 17 C.F.R. § 37.3); and commodity options must likewise be conducted on a DCM (see 7 U.S.C. § 6c(b) and 17 C.F.R. § 32.2).

DCMs are national boards of trade or exchanges that operate under the regulatory oversight of the CFTC pursuant to Section 5 of the CEA, 7 U.S.C. § 7. The CFTC designates a board of trade as a contract market through a formal application process through which an applicant must demonstrate its ability to comply with detailed statutory requirements called "core principles." 7 U.S.C. § 7(d). These core principles require, for example, that DCMs:

- establish, monitor, and enforce compliance with the rules of the market including

---

[7] For instance, airlines that need to buy jet fuel in the foreseeable future might manage the risk that the price will increase by entering into a derivative contract, *e.g.* a futures contract, to hedge against that risk. It would take a "long" position, *i.e.*, a futures contract that will increase in value if the price of the airline's fuel increases. On the other hand, a fuel supplier might manage the risk that the price of oil will decline by taking a "short" position, *i.e.*, a futures contract that will increase in value if the price of fuel goes down.

access requirements, the terms and conditions of any contracts to be traded, and rules prohibiting abusive trade practices, 17 C.F.R. § 38.150(a) (Core Principle 2),

- have the capacity to detect, investigate, and apply appropriate sanctions to any person that violates any rule of the market, 17 C.F.R. § 38.150(b) (Core Principle 2),

- list only contracts that are not readily susceptible to manipulation, 17 C.F.R. § 38.200 (Core Principle 3),

- have the capacity and responsibility to prevent manipulation, price distortion, and disruptions of the delivery or cash-settlement process through market surveillance, compliance, and enforcement practices and procedures, including methods for conducting real-time monitoring of trading and comprehensive and accurate trade reconstructions, 17 C.F.R. § 38.250 (Core Principle 4),

- provide a competitive, open and efficient market and mechanism for executing transactions that protects the price discovery process, 17 C.F.R. § 38.500 (Core Principle 9),

- maintain rules and procedures to provide for the recording and safe storage of all identifying trade information in a manner that enables the contract market to use the information to assist in the prevention of customer and market abuses and to provide evidence of any violations of the rules of the contract market, 17 C.F.R. § 35.550 (Core Principle 10).

Today 25 exchanges in the United States have active designations from the CFTC to operate as a contract market.  These DCMs include Gemini.

## II.    New York unlawfully attempts to apply state gambling laws to CFTC-regulated derivatives markets

On October 24, 2025, the New York State Gaming Commission sent Kalshi a cease-and-desist letter directing it to immediately stop "advertising, promoting, administering, managing, or otherwise making available sports wagering and/or a mobile sports wagering platform" because "offering events contracts . . . without a sports gaming license violate[s] New York law." *KalshiEX, LLC v. Williams, et al.*, No. 1:25-cv-08846-AT (S.D.N.Y.); Dkt. No. 1 ¶ 48. The letter threatened to hold Kalshi criminally and civilly liable if it failed to submit to New York's demands. *Id.* ¶ 52.

New York then took its unlawful regulatory efforts much further.  On April 21, 2026, New York filed two civil enforcement suits against Coinbase and Gemini.  *See New York v. Coinbase Financial Markets, Inc.*, No. 451604/2026 (N.Y. Sup. Ct.); *New York v. Gemini Titan, LLC*, No. 451603/2026 (N.Y. Sup. Ct.).  New York alleges that Coinbase and Gemini are engaged in illegal and unlicensed gambling in violation of New York Racing Law Section 1367 and New York Penal Law Section 225.20.   New York seeks: (1) permanent injunctions prohibiting Coinbase and Gemini from offering events contracts without a New York license, (2) restitution for customers who have used Coinbase's and Gemini's platforms, and (3) penalties and damages.

### LEGAL STANDARD

A plaintiff seeking a preliminary injunction must establish that it "is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  When the federal government is a litigant, the equities and public interest factors merge. *New York v. United States Dep't of Homeland Sec.*, 969 F.3d 42, 58–59 (2d Cir. 2020).  The irreparable harm factor is the most important consideration in

7

issuing a preliminary injunction, and the moving party must first show an injury is likely before the other factors are examined. *Care One, LLC v. NLRB*, 166 F.4th 335, 343 (2d Cir. 2026) (internal citations omitted).

## ARGUMENT

This Court should enter a preliminary injunction because New York gambling laws are preempted as applied to federally regulated DCMs listing swaps, and New York's aggressive enforcement of its preempted state laws—including through its threats of criminal prosecution and use of civil enforcement suits to intimidate federally regulated entities and, ultimately, disrupt the operation of federally regulated markets—causes irreparable harm to the federal plaintiffs.

### I.     Plaintiffs Have Standing

Standing requires Plaintiffs to "have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). To establish an injury in fact, Plaintiffs must demonstrate "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical[.]" *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

Plaintiffs have at least two legally protected "sovereign injuries" that Defendants' conduct have invaded. *Arizona v. Yellen*, 34 F.4th 841, 852-53 (9th Cir. 2022); *see also In re Debs*, 158 U.S. 564, 586 (1895); *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 601 (1982); *Illinois v. City of Chicago*, 137 F.3d 474, 477-78 (7th Cir. 1998). First, the Supreme Court has stated that "[i]t is beyond doubt" that a complaint "asserts an injury to the United States" if it alleges an "injury to [U.S.] sovereignty arising from violation of its laws." *Vermont Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 771 (2000). For example, "when the SEC

8

brings a civil enforcement action or the United States brings a criminal action under the securities laws, 'issues such as standing . . .' are irrelevant." *S.E.C. v. Gaspar*, No. 83 Civ. 3037, 1985 WL 521, at *16 (S.D.N.Y. Apr. 16, 1985). This is true even though the United States is not injured in a traditional sense when it brings a criminal or civil enforcement action to vindicate federal law and the public interest. *See United States v. Missouri*, 114 F.4th 980, 984-85 (8th Cir. 2024) ("The United States has a legally protected interest in enforcing federal law."). As noted, the CFTC has the "exclusive jurisdiction" to regulate DCMs, 7 U.S.C. § 2(a)(1)(A), and can likewise bring civil suits to enforce its authority, 7 U.S.C. § 13a-1(a). New York is violating this exclusive jurisdiction and the Supremacy Clause by stepping into a realm that Congress expressly and implicitly reserved solely for the CFTC.

Second, and relatedly, "[t]he United States suffers injury when its valid laws in a domain of federal authority are undermined by impermissible state regulations." *United States v. Alabama*, 691 F.3d 1269, 1301 (11th Cir. 2012); *see also McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 361 (1819) ("states are prohibited from passing any acts which shall be repugnant to a law of the United States."). Indeed, the United States regularly brings preemption lawsuits to invalidate state laws that are contrary to federal law. *See, e.g., id.; Arizona v. United States*, 567 U.S. 387, 394 (2012); *United States v. South Carolina*, 720 F.3d 518, 528 (4th Cir. 2013). Here, New York's attempts to regulate DCMs undermines and conflicts with the CFTC's exclusive and preemptive jurisdiction. *See* Declaration of Joshua Beale ¶ 7, attached as **Exhibit A**. It thus undermines the agency's regulatory authority, the uniformity of federal law, and can subject DCMs to a patchwork of 50 state regulations contrary to Congress's goals. *Id.* In doing so, New York at least directly violates and undermines the CFTC's regulation requiring "impartial access" to all eligible

9

participants nationwide.   17 C.F.R.   § 38.151(b).   New York's disruption of this regulatory authority constitutes a cognizable injury.

Even if more was required, however, compromising the CEA's regulatory scheme via a patchwork of state regulation makes the agency's task of uniformly regulating DCMs more difficult.   Because Congress granted the CFTC "exclusive authority" over DCMs, it is not equipped to manage markets that are subject both to the CEA and to a patchwork of state regulations.  As a result, Defendants' actions undermine CFTC's authority and require additional agency resources to engage in regulatory oversight of these DCMs.  That is a classic Article III injury.

These injuries are caused by Defendants' attempts to regulate CFTC regulated DCMs under state laws in violation of CFTC's "exclusive jurisdiction" and the Supremacy Clause.  An injunction against Defendants' efforts to apply its laws to those federally regulated DCMs would redress the Plaintiffs' sovereign injury.

## II.     Plaintiffs are likely to succeed in establishing that federal law preempts state law as to commodity derivatives transactions on CFTC-regulated DCMs

The United States and its agencies are entitled to a preliminary injunction against a State when federal plaintiffs establish a likelihood to succeed in establishing state law is preempted. *Arizona,* 567 U.S. at 394 (upholding a preliminary injunction against an Arizona immigration law because the federal government occupies the field of immigration).   Where Congress makes "a single sovereign responsible for maintaining a comprehensive and unified system" of regulation, allowing States to regulate the same field "'detract[s] from the "integrated scheme of regulation" created by Congress.'"  *Id.* at 401-02 (quoting *Wisconsin Dept. of Industry v. Gould Inc.*, 475 U.S. 282, 288-89 (1986)).

10

New York's attempt to shut down federally regulated DCMs intrudes on the federal scheme Congress designed to oversee national swaps markets.  Prompted by the evolution of national financial markets and repeated conflicts with a patchwork of state laws, Congress enacted the CEA, granting the CFTC exclusive jurisdiction to regulate those markets and enacting a comprehensive federal regulatory framework that expressly preempts state laws that attempt to regulate the operation of, or transactions on, CFTC-regulated exchanges.  *See* Dkt. No. 1 ¶¶ 70–82.  This comprehensive federal regulatory scheme preempts New York law as applied to event contracts traded on federally regulated exchanges.

By describing event contracts as "bets" or "wagers," see, *e.g.*, *New York v. Gemini Titan, LLC*, No. 1:26-cv-03318 (S.D.N.Y.), Dkt. No. 1 ¶ 8, New York misconstrues both the nature of these contracts offered on CFTC-regulated DCMs and the federal regulatory framework.  New York's limited and superficial review of fundamentally different products explains much of the confusion.  *Id.* at 23–29.  Contracts where the underlying event is a sporting event or an election function no differently than event contracts predicated on the weather, or the price of oil rising above a certain level.

And the CEA is clear that the CFTC has "exclusive jurisdiction" over event contracts that are swaps.  7 U.S.C. § 2(a)(1)(A).  Event contracts, including sports-related or political event contracts that are listed on DCMs, are covered by the CEA, and the CEA prohibits States from invading the CFTC's exclusive jurisdiction over event contract transactions offered by and executed on federally regulated DCMs.  By prohibiting these DCMs from operating in New York without a New York license or by conditioning their operation on compliance with New York laws and regulations, New York directly interferes with the CFTC's authority pursuant to the federal scheme imposed by Congress through the CEA.

11

New York's interference with federally regulated DCMs is preempted.  This Court should halt the ongoing efforts by Defendants to undermine the uniform application of federal law by enjoining New York from applying laws related to betting and wagering to event contract swaps listed for trading on CFTC-regulated DCMs.  *See KalshiEX, LLC*, 2026 WL 924004, at *3 (finding that Kalshi's sports-related event contracts are swaps under the CEA); *KalshiEX, LLC*, 2026 WL 976055, at *2 (enjoining Arizona from enforcing state gambling law against "event contracts listed on CFTC-regulated DCMs.").  Unless restrained and enjoined by the Court, Defendants are likely to continue their attempts to subvert federal law and the exclusive jurisdiction to regulate event contract swaps conferred on the CFTC by Congress.

### A. Event contracts are "swaps" under the CEA

Event contracts are swaps as defined by the CEA.[8]  "In all cases of statutory interpretation," the analysis must "start with the text."  *United States v. Gear*, 9 F.4th 1040, 1044 (9th Cir. 2021).  The Act defines "swap" to include "any agreement, contract, or transaction . . . that provides for any purchase, sale, payment, or delivery . . . that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency *associated with a potential* financial, economic, or commercial consequence."  7 U.S.C. § 1a(47)(A)(ii) (emphasis added).  Event contracts, including sports event contracts, are settled based on the occurrence or non-occurrence of a specified future event, like the occurrence of a weather event or the outcome of an election or sporting event.  And those occurrences are "associated with [] potential financial, economic, or

---

[8] Congress also currently considers event contracts traded on DCMs to be swaps.  On April 30, 2026, the Senate changed its rules to add a provision barring members from participating in "prediction market[s]" and describing those transactions as "swap[s] ... as defined in section 1a of the Commodity Exchange Act . . . that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of a specific event or contingency."  S. Res. 708, 119th Cong. (2026).  The resolution specifies that it does not "change the definitions of any of the types of contracts" and merely reflects current CEA definitions.  *Id.*

commercial consequence[s]"—a storm affects shipping and crops; an election affects tax and spending policy; and a sporting event affects ticket and merchandise sales, advertising, brand endorsements, vendors, lodging businesses, and food and beverage services.  *Id.*; *see also KalshiEX*, 2026 WL 924004, at *3 (listing similar examples).

Event contracts often qualify as binary options under the CEA, which are "option[s] whose payoff is either a fixed amount or zero."[9]  As binary options, event contracts are also swaps under 7 U.S.C. § 1a(47)(A)(i), which defines "swap," to include "any agreement, contract, or transaction . . . that is a[n] . . . option of any kind that is for the purchase or sale, or based on the value, of 1 or more . . . quantitative measures, or other financial or economic interests or property of any kind."[10]

Event contracts based on sports or elections also implicate "potential financial, economic, or commercial consequence[s]" under the CEA.  7 U.S.C. § 1a(47)(A)(ii).  As the Third Circuit held, a sports event affects "numerous . . . stakeholders, including sponsors, advertisers, television networks, franchises, and local and national communities."  *KalshiEX*, 2026 WL 924004, at *3.

Many of the stakeholders to a sport event may wish to hedge against a team's or participant's performance.  *See id.*   And the same is true for political event contracts: any number of stakeholders may want to hedge against an expected policy change.  The only difference between a sports or political event contract and the types of event contracts on the weather or corn production that have traded on DCMs for decades is the underlying event.  Carving out sports and

---

[9]  CFTC Futures Glossary: A Guide to the Language of the Futures Industry, https://www.cftc.gov/LearnAndProtect/AdvisoriesAnd Articles/CFTCGlossary/index.htm#B.

[10]  *See also* §§ 1a(47)(A)(iv) (including transactions "commonly known to the trade as swaps") and (vi) ("any combination or permutation of, or option on, any agreement, contract, or transaction described in any of clauses (i) through (v)").

13

political event contracts from the CEA's definition of "swap," would destabilize those previously uncontroversial markets, potentially subjecting them to a patchwork of state gambling regulations. By contrast, adhering to the plain text of the CEA does nothing to limit New York's existing authority to regulate gambling—indeed, New York's gambling industry and related state revenue continues to grow rapidly.[11]  The plain text reading of the CEA is also the least disruptive to both federal futures regulation and the typical application of New York's gambling laws.

### B.  The CEA expressly preempts state law

"Express preemption occurs when a federal statute explicitly states that it overrides state or local law." *Hoagland v. Town of Clear Lake,* 415 F.3d 693, 696 (7th Cir. 2005).  Congress explicitly preempted state regulation of commodity derivatives transactions, vesting the Commission with "exclusive jurisdiction," except as otherwise expressly provided by Congress, over all "accounts, agreements . . . , and transactions involving swaps or contracts of sale of a commodity for future delivery."  7 U.S.C. § 2(a)(1)(A).

This "exclusive jurisdiction" provision was first enacted by the Commodity Futures Trading Commission Act of 1974, Pub. L. 93-463, 88 Stat. 1389 (1974) ("CFTC Act of 1974"). Preemption was the primary goal of the "exclusive jurisdiction" provision.  After decades of amendment and refinement of the CEA, Congress chose to expressly preempt any concurrent state regulation of the markets at issue in this case by conferring on the CFTC "exclusive jurisdiction" to regulate "transactions involving swaps" traded on CFTC-regulated DCMs.   7  U.S.C. § 2(a)(1)(A).  Indeed, potentially limiting language was stricken from the statute "to assure that

---

[11] *Compare* N.Y. State Gaming Comm'n, 2024 Annual Report 12 (reporting $2.06 billion in gross mobile sports wagering revenue and $1.05 billion in mobile sports wagering tax revenue) *with* N.Y. State Gaming Comm'n, 2023 Annual Report 12 (reporting $1.69 billion in gross mobile sports wagering revenue and $862 million in mobile sports wagering tax revenue), https://gaming.ny.gov/annual-reports/.

Federal preemption is complete."   120 Cong. Rec. S 30458, 30464 (daily ed. Sept. 9, 1974) (Statement of Sen. Curtis).  Preemption of state law was necessary because, for decades, states had attempted to apply state gambling laws to derivatives trading.  By the mid-nineteenth century, commodity exchanges in major trading hubs like New York and Chicago had organized trading to facilitate price discovery (information exchange), risk management (hedging), and speculation. But many states prohibited futures trading as a form of gambling.  *See, e.g., Irwin v. Williar*, 110 U.S. 499, 508-09 (1884) (describing futures contracts as "nothing more than a wager"); *see also Cothran v. Ellis*, 16 N.E. 646, 647 (Ill. 1888) (describing futures as "gambling in grain").  Congress recognized the need for uniform, nationwide regulation of futures and options markets because concurrent regulation by the states or other federal regulators such as the Securities and Exchange Commission could lead to "total chaos."  *See* Commodity Futures Trading Act of 1974: Hearings Before the S. Comm. on Agric. & Forestry on S. 2485, S. 2578, S. 2837, H.R. 13113, 93d Cong., 2d Sess. 685 (1974) (statement of Sen. Clark).

As financial derivatives markets have developed and grown, Congress has steadily expanded the CFTC's jurisdiction to include commodity swaps and event contracts.  In 2010, Congress amended the CEA to add "transactions involving swaps" to the CFTC's § 2(a)(1) exclusive jurisdiction.  *See* Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010); 7 U.S.C. § 2(a)(1)(A).  In the same legislation, Congress emphasized the CFTC's exclusive jurisdiction over event contracts by adding the "Special Rule," CEA § 5c(c)(5)(C) to the Act.  *See* 7 U.S.C. § 7a-2(c)(5)(C).  In § 5c(c)(5)(C), Congress granted the CFTC specific oversight and prohibitory authority over event contracts by providing that the CFTC "may determine" event contracts involving certain categories "are contrary to the public interest" and may not be listed on CFTC-regulated markets.  7 U.S.C. § 7a-2(c)(5)(C)(i)-(ii). Rule

15

40.11 implements the Special Rule by prohibiting DCMs from offering event contracts "that involve[], relate[] to, or reference[] terrorism, assassination, war, gaming, or an activity that is unlawful under any State or Federal law." 17 C.F.R. § 40.11(a)(1). The CFTC is empowered by Congress to prohibit DCMs from offering event contracts that it determines "to be contrary to the public interest." *Id.* § 40.11(a)(2). By creating a specific public interest review process, Congress clearly signaled that these contracts are within the CFTC's exclusive regulatory purview, not the States'.

### C. The CEA occupies the field of derivatives trading regulation, preempting application of state law

Even without the express language of the CEA preempting state regulation, state laws prohibiting or purporting to regulate transactions listed by or executed on CFTC-regulated DCMs are preempted because Congress "occupied the field" of regulation of event contracts traded on CFTC-regulated DCMs. *See KalshiEX*, 2026 WL 924004, at *4; *Boomer v. AT & T Corp.,* 309 F.3d 404, 417 (7th Cir. 2002). In general, state law must give way if "Congress, acting within its proper authority, has determined [that a category of conduct] must be regulated by its exclusive governance" or where "the challenged state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Arizona*, 567 U.S. at 399 (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)).

When Congress amended CEA § 2(a)(1) in 1974 to give the CFTC "exclusive jurisdiction" over futures transactions, it did so with the intent that the CEA would "preempt the field insofar as futures regulation is concerned" such that "if any substantive State law regulating futures trading was contrary to or inconsistent with Federal law, the Federal law would govern." H.R. Rep. No. 93-1383 (1974) (Conf. Rep.), *reprinted in* 1974 U.S.C.C.A.N. 5894, 5897.

16

Over the years, amendments to the CEA repeatedly reinforced the CFTC's exclusive jurisdiction over the field of futures derivatives trading.  In 1978, proposals to carve off pieces of the CFTC's "exclusive" jurisdiction were rejected, because "[t]he nature of the underlying commodity is not an adequate basis to divide regulatory authority."  S. Rep. No. 95-850, at 111-12 (1978), *reprinted in* 1978 U.S.C.C.A.N. 2087, 2110-11.  That "a futures contract market does not fit into the traditional mold where there are both hedging and price-discovery functions should not be the determining factor in whether the contract is to be regulated by the CFTC." *Id.*  Congress also underscored the importance of the CFTC's exclusive jurisdiction over commodity derivatives, citing concerns over "costly duplication and possible conflict of regulation or over-regulation." *Id.*  When amending the CEA in 1982, Congress "continue[d] to support the idea of a single unified program of regulation and exclusive CFTC jurisdiction over exchange-traded futures," "recognizing the somewhat esoteric nature of the commodity futures markets and the desire to have knowledgeable and uniform enforcement of the Act." H.R. Rep. No. 97-565, at 44-45 & 102-103, *reprinted in* 1982 U.S.C.C.A.N. at 3893-94, 3951-52.

A field is preempted from state regulation "if the scope of the statute indicates that Congress intended federal law to occupy the legislative field." *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76 (2008).  The scope of the CEA and the long history of Congress's amendments to ensure federal law captured the evolving futures and derivatives markets makes clear that Congress intended to occupy the field.  With 7 U.S.C. § 2(a)(1)(A), Congress intended the CEA to occupy the field of "accounts, agreements . . . and transactions involving swaps or contracts of sale of a commodity for future delivery . . . traded or executed on a contract market . . . or any other board of trade, exchange, or market."  When an instrument is trading on a CFTC-regulated market as a "swap" or "future," state gambling laws do not apply.

17

### D.  New York's application of its state laws conflicts with the CEA.

Offering event contracts on a DCM cannot, in and of itself, be an activity that is unlawful under any state law because such an application of state law would conflict with the CEA. "Congress's intent was to provide the CFTC with exclusive jurisdiction to regulate commodities" and "[s]uch exclusive jurisdiction precludes states from exercising supplementary regulatory authority over commodity transactions." *Stuber v. Hill*, 170 F. Supp. 2d 1146, 1151 (D. Kan. 2001); *see also KalshiEX*, 2026 WL 924004, at *5 ("[C]onflict preemption also prohibits New Jersey from regulating sports-related event contracts on CFTC-licensed DCMs.").

A State applying local gambling laws to federally regulated DCMs "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona*, 567 U.S. at 399 (internal citation omitted).  The CEA presents a "comprehensive regulatory structure to oversee the volatile and esoteric futures trading complex."  *Merrill Lynch, Pierce, Ferner & Smith, Inc. v. Curran*, 456 U.S. 353, 356 (1982).  State gambling laws often require local licensing, fees, enforcement, and specific hardware.  Applying state-by-state local requirements to national commodity exchanges would create the very "patchwork" that Congress set out to prevent in these complex markets.  Indeed, the history of the CEA demonstrates repeated efforts by Congress to protect nationwide markets under uniform federal regulation as those markets evolve and as states attempt to limit them.

What's more, complying with both state and federal law regulating event contracts traded on CFTC-regulated DCMs would be impossible because a DCM is required by federal law to provide "impartial access" to all eligible participants nationwide.  17 C.F.R. § 38.151(b).  If a state bans the contract, the DCM cannot fulfill its federal mandate to provide impartial national access.  Other state-imposed restrictions on access to markets would similarly make it impossible for the regulated DCMs to comply with federal regulations. The CEA reflects Congress's

understanding that commodity derivatives markets require nationally uniform rules governing the listing, trading, clearing, settlement, and surveillance of financial instruments traded in these markets to prevent the type of fragmented oversight at risk in this case. Complying with fractured state regulations would derail that goal.

Congress has consistently chosen centralized, federal oversight and regulation of derivatives markets, recognizing the negative effects of a patchwork of state regulation even in the predecessor statutes to the current CEA. *See* Future Trading Act of 1921, Pub. L. No. 67-66, 42 Stat. 187 (1921); Grain Futures Act of 1922, Pub. L. No. 67-331, 42 Stat. 998 (1922). In passing these laws, Congress recognized the importance of uniform federal regulation of futures markets, even over objections that the new legislation would displace some States' regulations. *Cf.* H.R. Rep. No. 67-1095, at 5 (1922) (Conf. Rep.) (objecting that the bill was "designed to . . . more or less eliminate some of the most important police powers of several sovereign States"). Congress's "clear and manifest purpose" was indeed to preempt these historic police powers. *Altria Grp., Inc.*, 555 U.S. at 77 (noting "the assumption that the historic police powers of the States [are] not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress") (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)). The plain language of the text, underscored by the consistent legislative history to preempt states from applying 50 state requirements on national markets, indicates this "clear and manifest purpose" to preempt state police powers.

### III.    The remaining factors favor granting preliminary relief

Absent an injunction, the United States and the CFTC will suffer irreparable harm. Irreparable harm necessarily results from the enforcement of an unconstitutional state law. *Goldie's Bookstore, Inc. v. Superior Ct. of State of Cal.*, 739 F.2d 466, 472 (9th Cir. 1984) ("An

alleged constitutional infringement will often alone constitute irreparable harm."). And the United States suffers irreparable harm "when its valid laws in a domain of federal authority are undermined by impermissible state regulations." *Alabama*, 691 F.3d at 1301. The federal government's ability to enforce its policies and achieve its objectives will be undermined by the state's enforcement of statutes that interfere with federal law. *See Crosby v. National Foreign Trade Council*, 530 U.S. 363, 379-80 & n. 14 (2000). *See also* Beale Decl. ¶ 7. "The ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015). The United States and the CFTC seek to protect their distinct interests in preventing a State from nullifying federal law and evading Congress's intent and direction in the CEA.

New York seeks not only to regulate CFTC-regulated DCMs but also threatens to criminally prosecute them for operating markets in compliance with federal law. *KalshiEX, LLC v. Williams, et al.*, No. 1:25-cv-08846-AT (S.D.N.Y.), Dkt. No. 1 ¶¶ 48, 52. There is no remedy at law for such an injury. *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992). Each additional step that New York takes in threatening criminal prosecution or pursuing civil enforcement serves both to increase the risk to companies like Coinbase and Gemini in complying with federal law and generally serves to disrupt the markets that the CFTC is tasked with regulating. *See* Beale Dec. ¶ 7. Further, although New York is silent as to the scope of monetary recovery it seeks in its suits against Coinbase and Gemini, the State may choose to "seek relief on behalf of out-of-state residents" and "may obtain disgorgement of [Coinbase's and Gemini's] net profits attributable to the entirety of [their] U.S. sales." *See Federal Trade Comm'n v. Vyera Pharm.*, 2021 WL 4392481, at *4 (S.D.N.Y. Sept. 24, 2021) (Cote, J.). The likelihood of

irreparable harm to the interests of the United States and the CFTC thus warrants preliminary relief. *See American Ins. Ass'n v. Garamendi*, 539 U.S. 396, 413 (2003) (enjoining permanently the enforcement of a state statute that is preempted by federal law because it interferes with the federal government's ability to enforce its policies); *Crosby*, 530 U.S. at 372, 379-80 (same).

The public interest and equities prongs merge when the United States is a party because "[f]rustration of federal statutes and prerogatives are not in the public interest," and where a state law is preempted, the State is not "harm[ed] from . . . nonenforcement of invalid legislation." *Alabama*, 691 F.3d at 1301. As the Third Circuit recently held in a nearly identical case, allowing a state to enforce a state law in violation of the Supremacy Clause is neither equitable nor in the public interest. *See KalshiEX, LLC*, 2026 WL 924004, at *17; *see also American Trucking Ass'ns, Inc. v. City of L.A.*, 559 F.3d 1046, 1059-60 (9th Cir. 2009). New York's actions to enforce its gambling laws as applied to event contracts trading on CFTC-regulated exchanges interferes with federal policy as set out by Congress. A preliminary injunction would allow the federal government to continue to pursue federal priorities, which are inherently in the public interest, until a final judgment is reached in this case. *American Trucking*, 559 F.3d at 1059-60.

Preserving the status quo through a preliminary injunction is less harmful than allowing state laws that are likely preempted by federal law to be enforced. See *Id.* There is no public interest in New York's enforcement of preempted laws. *Chamber of Com. of U.S. v. Edmondson*, 594 F.3d 742, 771 (10th Cir. 2010). Entering a preliminary injunction would both protect the federal government from irreparable harm and would preserve the status quo while the Court considers the merits.

**CONCLUSION**

New York's gambling laws are preempted as applied to event contracts traded on CFTC-regulated DCMs. The United States and the CFTC respectfully ask this court to enter a preliminary injunction prohibiting New York from applying its laws against CFTC-regulated DCMs.

Dated: May 1, 2026                         Respectfully submitted,


By: */s/ Alexandra McTague*
Alexandra McTague
Senior Litigation Counsel
U.S. Department of Justice Civil Division
Enforcement & Affirmative Litigation Branch
450 5th Street, N.W., Suite 6400-South
Washington, D.C. 20530
Tel. 202-718-0483
Alexandra.mctague2@usdoj.gov

22

*Attorneys for the United States of America*

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

YAAKOV M. ROTH
Principal Deputy Assistant Attorney General

TIBERIUS DAVIS
Counsel to the Assistant Attorney General
450 5th St. NW,
Washington, DC 20001
Tiberius.davis@usdoj.gov
202-860-8970

ALEXANDRA McTAGUE
Senior Litigation Counsel
Alexandra.mctague2@usdoj.gov
202-718-0483

*Attorneys for the Commodity Futures Trading Commission*

Tyler S. Badgley
    General Counsel
M. Jordan Minot
    Deputy General Counsel
    (*pro hac vice pending*)
Anne Stukes
    Senior Assistant General Counsel
    (*pro hac vice pending*)
Carlin Metzger
    Senior Assistant General Counsel
    (*pro hac vice pending*)
Andrew J. Weisberg
    Senior Assistant General Counsel
    (*pro hac vice pending*)

U.S. Commodity Futures Trading Commission
Three Lafayette Center
1155 21st Street, NW
Washington, DC 20581
Tel:  (202) 209-1087
Fax:  (202) 418-5567
tbadgley@cftc.gov
jminot@cftc.gov
astukes@cftc.gov
cmetzger@cftc.gov
aweisberg@cftc.gov

## Certification Pursuant to S.D.N.Y. Local Civil Rule 7.1

I, Alexandra McTague, hereby certify that this document was prepared on a computer using Microsoft Word, and the word count for this memorandum of law is 6,683, inclusive of all footnotes, and exclusive of the caption, table of contents, table of authorities, and signature block.

Dated: May 1, 2026

/s/ Alexandra McTague
Alexandra McTague