UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

THE UNITED STATES OF AMERICA and COMMODITY
FUTURES TRADING COMMISSION,

<em>Plaintiffs</em>,

-against-

STATE OF NEW YORK; KATHLEEN HOCHUL, *in her official capacity as Governor of the State of New York*; LETITIA JAMES, *in her official capacity as Attorney General of the State of New York*; the NEW YORK STATE GAMING COMMISSION; ROBERT WILLIAMS, *in his official capacity as Executive Director of the New York State Gaming Commission*; BRIAN O'DWYER, *in his official capacity as Chair and Commissioner of the New York State Gaming Commission*; JOHN A. CROTTY, *in his official capacity as Commissioner of the New York State Gaming Commission*; SYLVIA B. HAMER, *in her official capacity as Commissioner of the New York State Gaming Commission*; MARTIN J. MACK, *in his official capacity as Commissioner of the New York State Gaming Commission*; PETER J. MOSCHETTI, JR., *in his official capacity as Vice Chair and Commissioner of the New York State Gaming Commission*; MARISSA SHORENSTEIN, *in her official capacity as Commissioner of the New York State Gaming Commission*; and JERRY SKURNIK, *in his official capacity as Commissioner of the New York State Gaming Commission*,

<em>Defendants</em>.

1:26-cv-3404-VM

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

LETITIA JAMES
Attorney General
State of New York
*Attorney for Defendants*

Katherine Rhodes Janofsky
Zachary Manley
Assistant Attorneys General
*Of Counsel*

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ............................................................................................. 1

STATUTORY AND REGULATORY BACKGROUND.................................................................. 4

    I.    NEW YORK'S HISTORY OF POLICING GAMBLING........................................................ 4

    II.    FEDERAL REGULATION OF COMMODITY FUTURES TRADING........................................ 5

RELEVANT FACTS AND PROCEDURAL HISTORY .............................................................. 6

LEGAL STANDARD.......................................................................................................... 10

SCOPE OF THE LITIGATION ............................................................................................ 11

ARGUMENT .................................................................................................................... 12

    I.    PLAINTIFFS HAVE NOT SHOWN A LIKELIHOOD OF SUCCESS ON THE MERITS ............. 12

        A.    Governor Hochul Is Not A Proper Party And Must Be Dismissed. ............................ 12

        B.    The Event-Contracts At Issue Are Not "Swaps" Under The CEA. .............................. 12

            i.    Applicable Rules Of Statutory Construction ............................................................. 12

            ii.    The "Event Contracts" Are Not Swaps Under Section 1a(47)(A)(ii) Because ........... They Are Not "Associated With A Potential Financial, Economic, Or ...................... Commercial Consequence."..................................................................................... 13

                a.    Interpreting Section 1a(47)(A)(ii).............................................................. 14

                b.    Applying Section 1a(47)(A)(ii)................................................................... 19

            iii.    The "Event Contracts" are not swaps under the plain meaning of Section 1a(47)(A)(i).............................................................................................................. 22

        C.    Even If The Event Contracts Are "Swaps," The CEA Does Not Preempt New ............. York Laws.............................................................................................................. 23

                a.    The CEA Does Not Expressly Preempt New York Law. ................................... 23

                b.    The CEA Does Not Field-Preempt New York Law. ......................................... 25

                c.    The CEA Does Not Conflict-Preempt New York Law. ..................................... 28

    II.    PLAINTIFF HAS NOT SHOWN A LIKELIHOOD OF IRREPARABLE HARM........ 30

        A.    Plaintiffs' Allegations Regarding a Supremacy Clause Violation Do Not ...................... Amount to Automatic Irreparable Harm...................................................................... 30

        B.    Plaintiffs Cannot Impute DCMs' Harms to Themselves. ........................................... 32

    III.    THE EQUITIES DO NOT FAVOR A PRELIMINARY INJUNCTION ................... 32

CONCLUSION................................................................................................................. 35

# TABLE OF AUTHORITIES

**CASES**                                                                                                    **PAGE(S)**

*Ah Sin v. Wittman*,
   198 U.S. 500 (1905)......................................................................................................25

*Ala. Ass'n of Realtors v. Dep't of Health & Human Servs.*,
   594 U.S. 758 (2021)......................................................................................................18

*Altria Grp., v. Good*,
   555 U.S. 70 (2008)........................................................................................................24

*Am. Petroleum Inst. v. Jorling*,
   710 F. Supp. 421 (N.D.N.Y. 1989)................................................................................31

*American Insurance Association v. Garamendi*,
   539 U.S. 396 (2003)......................................................................................................31

*Art & Antique Dealers League of Am. v. Seggos*,
   121 F.4th 423 (2d Cir. 2024) .................................................................................13, 29

*Ass'n of Int'l Auto. Mfrs. v. Abrams*,
   84 F.3d 602 (2d Cir.1996)............................................................................................24

*Barrett v. Harwood*,
   967 F. Supp. 744 (N.D.N.Y. 1997)...............................................................................31

*Bond v. United States*,
   572 U.S. 844 (2014)................................................................................................17, 19

*Buono v. Tyco Fire Prods., LP*,
   78 F.4th 490 (2d Cir. 2023) .........................................................................................25

*Chan v. U.S. Dep't of Trans.*,
   23-cv-10365, 2024 WL 5199945 (S.D.N.Y. Dec. 23, 2024)........................................31

*Churchill Downs Tech. Initiatives Co. v. Mich. Gaming Control Bd.*,
   162 F.4th 631 (6th Cir. 2025) .................................................................................27-28

*Cipollone v. Liggett Grp.*,
   505 U.S. 504 (1992)......................................................................................................24

*Coal. for Competitive Elec., Dynegy v. Zibelman*,
   272 F. Supp. 3d 554 (S.D.N.Y. 2017)...........................................................................26

*Crosby v. National Foreign Trade Council,*
530 U.S. 363 (2000)...........................................................................................31

*Davis v. Mich. Dept. of Treasury,*
489 U.S. 803 (1989)...........................................................................................13

*De Buono v. NYSA–ILA Med. & Clinical Servs. Fund,*
520 U.S. 806 (1997)...........................................................................................23

*Dubin v. United States,*
599 U.S. 110 (2023)...........................................................................................16

*Epic Sys. v. Lewis,*
584 U.S. 497 (2018)..................................................................................... 17-18

*Fellner v. Tri-Union Seafoods,*
539 F.3d 237 (3d Cir. 2008)..............................................................................30

*Figueroa v. Foster,*
864 F.3d 222 (2d Cir. 2017).........................................................................28-29

*Fischer v. United States,*
603 U.S. 480 (2024)...........................................................................................16

*Gazzola v. Hochul,*
645 F. Supp. 3d 37 (N.D.N.Y. 2022)................................................................12

*Greater New Orleans Broad. Ass'n v. United States,*
527 US 173 (1999)..............................................................................................16

*Horn v. Med. Marijuana,*
80 F.4th 130 (2d Cir. 2023) ..............................................................................14

*Inv. Co. Inst. v. CFTC,*
720 F.3d 370 (D.C. Cir. 2013).............................................................................5

*Inv. Co. Inst. v. CFTC,*
891 F. Supp.162 (D.D.C. 2012).........................................................................19

*James v. Coinbase Fin. Mkts.,*
Index No. 451604/2026 ........................................................................................7

*James v. Gemini Titan LLC,*
Index No. 451603/2026 ........................................................................................7

*KalshiEX LLC v. Flaherty,*
172 F.4th 220 (3d Cir. 2026) ............................................................. 21, 25, 28-29

*KalshiEX LLC v. Johnson*,
  2026 WL 1223373 (D. Ariz. 2026)......................................................................................21, 29

*KalshiEX LLC v. Martin*,
  793 F. Supp. 3d 667 (D. Md. 2025) ............................................................................ passim

*KalshiEX LLC v. Orgel*,
  26-cv-00034, 2026 WL 474869 (M.D. Tenn. Feb. 19, 2026)..................................... 13, 20-21

*KalshiEX LLC v. Schuler*,
  26-3196, 2026 WL 1295806 (6th Cir. Apr. 24, 2026)...................................................... passim

*KalshiEX LLC v. Williams*,
  25-cv-8846, ECF 35-2 ............................................................................................... 9-10

*KalshiEX, LLC v. Hendrick*,
  817 F. Supp. 3d 1014 (D. Nev. 2025)................................................................................ passim

*KalshiEX, LLC v. Schuler*,
  25-cv-1165, 2026 WL 657004 (S.D. Ohio Mar. 9, 2026) .................................... 14, 16-17, 27

*Kane v. Johns-Manville.*,
  843 F.2d 636 (2d Cir. 1988)...................................................................................................32

*Kerr v. First Commodity Corp.*,
  735 F.2d 281 (8th Cir. 1984) ................................................................................................26

*Kilinc v. PMMUE Eduservices Private*,
  2026 WL 601937 (S.D.N.Y. March 4, 2026) ........................................................................32

*Le Metier Beauty Inv. Partners LLC v. Metier Tribeca, LLC*,
  2015 WL 769573 (S.D.N.Y. Feb. 24, 2015)..........................................................................11

*Learning Resources, Inc. v. Trump*,
  146 S. Ct. 628 (2026)............................................................................................................17

*Medtronic v. Lohr*,
  518 U.S. 470 (1996)..........................................................................................................24-25

*Merrill Lynch, Pierce, Fenner, & Smith v. Curran*,
  456 U.S. 353 (1982)...........................................................................................................5, 12

*Methyl Tertiary Butyl Ether Prods. Liab. Litig.*,
  725 F.3d 65 (2d Cir. 2013)................................................................................................28-29

*Metro. Transp. Auth. v. Duffy*,
  784 F. Supp. 3d 624 (S.D.N.Y. 2025).....................................................................................6

iv

*Moreira v. Société Générale, S.A.*,
    125 F.4th 371 (2d Cir. 2025) ....................................................................................12

*Mullins v. City of New York*,
    626 F.3d 47 (2d Cir. 2010)..........................................................................................6

*Murphy v. Nat'l Collegiate Athletic Ass'n*,
    584 U.S. 453 (2018)................................................................................ 4, 16-17, 25

*N. Am. Derivatives Exchange v. Nevada*,
    815 F. Supp. 3d 1169 (D. Nev. 2025)...................................................................13, 18

*N. Am. Soccer League v. U.S. Soccer Fed'n*,
    883 F.3d 32 (2d Cir. 2018)........................................................................................11

*N.Y. SMSA v. Town of Clarkstown*,
    612 F.3d 97 (2d Cir. 2010).......................................................................................23

*N.Y. State Firearms Ass'n v. James*,
    157 F.4th 232 (2d Cir. 2025) ...................................................................................11

*N.Y. State Telecomms. Ass'n. v. James*,
    101 F.4th 135 (2d Cir. 2024) ...................................................................................25

*New Jersey v. Bessent*,
    149 F.4th 127 (2d Cir. 2025) ...................................................................................13

*Oneok v. Learjet*,
    575 US 373 (2015)....................................................................................................27

*QCX LLC v. Nessel*,
    1:26-CV-710, 2026 WL 1166362 (W.D. Mich. Mar. 10, 2026)...................................... passim

*Saratoga Cnty. Chamber of Commerce v. Pataki*,
    798 N.E.2d 1047 (N.Y. 2003)......................................................................................4

*St. Joseph's Hosp. Health Ctr. v. Am. Anesthesiology of Syracuse, P.C.*,
    131 F.4th 102 (2d Cir. 2025) ...................................................................................31

*United States v. Alabama*,
    691 F.3d 1269 (11th Cir. 2012) ...............................................................................31

*United States v. California*,
    2026 WL 784514 (C.D. Cal. 2026).........................................................................32

*United States v. Five Gambling Devices*,
    346 U.S. 441 (1953)......................................................................................17, 19, 27

*United States v. Harris,*
    838 F.3d 98 (2d Cir. 2016)........................................................................................16

*United States v. Miller,*
    604 U.S. 518 (2025)..................................................................................................15

*United States v. New York,*
    814 F. Supp. 3d 266 (N.D.N.Y. 2025).....................................................................12

*United States v. Phillips,*
    155 F.4th 102 (2d Cir. 2025) ...................................................................................12

*United States v. Texas,*
    97 F4th 268 (5th Cir. 2024) .....................................................................................35

*Walden v. Kosinski,*
    153 F.4th 118 (2d Cir. 2025) ...................................................................................10

*Warden v. Pataki,*
    35 F. Supp.2d 354 (S.D.N.Y.)..................................................................................12

*We The Patriots USA v. Hochul,*
    17 F.4th 266 (2d Cir. 2021) ...............................................................................11, 31

*West Virginia v. EPA,*
    597 U.S. 697 (2022)..................................................................................................18

*Whitman v. Am. Trucking Associations,*
    531 U.S. 457 (2001)..................................................................................................17

**STATE STATUTES**

N.Y. Executive Law
    §63(12).................................................................................................................2, 11

N.Y. Gen. Oblig. Law
    §§5-401–5-423 ...........................................................................................................4

N.Y. Penal Law
    §225.00(2)..................................................................................................................4
    §225.00(4)..................................................................................................................4
    §225.00(5)..................................................................................................................4
    §225.05..................................................................................................................2, 4
    §225.10..................................................................................................................2, 4
    §25.20.......................................................................................................................2

N.Y. Racing, Pari-Mutuel Wagering and Breeding Law
    Art. 13, titles 3–8 ..............................................................................................5
    §1367..............................................................................................................2, 4
    §1367(1)(b) .......................................................................................................30
    §1367(1)(s).........................................................................................................34
    §1367-a ...............................................................................................................4
    §1367-a(4)(a)(xi)...............................................................................................34
    §1367-a(4)(e) ....................................................................................................33

**FEDERAL STATUTES**

7 U.S.C.
    §1a(47)(A)(i)...............................................................................................22-23
    §1a(47)(A)(ii)............................................................................................. passim
    §1a(47)(A)(i)–(vi).................................................................................................5
    §2(a)(1)(A) ................................................................................................. passim
    §2(d)...................................................................................................................25
    §2(e) ...................................................................................................................16
    §5.............................................................................................................5, 16, 20
    §6..........................................................................................................................5

15 U.S.C.
    §§3001(a)(1), 1178 .............................................................................................17

18 U.S.C.
    §1084(a) ...........................................................................................2, 11, 17, 18
    §1084(b)..............................................................................................................17
    §§1952–1953.......................................................................................................17
    §1955...................................................................................................................17

31 U.S.C.
    §5131(b)..............................................................................................................17
    §5362–5363.........................................................................................................17

28 U.S.C.
    §3702 *et seq*. .....................................................................................................4

Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. 111-203, July
    21, 2010, 124 Stat 1376 ......................................................................................5

**STATE REGULATIONS**

9 NYCRR

Parts 5329–5330................................................................................................5
§§5330.3(c), 5330.5 ........................................................................................29
§§5330.8, 5330.10(d)(5), 5330.19 ..................................................................33
§5330.13...........................................................................................................34
§5330.34...........................................................................................................33
§5330.45...........................................................................................................33

**FEDERAL REGULATIONS**

17 C.F.R.

§§38.151(b).......................................................................................................30
§ 38.150...........................................................................................................30
§40.11(a) ..........................................................................................................6

75 Fed. Reg. 80572 .......................................................................................30

91 Fed. Reg. 5386 .........................................................................................10

Defendants the State of New York ("State"), Governor Kathleen Hochul ("Governor"), Attorney General Letitia James ("AG"), and New York State Gaming Commission and its various official-capacity defendants ("Gaming Commission"), respectfully submit this memorandum of law, with the accompanying Declaration of Katherine Rhodes Janofsky ("Decl."), in opposition to the preliminary injunction motion by Plaintiffs the United States of America and the Commodities Futures Trading Commission ("CFTC").

## PRELIMINARY STATEMENT

The CFTC has no power or authority over whether an 18-year-old college student in New York may wager $200 on whether Taylor Swift will meet with Pope Leo XIV before 2027 or whether quarterback Josh Allen will throw more than 175 yards in the first game of the season. Facilitating such wagers is illegal under both New York and federal law, and the convoluted arguments necessary to claim otherwise—that such wagers are dubbed "swaps" within the meaning of a *single subsection* of a statute having *nothing to do* with gambling somehow preempts state gaming law—strain the bounds of logic and law. The Commodity Exchange Act ("CEA") has nothing to do with sports. Or with Taylor Swift meeting the Pope. Yet the federal government here seeks to disrupt the workings of New York State, its agencies, and its officials engaging in the legitimate, lawful exercise of state authority over entities engaged in multi-billion-dollar illegal gambling operations in this State—exercises Congress *never* concluded ought to be within the sole authority of a federal commodities agency. Plaintiffs' overreach should be rejected, and this motion for preliminary injunctive relief, which seeks not only to enjoin civil and criminal enforcement and regulatory power, but also state *investigatory* power, must be denied.

On April 21, 2026, the AG on behalf of the People of New York, sued non-parties Gemini Titan, LLC ("Gemini") and Coinbase Financial Markets, Inc. ("Coinbase") in New York state

court alleging violations of New York Executive Law §63(12) predicated on violations of the Federal Interstate Wire Act, 18 U.S.C. §1084(a); Article I, §9 of the New York State Constitution; New York Racing, Pari-Mutuel Wagering and Breeding Law ("Racing Law") §§1367 and 1367-a; and New York Penal Law §§225.10, 225.05, 225.20 (together, the "State Enforcement Actions"). Gemini operates an illegal mobile betting platform for sports, elections, and entertainment/culture wagering. Coinbase is an intermediary that allows its customers to place bets on its illegal mobile betting platform, which are then executed through non-party KalshiEX, LLC ("Kalshi"). Prior to the State Enforcement Actions, Defendant Gaming Commission sent Kalshi a civil cease-and-desist letter in October 2025.

Significantly, Plaintiffs do not challenge Defendants' ability to bring claims involving 18 U.S.C. §1084(a) against Coinbase and Gemini or other CFTC-designated contract markets ("DCMs"), and that portion of the State Enforcement Actions is therefore not at issue and beyond the scope of the relief requested in this case. Plaintiffs also do not dispute that such conduct violates New York law.

Instead, arguing that these routine but vital state actions "violated" CFTC's "exclusive jurisdiction" over "swap" agreements, Plaintiffs commenced this litigation to enjoin state oversight and investigation of these and other companies, and to prevent traditional regulation of gambling within state borders, claiming that Racing Law §1367 and Penal Law §225 as-applied to DCMs who "self-certify" such wagers as "event contracts" are preempted by the CEA.

Plaintiffs' motion should be denied. First, Plaintiffs fail to demonstrate a likelihood of success. Coinbase and Gemini's sports, election, and entertainment/culture "event-contracts" are not "swaps" as defined under the CEA. Nowhere in the CEA's plain text, statutory scheme, historical context, or legislative history is there any indication that Congress added "swaps" to the

2

statute in the wake of the 2008 financial crisis intending to federalize a vehicle for sports and other types of illicit gambling. In fact, Plaintiffs do not even *attempt* to argue that entertainment/culture "event-contracts" *are* swaps, focusing their papers exclusively on "sports" and "political" offerings, conceding the issue. Coinbase executives, for their part, are also not even pretending they offer anything other than recreational gambling: "[P]rediction markets [are] a huge phenomenon. [..S]ome of the wagers certain folks had on the primaries last night or the NBA semifinals and so on. It's just a fun activity, and I think it's very engaging for users to be able to make these bets on these platforms."[1]

Even if these offerings were "swaps," the CEA does not preempt the challenged laws. Neither Plaintiffs' express preemption nor field preemption arguments has any support in the CEA's text, structure, context, or legislative history, or the centuries-old history of New York gambling prohibitions, particularly given Supreme Court precedent reiterating that the general federal approach to gambling is to *defer* to, not supplant, state law. Plaintiffs' conflict-preemption argument fails as well: Plaintiffs do not cite any New York provision that makes dual compliance with state and federal law impossible. These same express, field, and conflict preemption arguments have already been rejected by the Sixth Circuit denying a stay of injunction, and by other courts. The only circuit to rule otherwise issued a deeply flawed 2-1 decision that, as discussed *infra* at 22, 28–29, applied a maximalist interpretation without any regard to the overall statutory scheme.

Next, Plaintiffs' allegations of irreparable harm miss the mark, especially where Plaintiffs have failed to show likelihood of success. Nor can irreparable harm be self-imputed.

---

[1] Transcript of May 20, 2026 conference available at: https://seekingalpha.com/article/4907051-coinbase-global-inc-coin-presents-at-j-p-morgan-54th-annual-global-technology-media-and.

Finally, a preliminary injunction would harm public interests, and the equities strongly favor Defendants.  Prediction markets target retail consumers.  The public harms of unregulated betting are well-documented, especially to young people, who are bombarded with targeted advertising, and persons struggling to overcome gambling addictions.  The injunction sought here would disrupt New York from exercising its traditional police powers to protect public health and welfare and prevent the AG from utilizing specific statutory authority to enjoin businesses engaging in repeated illegal activities.  Preliminary injunctive relief must be denied.

**STATUTORY AND REGULATORY BACKGROUND**

**I.    NEW YORK'S HISTORY OF POLICING GAMBLING**

New York has policed gambling since 1771.  *See Saratoga Cnty. Chamber of Commerce v. Pataki*, 798 N.E.2d 1047, 1063–65 (N.Y. 2003) (Smith, J., concurring in part).  Gambling is prohibited under the New York State Constitution with limited exceptions.  N.Y. Const., art. I, §9.

New York's Penal Law §225.00(2) provides that "[a] person engages in gambling when he stakes or risks something of value upon the outcome of a contest of chance or a future contingent event not under his control or influence, upon an agreement or understanding that he will receive something of value in the event of a certain outcome."  Private wagers are subject to civil regulation only. *See, e.g.* Gen. Oblig. Law §§5-401–5-423.  But there is criminal liability for "promoting" or "advancing" "gambling activity," Penal Law §§225.00(4), 225.00(5), 225.05, 225.10, or possessing gambling records or devices, *id*. §§225.15, 225.20, 225.30.

The 1992 Professional and Amateur Sports Protection Act ("PASPA"), 28 U.S.C. §3702 *et seq*., effectively banned commercial sports betting in most states, and was struck down in 2018. *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 474 (2018).  Racing Law §1367 then became effective in 2019, permitting authorized in-person sports wagering at commercial casinos.  In 2021, authorized mobile sports wagering was added under Racing Law §1367-a.  Both forms

of wagering are subject to New York's comprehensive statutory and regulatory regimes. *See generally,* Racing Law Art. 13, titles 3–8; 9 NYCRR Parts 5329–5330.

## II.    FEDERAL REGULATION OF COMMODITY FUTURES TRADING

Derivatives are "contracts deriving their value from underlying assets." *Inv. Co. Inst. v. CFTC*, 720 F.3d 370, 372 (D.C. Cir. 2013). Congress responded to concerns after World War I about price manipulation and other issues by authorizing federal regulation of commodity futures exchanges. *See Merrill Lynch, Pierce, Fenner, & Smith v. Curran,* 456 U.S. 353, 360 (1982).

Today, the CEA requires a variety of instruments to be traded on CFTC-designated exchanges. 7 U.S.C. §§2, 6. In 2000, the CEA was amended to allow DCMs to list contracts without prior CFTC approval by "self-certifying" that their contracts comply with applicable laws. *Id*. §7a-2(c)(1). The CEA's finding and purpose was also revised, making clear that "[t]he transactions subject to [the CEA] are entered into regularly in interstate and international commerce and are affected with a national public interest by providing a means for managing and assuming price risks, discovering prices, or disseminating pricing information through trading in liquid, fair and financially secure trading facilities." 7 U.S.C. §5

Following the 2008 financial crisis, Congress increased oversight and reporting for swaps. *See* Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. 111-203, July 21, 2010, 124 Stat 1376. Jurisdiction over swaps was divided among CFTC and other regulators. *Id*. Subject to important limitations discussed *infra*, CFTC was granted "exclusive jurisdiction…with respect to accounts, agreements…, and transactions involving swaps or contracts of sale of a commodity for future delivery," where such transactions are "traded or executed" on DCMs. §722, 124 Stat. 1376, 1672 (amending 7 U.S.C. §2(a)(1)(A)). These "swaps" are defined by 7 U.S.C. §1a(47)(A)(i)–(vi).

5

The CEA also contains express preemption clauses. The CEA supersedes "[s]tate or local law that prohibits or regulates gaming" *only for* certain limited derivatives (such as transactions in "security warrants," certain repurchase transactions, and certain banking products) not at issue here. *Id.* §16(e)(2). In addition, Section 16(h)(2) provides that a swap "may not be regulated as an insurance contract under the law of any State."

In the face of a DCM's ability to "self-certify" its own listings, Congress enacted a special rule for so-called "event contracts," that is, swaps and other financial products in "excluded commodities" (which Plaintiffs allege encompass the offerings at issue here). §7a-2(c)(5)(C) ("Special Rule"); *id.* §1a(19)(iv) (defining "excluded commodity"). Under the Special Rule, CFTC may determine whether certain event contracts are contrary to the public interest and prohibit them from being listed, traded, and cleared on DCMs. *Id.* §7a-2(c)(5)(C)(i)–(ii) (prohibiting event contracts determined to involve "activity that is unlawful under any Federal or State law," "terrorism," "assassination," "war," "gaming," or "other similar activity determined by the Commission, by rule or regulation, to be contrary to the public interest"). Moreover, CFTC regulations **outright prohibit** DCMs from listing event contracts related to any of these enumerated factors. 17 C.F.R. §40.11(a).

## RELEVANT FACTS[2] AND PROCEDURAL HISTORY

The collective history of this sports-oriented "prediction markets phenomenon" is less than 18 months long. The first self-certified sports offerings appeared on DCMs in January 2025. Gemini received a DCM license on December 10, 2025. Compl. ¶25. Coinbase first started offering prediction markets as a Futures Commission Merchant ("FCM"), acting as an

---

[2] Defendants cite documentary evidence that the Court may consider "in determining whether to grant a preliminary injunction." *Mullins v. City of New York*, 626 F.3d 47, 52 (2d Cir. 2010); *see also Metro. Transp. Auth. v. Duffy*, 784 F. Supp. 3d 624, 649 n.38–42 (S.D.N.Y. 2025).

intermediary between the public and a DCM) in January 2026. *James v. Coinbase Fin. Mkts.*, Index No. 451604/2026, Decl. Ex. 1 ("Tomer Aff.") ¶4. Through these platforms customers bet on sports, elections, entertainment, and culture, among other things, by purchasing "event contracts." *James v. Gemini Titan LLC*, Index No. 451603/2026, Decl. Ex. 2 ¶¶15–16; Tomer Aff. ¶20.

The public immediately (rightly) questioned the legality and integrity of such offerings, recognizing this as gambling.[3] Offerings included not only the outcome of a football game, but also the margin of victory or how many passing yards one of the quarterbacks will have, among other things; customers can even combine bets into a "parlay" for a higher payout, just as sports bettors may do with state-licensed sports-gambling operators.[4] DCMs and FCMs advertise their offerings as unambiguously as sports wagering:




LEFT:  Decl. Ex. 5.[5]                    RIGHT: Decl. Ex. 6.[6]

---

[3] *See, e.g.,* Brady Dale & Sami Sparber, *Prediction markets bring Super Bowl to states without sports betting*, Axios (Jan. 31, 2025) https://www.axios.com/2025/01/31/super-bowl-kalshi-sports-betting (Decl. Ex. 3).

[4] *See* Ben Blatt & Amy Fan, *Is Sports Betting Illegal in Your State? Not if You Call It a 'Prediction Market'*, N.Y. Times (Oct. 5, 2025) https://www.nytimes.com/2025/10/05/upshot/sports-betting-prediction-markets.html (Decl. Ex. 4).

[5] Jessica Welman, *CA tribes want court to stop Kalshi calling its product sports betting*, SBC Americas (Sept. 9, 2025) https://sbcamericas.com/2025/09/09/kalshi-california-false-advertising/.

[6] Dustin Gouker, *The Closing Bell: Kalshi Is Using NFL And College Logos To Advertise Sports Betting*, Event Horizon (Sept. 5, 2025).

Since January 2025, sports offerings and other "prediction markets" have grown exponentially. Betting activity is reportedly projected to "see over 445 billion contracts traded in 2026" and "[s]ports betting is the biggest draw and most dominant force in prediction markets."[7]



*Gemini*, Index No. 451603/2026, OAG Pet., Decl. Ex. 8 ¶44.

---

[7] Rob Lenihan, *Prediction markets like Kalshi are monetizing reality & the gaming industry is pushing back*, TheStreet (Jan. 20, 2026) https://www.thestreet.com/economy/prediction-markets-like-kalshi-are-monetizing-reality-the-gaming-industry-is-pushing-back (Decl. Ex. 7).



*Coinbase*, Index No. 451604/2026, OAG Pet., Decl. Ex. 9 ¶36

Beginning around March 2025, numerous state gaming commissions issued cease-and-desist orders against "prediction markets" or commenced civil enforcement. At present, for example, Coinbase is enjoined from offering sports, elections, and entertainment "event contracts" in Nevada. *See Nevada v. Coinbase Fin. Mkts.*, 26 OC 00030 1B (Nev. 1st Jud. Dist. Ct.), March 26, 2026 Order (Decl. Ex. 10). On October 24, 2025, Defendant Gaming Commission sent a civil cease-and-desist letter to Kalshi, *KalshiEX LLC v. Williams*, 25-cv-8846, ECF 35-2. Kalshi sued

9

and Commission Defendants stipulated to refrain from enforcement until a pending preliminary injunction motion is resolved.  *Id.* ECF 34 ¶4.

In the last four months, CFTC, which is operating with only one Commissioner, has abandoned more than a decade of consistent agency policy on the legality of sports and political "event contracts" and dramatically changed course.  On February 4, 2026, CFTC withdrew both a 2024 notice of proposed rulemaking which would have clarified that event contracts involving sports and political betting may not be listed on exchanges and a recent staff advisory.[8]  On March 12, 2026, CFTC published a purported Advanced Notice of Proposed Rulemaking to which ***New York and 39 other states*** submitted a public comment emphasizing CFTC's lack of jurisdiction over sports-related "contracts."[9]

On April 21, 2026, the New York AG sued Coinbase and Gemini.  Those cases were wrongly removed by Coinbase and Gemini, and motions to remand are presently pending.  CFTC initiated this lawsuit on April 24, 2026, seeking sweeping injunctive relief.  ECF 1 at 28–29.  This case is one of six recent federal lawsuits by Plaintiffs against states asserting the same flawed preemption claim made here.

## **LEGAL STANDARD**

A preliminary injunction is an "extraordinary and drastic remedy."  *Walden v. Kosinski,* 153 F.4th 118, 134 (2d Cir. 2025).  In the Second Circuit, "when, as here, the preliminary injunction will affect government action taken in the public interest pursuant to a statutory or regulatory scheme," Plaintiffs "must establish a *clear or substantial* likelihood of success on the

---

[8] *See* Press Release, CFTC, *CFTC Withdraws Event Contracts Rule Proposal and Staff Sports Event Contracts Advisory* (Feb. 4, 2026) https://www.cftc.gov/PressRoom/PressReleases/9179-26 (Decl. Ex. 11); Event Contracts; Withdrawal of Proposed Regulatory Action, 91 Fed. Reg. 5386 (Feb. 6, 2026).

[9] Letter from Forty States to Michael S. Selig, CFTC Chairman (Apr. 30, 2026) (Decl. Ex. 12).

merits." *N.Y. State Firearms Ass'n v. James*, 157 F.4th 232, 242 (2d Cir. 2025) (quotation marks omitted) (emphasis added); *see also N. Am. Soccer League v. U.S. Soccer Fed'n*, 883 F.3d 32, 37 (2d Cir. 2018) (heightened standard for preliminary injunction also applies when a party seeks to alter long-standing dynamics).  Plaintiffs must also show "[(2)] that [they are] likely to suffer irreparable harm in the absence of preliminary relief, [(3)] that the balance of equities tips in [their] favor, and [(4)] that an injunction is in the public interest." *James*, 157 F.4th at 241 (quoting *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008)).  "When the government is a party to the suit, [the Court's] inquiries into the public interest and the balance of the equities merge." *We The Patriots USA v. Hochul*, 17 F.4th 266, 295 (2d Cir. 2021) (citation omitted).

## SCOPE OF THE LITIGATION

Plaintiffs do not challenge Defendants' ability to bring Executive Law §63(12) claims involving 18 U.S.C. §1084(a) and those portions of the State Enforcement Actions are therefore not at issue and beyond the scope of the injunction requested in this case.

In addition, the State Enforcement Actions concern Coinbase and Gemini's offerings that fall outside the definition of "swap" under the CEA, including those labeled in one of three categories on their platforms: (i) sports (ii) elections, and (iii) culture/entertainment.  Plaintiffs argue only that Coinbase and Gemini's "sports" and "political" offerings are "swaps" subject to the CEA.  (*See, e.g.,* Mem. at 11, 13.)  They do not also claim that culture/entertainment "event contracts" are "swaps" within their jurisdiction; indeed, Plaintiffs' papers are entirely silent as to this category.  As such, this issue is undisputed and Plaintiffs have waived any preemption claim concerning Gemini and Coinbase's entertainment and culture offerings. *See Le Metier Beauty Inv. Partners LLC v. Metier Tribeca, LLC*, 2015 WL 769573, at \*7 n.4 (S.D.N.Y. Feb. 24, 2015).

11

**ARGUMENT**

I.    **PLAINTIFFS HAVE NOT SHOWN A LIKELIHOOD OF SUCCESS ON THE MERITS**

A.    **Governor Hochul Is Not A Proper Party And Must Be Dismissed.**

The Governor is not a proper party and must be dismissed.  Plaintiffs failed to establish Article III standing based upon an injury that is "fairly traceable to the challenged conduct of the defendant[.]"    *Moreira v. Société Générale, S.A.*, 125 F.4th 371, 384 (2d Cir. 2025). "[R]edressability against New York State does not establish traceability as to the Governor." *United States v. New York*, 814 F. Supp. 3d 266, 275 (N.D.N.Y. 2025).  Plaintiff has not alleged that the Governor is involved in the enforcement or administration of the New York Racing Laws (*see* Compl. ¶¶4, 18), and it is well-settled that "a state official's duty to execute the laws is not enough by itself to make that official a proper party in a suit challenging a state statute."  *Warden v. Pataki*, 35 F. Supp.2d 354, 359 (S.D.N.Y.) *aff'd* 201 F.3d 430 (2d Cir. 1999).  Plaintiffs' claim that the Governor has made public statements (*see* Compl. ¶4) is insufficient.  *See, e.g., United States*, 814 F. Supp. 3d at 275; *Gazzola v. Hochul*, 645 F. Supp. 3d 37, 59 (N.D.N.Y. 2022). Governor Hochul is thus not a proper party and should be dismissed.

B.    **The Event-Contracts At Issue Are Not "Swaps" Under The CEA.**

Plaintiffs' preemption theory hinges on an assertion that the offerings at issue are "swaps" within the meaning of the CEA, 7 U.S.C. §1a(47)(A)(ii). (Mem. 3.)  By any standard of review, Plaintiffs are incorrect.

i.    **Applicable Rules Of Statutory Construction**

This Court has authority to interpret the CEA, including its definition of "swap."  *Merrill,* 456 U.S. at 386–87 (construing CEA); *United States v. Phillips*, 155 F.4th 102, 113 (2d Cir. 2025) (same).  Moreover, the CEA does not "supersede or limit the jurisdiction conferred on courts of

12

the United States." 7 U.S.C. §2(a)(1)(A). "In the post-*Chevron* era…interpretation of the statute is a question of law, and…it is the court, and not the administrative agency, that determines its meaning." *Art & Antique Dealers League of Am. v. Seggos*, 121 F.4th 423, 435 (2d Cir. 2024) (citing *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 391 (2024)).

"When interpreting a statute, we begin with the plain language of the statute, giving the statutory terms their ordinary or natural meaning." *New Jersey v. Bessent*, 149 F.4th 127, 145 (2d Cir. 2025) (cleaned up). Where meaning is ambiguous, a court may use "a variety of interpretive tools, including canons, statutory structure, and legislative history." *Id.* "[T]he words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Davis v. Mich. Dept. of Treasury*, 489 U.S. 803, 809 (1989).

### ii. The "Event Contracts" Are Not Swaps Under Section 1a(47)(A)(ii) Because They Are Not "Associated With A Potential Financial, Economic, Or Commercial Consequence."

Plaintiffs claim the offerings are "swaps" under 7 U.S.C. §1a(47)(A)(ii), defined as:

> [an] agreement, contract, or transaction…that provides for any purchase, sale, payment, or delivery…that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency[10] associated with a potential financial, economic, or commercial consequence.

Neither sports nor political (nor entertainment/culture) offerings fit this definition because they are not "associated with a potential financial, economic, or commercial consequence."

Three federal courts have ruled that sports offerings like Coinbase and Gemini's are not swaps under this definition: *KalshiEX, LLC v. Hendrick*, 817 F. Supp. 3d 1014, 1027 (D. Nev.

---

[10] Several courts have also found that sports "event contracts" do not meet the definition of "occurrence," "nonoccurrence," and "extent of the occurrence of an event or contingency" set forth in Section 1a(47)(A)(ii). *KalshiEX, LLC v. Hendrick*, 817 F. Supp. 3d 1014, 1026–32 (D. Nev. 2025), *appeal docketed*, No. 25-7516 (sports event contracts do not meet this definition); *see also N. Am. Derivatives Exchange v. Nevada*, 815 F. Supp. 3d 1169, 1180–87 (D. Nev. 2025) (same); *but see KalshiEX LLC v. Orgel*, 26-cv-00034, 2026 WL 474869, at *7 (M.D. Tenn. Feb. 19, 2026). For purposes of this briefing, Defendants focus on another portion of the definition but submit that no part of the definition is met here.

2025), *appeal docketed*, No. 25-7516; *QCX LLC v. Nessel*, 1:26-CV-710, 2026 WL 1166362, at

*3 (W.D. Mich. Mar. 10, 2026); *KalshiEX, LLC v. Schuler*, 25-cv-1165, 2026 WL 657004, at *5–

6 (S.D. Ohio Mar. 9, 2026), *appeal docketed*, No. 26-3196.   These holdings are persuasive.

Relying on the "statutory text, legislative context, CFTC's post-enactment guidance, and

federalism principles," the U.S. District Court for the District of Nevada interpreted

> 'associated with a potential financial, economic, or commercial consequence' [to]
> mean[] that the event or contingency is itself inherently[11] joined or connected with
> a potential financial economic, or commercial consequence. This means that the
> event or contingency itself has some potential financial, economic, or commercial
> consequence without looking at externalities like potential downstream financial
> consequences such as parties extrinsic to the event betting on it. And it does not
> include consumer transactions that have not historically been known to be swaps,
> such as sports wagers.

*Hendrick*, 817 F. Supp. 3d at 1027; *see id. at* 1027–32 (analyzing phrase).   Similarly, in *Schuler*,

another court noted that the CEA's purpose is better met by the interpretation that "swaps are

limited to events and contingencies that have a...direct and inherent association with matters of

financial, economic, or commercial consequence."  2026 WL 657004, at *5 (cleaned up).

Such an interpretation should be adopted here.

### a.  Interpreting Section 1a(47)(A)(ii)

*__Plain Text__.*  Defendants' reading, and that of *Hendrick, Nessel,* and *Schuler,* aligns with

the plain text of Section 1a(47)(A)(ii) and gives meaning to each of the significant limiting factors

within the definition.  *See Horn v. Med. Marijuana,* 80 F.4th 130, 140 (2d Cir. 2023) (applying

negative-implication canon).

To "associate" means to "connect (someone or something) with something else in one's

mind" or to "connect (something) with something else because they occur together or one produces

---

[11] As discussed *infra* at 16, critiques that the word "inherently" should not guide the scope of "consequences" because it is not in the text are unconvincing because they are used to justify statutory interpretations to "infinity," *Nessel,* 2026 WL 1166362, at *3, not those naturally deduced by a reasonable person.

14

another."  "Associate," The New Oxford American Dictionary, 2d Edition (2005).  Such a connection in the mind cannot reasonably exist unless the potential effects on these types of conditions are sufficiently material and direct.  Thus, Section 1a(47)(A)(ii) requires the event itself to have "some potential financial, economic, or commercial consequence without looking at externalities like potential downstream financial consequences such as parties extrinsic to the event betting on it."  *Hendrick*, 817 F. Supp. 3d at 1027.

In contrast, Plaintiffs' reading would render the "associated with" clause almost meaningless.  Contrary to Plaintiffs' suggestion, there is nothing in the plain text to support or justify the maximalist interpretation that a potential financial consequence may be downstream, removed, or illogically obscure to meet the definition of "swap."  "Anything can potentially have economic ramifications given enough attenuation and happenstance." *Nessel*, 2026 WL 1166362, at *3.  Plaintiffs' suggestion that merely "implicating" consequences is sufficient (Mem. 13), rather than being "associated" with them, has no support in the text whatsoever.  One can imagine limitless occurrences that could have some economic consequence for someone in their life, but Congress cannot conceivably have brought them all within the "exclusive jurisdiction" of CFTC.  Plaintiffs' emphasis on the words "a potential," which in context merely suggests the inherent contingency of event contracts, to support a boundless definition of "swap" fares no better.  "Reading *associated with* to require an inherent connection to those consequences rather than a downstream, attenuated consequence reins in the potential chains of association to infinity," *id.*, consistent with the surrounding text.

**_Federal Statutory Context_**. Statutory context likewise confirms the phrase "associated with" must be given this appropriately constrained meaning.  *United States v. Miller*, 604 U.S. 518, 533 (2025).  Here, the other definitions of "swap" found in Section 1a(47)(A)(i)-(vi) "refer

15

almost exclusively to financial measures, indices, or instruments." *Hendrick*, 817 F. Supp. 3d at 1027; *Nessel,* 2026 WL 1166362, at *3; *Dubin v. United States*, 599 U.S. 110, 124–25 (2023) (applying *noscitur a sociis* canon concerning context of words).  Indeed, Congress declared that the statute is intended to cover transactions that provide for price discovery and hedging risk. 7 U.S.C. §5.  That context reflects statutory principles and purposes that "are better achieved when a 'swap' is understood as a transaction involving financial instruments and measures that traditionally and directly affect commodity prices [or hedge market risk].  Currency exchange rates, the weather, and energy costs all do that; the number of points scored in the Huskies-Bobcats game does not." *Schuler*, 2026 WL 657004, at *6.

Plaintiffs' reading, in contrast, also runs aground on the canon against superfluity by rendering other subdefinitions of swap superfluous. *See United States v. Harris*, 838 F.3d 98, 106 (2d Cir. 2016) (applying canon against superfluity).  In particular, construing section 1a(47)(A)(ii)'s terms as broadly as Plaintiffs seek here would subsume other subdefinitions of "swap." *See Fischer v. United States*, 603 U.S. 480, 490 (2024).  Such an expansive reading would also encompass all licensed gaming because such bets would qualify as swaps and swaps with retail customers must occur on DCMs.  7 U.S.C. § 2(e) (making it "unlawful" for retail customers to enter into a swap unless the swap is entered into on a DCM).

Beyond the CEA itself, when Congress refers to conduct commonly understood to be gambling, betting, or wagering, it speaks clearly and explicitly.  Moreover, such laws manifest "a coherent federal policy: They respect the policy choices of the people of each State on the controversial issue of gambling." *Murphy*, 584 U.S. at 484; *see also Greater New Orleans Broad. Ass'n v. United States,* 527 US 173, 187 (1999) (acknowledging Congress's "decision to defer to, and even promote, differing gambling policies in different States.").

16

For example, 18 U.S.C. §1084 "outlaws the interstate transmission of information that assists in the placing of a bet on a sporting event… if the underlying gambling is illegal under state law." *Murphy*, 584 US at 484, *see also* 18 U.S.C. §1084(b).  Similarly, under 18 U.S.C. §1955, "operating a gambling business violates federal law only if that conduct is illegal under state or local law." *Murphy,* 584 U.S. at 484.  Numerous other federal laws reflect this deference to states regarding gambling.  *See* 15 U.S.C. §§3001(a)(1), 1178; 18 USC §§1952–1953; 31 U.S.C. §5131(b), §5362–5363.  Thus, when Congress speaks on gambling, it not only uses particular words (bets, wagers, etc.), but it also consistently evinces an intent to *support and assist* state police efforts, not to *eviscerate* states' ability to regulate or prohibit it, as Plaintiffs claim the CEA should be read to do.  *See KalshiEX LLC v. Martin*, 793 F. Supp. 3d 667, 679–84 (D. Md. 2025); *Schuler*, 2026 WL 657004 at *8.

Congress did not intend to legalize and centralize sports, political, or entertainment/culture betting under the CEA, severely undermining additional federal statutes, and preempting the states from regulating gambling, so long as for-profit DCMs self-certify their bets as "event contracts." *Whitman v. Am. Trucking Associations*, 531 U.S. 457, 468 (2001) (Congress does not "hide elephants in mouseholes."); *Learning Resources, Inc. v. Trump*, 146 S. Ct. 628, 676 (2026) (Kagan, J., concurring); *Bond v. United States*, 572 U.S. 844, 858 (2014) (courts must be "certain of Congress' intent before finding that federal law overrides the usual…balance of federal and state powers") (cleaned up).  *See also Epic Sys. v. Lewis*, 584 U.S. 497, 510 (2018) (presumption against implied repeals), *United States v. Five Gambling Devices*, 346 U.S. 441, 450 (1953); *Martin*, 793 F. Supp. 3d at 683; *Schuler*, 2026 WL 657004 at *8.  By Dodd-Frank, "Congress was bringing risky financial products out of the shadows that had threatened the stability of the entire U.S.

17

financial sector…. Congress was not enabling nationwide gambling on CFTC-designated exchanges." *Hendrick*, 817 F. Supp. 3d at 1031; *Martin*, 793 F. Supp. 3d at 679–84.

Lastly, by declining to challenge the AG's ability to bring claims involving 18 U.S.C. §1084(a), Plaintiffs acknowledge that Congress, through an ancillary definition in the CEA, did not repeal federal criminal statutes targeting bets, wagers, or gambling conduct that depend to some degree on state gambling law being operative. There is no basis to conclude that Congress, while leaving federal criminal statutes that are dependent on state gambling laws in place, intended to curtail or preempt those underlying state laws in substantial part. *Epic,* 584 U.S. at 515 ("more than a little doubtful" that Congress "trample[s] the work done by these other laws").

***Major Questions Doctrine.***  The major-questions doctrine provides yet another reason to reject Plaintiffs' interpretation. *Ala. Ass'n of Realtors v. Dep't of Health & Human Servs.*, 594 U.S. 758, 764 (2021) (employing major-questions and federalism canon, and notion that the "sheer scope" of an agency's argument would counsel against its position).  "[C]ourts expect Congress to speak clearly if it wishes to assign to an agency decisions of vast economic and political significance." *West Virginia v. EPA*, 597 U.S. 697, 716 (2022) (cleaned up); *Ala.*, 594 U.S. at 764. Gambling is unquestionably an area of vast economic and political significance, *see supra* n.6, particularly given, for example, the speed and volume of cash exchanged, state taxation, job creation, and government regulation.

***Legislative History.***  Finally, the CEA's legislative history provides further support that Congress never meant to encompass sports betting within the definition of "swaps."  Dodd-Frank sought to remedy regulatory failures concerning credit default swaps and other derivatives following the 2008 financial crisis.  *Hendrick*, 817 F. Supp. 3d at 1028–29.  This legislative purpose supports a definition of "swaps" as instruments meant to facilitate hedging risk.  *See Inv.*

18

*Co. Inst. v. CFTC*, 891 F. Supp. 2d 162, 168 n.3 (D.D.C. 2012) (such contracts "provide a way to transfer market risk or credit").  The legislative debate even addressed that "swaps" do not reach sports betting because these "types of contracts would not serve any real commercial purpose. Rather, they would be used solely for gambling."  56 Cong. Rec. S5902-01, 2010 WL 2788026, at S5906-07.  Plaintiffs' claims bear "little realism when responsible congressional committees and leaders, in managing a bill, have told Congress that the bill will not reach that which the Act is invoked in this Court to cover."  *Five Gambling Devices*, 346 U.S. at 450; *see also Bond*, 572 U.S. at 861–62.

### b.  Applying Section 1a(47)(A)(ii)

Thus defined, "swaps" are not what Coinbase and Gemini are selling.  Plaintiffs concede that commodity derivative markets exist to "hedge" economic risks, that is "managing the various price risks incidental to commercial activity."  (Mem. 5.)  Plaintiffs fail to explain, however, the alleged economic purpose underlying Coinbase and Gemini's offerings such as:

- "Will Taylor Swift meet with Pope Leo XIV before 2027?"

- "Will Josh Allen throw more than 175 yards in game?

- "Will Doctors Without Borders be the 2026 Nobel Peace Prize winner?"

- "Will Oklahoma City beat San Antonio over 2.5 points?"

- "Will Democrats hold more governorships after the midterms?"

*See, e.g.,* Decl. Ex. 13 (sample offerings).  Nor can they.  Plaintiffs have no evidence whatsoever of market needs these wagers purport to fill.  Plaintiffs mention "numerous stakeholders" (but not retail customers) and allege they could have hypothetical risk rising from a given athlete's performance before halftime in a single game, but offer no evidence that any exist, or that any hedging or price discovery takes place, let alone that which is affected with a "national public

19

interest," 7 U.S.C. §5.  The evidence does show, however, that customers are encouraged to bet "as entertainment," not for any economic purpose. *See supra* at 3; *Hendrick*, 817 F. Supp. 3d at 1029.  Coinbase and Gemini's platforms bear classic indicia of a gambling operation and are indistinguishable from mobile sports betting sites.  *Supra* 7-9.  DCMs even undertake targeted expansion campaigns to increase their retail base.[12]

And the types of "consequences" Plaintiffs point to—untethered effects on "ticket and merchandise sales, advertising, brand endorsements, vendors, lodging businesses, and food and beverage services" (Mem. 13) based on a team or athlete's performance in a specific game, or effects on "tax and spending policy" in connection with an election outcome (*id.*)—are exactly the kinds of remote and downstream externalities that cannot reasonably falls within any definition of "swaps."  *See Hendrick,* 817 F. Supp. 3d 1027; *Nessel*, 2026 WL 1166362, at *3 ("[Although] individual happenings within a sporting event, such as the number of points scored, can have economic ramifications in terms of 'the team's valuation, retailers' sales of team merchandise, and the hometown economy[,]'…[t]hese are all potential consequences dependent on the reactions of parties outside the game," falling outside the definition of "swaps").  *Even prediction markets themselves* concede that "What is the color of a Gatorade shower [after a game] going to be" is beyond the definition of "swap."  *KalshiEX LLC v. Orgel*, 26-cv-00034, ECF 47, Tr. 74–75.  They also conceded that "a coin flip would not be a swap because it does 'not have independent real-world consequences' and that would not change just because people bet on it." *Hendrick*, 817 F. Supp. 3d at 1028 n.3.  None of these offerings, or those at issue in this case, fall within any reasonable definition of "swap."

---

[12] *See, e.g.,* Hannah Erin Lang & Oyin Adedoyin, *Women Wanted: Kalshi Pushes to Expand Far Beyond Sport Bets*, Wall Street Journal (Mar. 8, 2026, 7:00 AM) https://www.wsj.com/business/media/kalshi-says-it-channels-the-wisdom-of-crowds-it-just-needs-more-women-fb11f3cd (Decl. Ex. 14).

Cases that have found otherwise—*KalshiEX LLC v. Flaherty,* 172 F.4th 220, 227 (3d Cir. 2026); *KalshiEX LLC v. Johnson*, 2026 WL 1223373, at *5 (D. Ariz. 2026); and *Orgel*, 2026 WL 474869, at *7–8 (M.D. Tenn. Feb. 19, 2026)—apply unnecessarily maximalist, "pretty broad," and "lenient" approaches to their reading (*Orgel* at *8), and none considers the meaning in the context of the larger statute, any canon of construction, or the historical context, and only give passing consideration of pre-Dodd-Frank legislative history.

The *Flaherty* majority, for example, refused to address that its interpretation of "swap" would yield absurd results like "bingo games to pingpong matches" falling under the CEA, claiming it to be unnecessary because CFTC itself has the authority to promulgate rules with a narrower construction. 172 F.4th at 227–28; *Johnson*, 2026 WL 1223373, at *5 (same). But these answers avoid reconciling that Plaintiffs' interpretation of "swap," on its face, *does* allow anyone to avoid state regulations of, for example, ping-pong matches, simply by registering as a DCM and self-certifying offerings, a result that is patently contrary to the structure of the CEA, the intent of Congress, numerous canons of statutory constructions noted above, and the legislative history.

Finally, Plaintiffs make the erroneous slippery-slope argument that "[c]arving out sports and political event contracts" would "destabilize" the "previously uncontroversial markets" of "corn production" and "weather," by subjecting them to state gambling laws. (Mem. at 13–14.) This is a nonsensical false choice for which Plaintiffs offer no evidence. Agricultural and weather derivatives are not at issue in the State Enforcement Actions. Nor do Plaintiffs provide evidence that the injunctions issued against Coinbase and other entities in other states, *see supra* at 10, created rapid market declines and increased volatility in corn or weather futures. If anything, it is construing the definition of "swap" to have no limit in order to accommodate recreational gambling on things that are demonstrably *not swaps* like sports on DCMs that begs regulatory

21

chaos.  Moreover, agricultural and exchanged-based weather derivatives *predate* the addition of "swaps" and "excluded commodities" to the CEA, and Section 1a(47)(A)(iii) expressly defines "commodity swaps," "agricultural swaps," and "weather swaps."[13]  "[W]eather (and its impacts on agriculture, among other things)…are linked to the national interest in a way that the outcome of a sporting event or how many points a particular team scores are not." *Hendrick*, 817 F. Supp. 3d at 1027 n.2.  The Court should not accept the self-serving proposition that the CEA must be twisted to insulate illegal betting for the sake of financial derivatives in weather and corn.

### iii.    The "Event Contracts" are not swaps under the plain meaning of Section 1a(47)(A)(i)

Plaintiffs state that, "depending on their structure," event contracts "*may* also satisfy other prongs of the swap definition[.]" (Mem. 3 n.5 (emphasis added)), and "[a]s binary options, event contracts are also swaps under 7 U.S.C. §1a(47)(A)(i)" (as opposed to (A)(ii) discussed *supra* Section I(B)(ii)) (Mem 13.).  Defendants are aware of no DCM or FCM claiming its offerings are swaps under 7 U.S.C. §1a(47)(A)(i), and with good reason.  Plaintiffs include no allegation or analysis concerning the offerings *at issue in this case*, but to any extent they mean to make this argument, it fails.

Section 1a(47)(A)(i) refers exclusively to financial measures, indices, or instruments and is even more restrictive than the definition of swap under Section 1a(47)(A)(ii).  Plaintiffs do not identify what "quantitative measures, or other financial or economic interests or property" described in Section 1a(47)(A)(i) are applicable to Coinbase or Gemini offerings here.  The result of a ballgame, for example, cannot be read into the definition beside "commodities, securities, instruments of indebtedness" under the *noscitur a sociis* canon.  Finding otherwise begs whether

---

[13] Marsha Burton & Daniel Rosenberg, *CME Takes Market's Temperature On Weather Derivatives*, Dow Jones Energy Service (Feb. 5, 1999) (Decl. Ex. 15).

even the outcomes of traditional casino games are also subject to the CEA, a point that Plaintiffs and DCMs otherwise appear to be trying to avoid.

Moreover, an option is defined in Section 1a(36) as "an agreement, contract, or transaction ***that is of the character of, or is commonly known to the trade as, an 'option'***, 'privilege', 'indemnity', 'bid', 'offer', 'put', 'call', 'advance guaranty', or 'decline guaranty[.]'" (emphasis added). Plaintiffs provide no evidence (nor can they) that a bet on a baseball game, a primary election, or a pop song reference is commonly known as an "option." including to the retail customers who make up the vast majority of users. This definition does not apply here.

### C.     Even If The Event Contracts Are "Swaps," The CEA Does Not Preempt New York Laws

There are three types of federal preemption: (1) "express," (2) "field," where "Congress has legislated so comprehensively that federal law occupies an entire field of regulation and leaves no room for state law;" and (3) "conflict" where state law conflicts with federal law "[i] such that it is impossible for a party to comply with both or [ii] the local law is an obstacle to the achievement of federal objectives." *N.Y. SMSA v. Town of Clarkstown*, 612 F.3d 97, 104 (2d Cir. 2010) (internal quotation omitted). Plaintiffs bear a "considerable burden of overcoming the starting presumption that Congress does not intend to supplant state law." *De Buono v. NYSA–ILA Med. & Clinical Servs. Fund*, 520 U.S. 806, 814 (1997) (cleaned up). Plaintiffs' claim fails under all three theories under any standard.

### a. The CEA Does Not Expressly Preempt New York Law.

Express preemption arises when "a federal statute expressly directs that state law be ousted." *Ass'n of Int'l Auto. Mfrs. v. Abrams*, 84 F.3d 602, 607 (2d Cir.1996). If "a federal law contains an express pre-emption clause, it does not immediately end the inquiry because the question of the substance and scope of Congress' displacement of state law still remains." *Altria*

23

*Grp. v. Good*, 555 U.S. 70, 76 (2008).  "The purpose of Congress is the ultimate touchstone in every pre-emption case," discerned in part from the "structure and purpose of the statute as a whole," and the court's "reasoned understanding of the way in which Congress intended the statute and its surrounding regulatory scheme to affect business, consumers, and the law."  *Medtronic v. Lohr*, 518 U.S. 470, 485–86 (1996) (cleaned up).

Plaintiffs argue that the Racing Law and Penal Law are expressly preempted under Section 2(a)(1)(A).  (Mem. 14–16.)  In their Complaint, Plaintiffs also seem to claim Section 16(e) expressly preempts these laws.  (Compl. ¶¶88, 97.)  These arguments are wrong.

Section 2(a)(1)(A) does not establish that Congress's clear and manifest purpose was to preempt New York gaming law as applied to DCMs.  Denying a stay of an injunction pending appeal, the Sixth Circuit observed that Section 2(a)(1)(A) addresses "jurisdiction," rather than "preemption," and includes multiple savings clauses and vague language concerning its scope and effect.  *KalshiEX LLC v. Schuler*, 26-3196, 2026 WL 1295806, at *4 (6th Cir. Apr. 24, 2026).  Section 16(e)(2), on the other hand, is an express preemption clause that preempts state gaming laws for certain limited kinds of swaps which are not at issue here.  *Martin*, 793 F. Supp. 3d at 680–81; *Schuler*, 2026 WL 1295806, at *4.  The Sixth Circuit held that Congress's choice to "expressly preempt only certain categories of state laws shows that it did not mean to 'withdraw' the States' power to enact all such laws in other circumstances."  *Id.* (citation omitted); *see Cipollone v. Liggett Grp.*, 505 U.S. 504, 517 (1992).  The savings clause set forth in Section 16(e)(1)(B)(2) (*see, e.g.*, Compl. ¶¶50–51), that section does not apply to swaps, *see* 7 U.S.C. §2(d), and cannot be used to counter the opposite inference from the express preemption provisions that do.  Had Congress wanted to preempt all state gaming law through the CEA, as Plaintiffs'

24

claim, it could have done so. *See generally Buono v. Tyco Fire Prods., LP*, 78 F.4th 490 (2d Cir. 2023); *Schuler*, 2026 WL 1295806, at *4.

### b.    The CEA Does Not Field-Preempt New York Law.

Field preemption is "rare" and "occurs when Congress manifests an intent to occupy an entire regulatory field to the exclusion of the states." *N.Y. State Telecomms. Ass'n. v. James*, 101 F.4th 135, 147 (2d Cir. 2024). "In all pre-emption cases," courts presume Congress did not preempt state law, "particularly" in "a field which the States have traditionally occupied." *Medtronic*, 518 U.S. at 485 (cleaned up). "[B]ecause the States are independent sovereigns in our federal system," courts "start with the assumption that the historic police powers of the States were not meant to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Id*. (citation omitted).

Here, "the presumption against preemption applies[.]" *Martin*, 793 F. Supp. 3d at 677; *see also Schuler*, 2026 WL 1295806, at *5. States' authority to regulate gambling conducted within their borders is long established. *See, e.g., Murphy*, 584 U.S. at 458–59; *Ah Sin v. Wittman*, 198 U.S. 500, 505–06 (1905). New York law regulating and policing gambling spans 250 years. *See supra* at 4.

*Schuler* and *Martin* both correctly found that the CEA does not field-preempt state gaming laws. *Schuler*, 2026 WL 1295806, at *5; *Martin*, 793 F. Supp. 3d at 684; *see also Flaherty*, 172 F.4th at 236–38 (Roth, J., dissenting). The Court should also decline to find field preemption for the reasons set forth in those decisions.

There is no field preemption here because the CEA "often permits state regulation." *Schuler*, 2026 WL 1295806, at *5. First, "the presence of a savings clause usually signals that Congress does not mean to preempt the field," *id.*, and the CEA has many, including the savings clauses contained within the provision at issue. Moreover, the savings clauses in Section

25

2(a)(1)(A) indicates that "Congress did not intend to preempt the field of futures trading." *Id.*; *see Kerr v. First Commodity Corp.*, 735 F.2d 281, 288 (8th Cir. 1984).

Second, although Plaintiffs argue the Special Rule "emphasizes" CFTC's "exclusive jurisdiction" (Mem. 15), the opposite is true. The Special Rule's allowance for exclusions based on state law confirms that Congress intended for some state laws to operate alongside the CEA. *Schuler*, 2026 WL 1295806, at *6. "[W]here 'coordinate state and federal efforts exist within a complementary administrative framework, and in the pursuit of common purposes, the case for federal pre-emption becomes a less persuasive one.'" *Coal. for Competitive Elec., Dynegy v. Zibelman*, 272 F. Supp. 3d 554, 567 (S.D.N.Y. 2017) (quoting *Hughes v. Talen Energy Mktg.,* 578 U.S. 150, 167 (2016) (Sotomayor, J., concurring)).

Third, reading the "exclusive jurisdiction" provision in Section 2(a)(1) to preempt *all* state gaming law would render Section 16(e)(2) and (h)(2) meaningless. *See Schuler*, 2026 WL 1295806, at *4; *Martin*, 793 F. Supp. 3d at 680–81. This inference is strengthened by Section 2(a)(1)(A)'s savings clause that nothing "supersede[s] or limit[s] the jurisdiction ... conferred on ... regulatory authorities under the laws of ... any State" or "restrict[s] … such other authorities from carrying out their duties and responsibilities in accordance with such laws." 7 U.S.C. §2(a)(1)(A). The legislative history Plaintiffs use to interpret "exclusive jurisdiction" predates Dodd-Frank and the Special Rule (Mem. 16–17, 19), and "the limited legislative history that exists from 2010 that bears on the scope of Congress's preemptive intent cuts against preemption." *Martin*, 793 F. Supp. 3d at 683; *see also Schuler*, 2026 WL 657004, at *8.

Finally, as discussed, *supra* at Section I(B)(ii), "[i]t is highly unlikely that Congress would have overridden state gambling laws without at least some indication in the text and legislative history." *Martin*, 793 F. Supp. 3d at 682; *Schuler*, 2026 WL 657004, at *8 ("History reveals no

26

evidence that Congress intended to preempt state sports gambling laws."); *see also Five Gambling Devices*, 346 U.S. at 450.

Plaintiffs rely on *Flaherty* to argue that "Congress 'occupied the field' of regulation of event contracts traded on CFTC-regulated DCMs." (Mem. 16 (citing *Flaherty*, 172 F.4th at 228).) Among the flaws in that decision (and *Johnson* and *Orgel*), *Flaherty* did not apply a presumption against preemption and limited its analysis to interpreting Section 2(a)(1)(A), without considering whether Congress manifestly intended to preempt state gaming laws with the addition of "swaps" to the CEA.  (*Schuler*, 2026 WL 1295806, at \*5, and *Martin*, 793 F. Supp. 3d at 676–84, by contrast, considered this question, and thus have greater persuasive value.  *See also Flaherty*, 172 F.4th at 233-238 (Roth, J., dissenting).)  *Flaherty* determined that there was no historic state police power at issue because "[s]tates have long regulated intrastate gambling, but not interstate gambling." 172 F.4th at 230 n.4 (citing *Churchill Downs Tech. Initiatives Co. v. Mich. Gaming Control Bd.*, 162 F.4th 631, 641 n.5 (6th Cir. 2025)).  However, *Flaherty* ignored the Supreme Court's guidance that courts must look to "the target at which the state law *aims* in determining whether that law is pre-empted."  *Oneok v. Learjet*, 575 U.S. 373, 385 (2015) (emphasis in original).  There, because the state law was found to directly "target" a related federal statute, *Churchill Downs*, 162 F.4th at 639, the court did not apply the presumption.  *Id*. at 641 n.5.  Had the state law not "target[ed] the [federal] scheme," there "might not [have] be[en] a conflict" because "any effect" on the federal law "would lie downstream of Michigan's earnest effort to regulate its residents' primary conduct."  *Id*. at 639.

*Flaherty* also gave deference to the DCMs' assertion that their "swap" self-certification could exempt them from state compliance.  This has no basis. *See Hendrick*, 817 F. Supp. 3d. at 1025–26 ("A DCM cannot insulate itself from state regulation through self-certification where its

27

conduct does not fall within the CFTC's exclusive jurisdiction provision."). Finally, *Flaherty* did not consider either Section 16(e)(2) or 16(h), instead focusing on the saving clause under Section 16(e)(1)(B)(i), which does not apply to swaps. 172 F.4th at 229.

Neither the structure, context, nor legislative history of the CEA support or "establish that Congress clearly and manifestly intended to preempt state sports-betting laws." *Martin*, 793 F. Supp. 3d at 679. Plaintiff's field preemption argument therefore fails.

### c. The CEA Does Not Conflict-Preempt New York Law.

Conflict preemption exists where state law conflicts with federal law "such that it is impossible for a party to comply with both or the [state] law is an obstacle to the achievement of federal objectives." *Figueroa v. Foster*, 864 F.3d 222, 228 (2d Cir. 2017). Burdens under both branches of conflict preemption are "heavy" and "sharp." *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, 725 F.3d 65, 101 (2d Cir. 2013) (quotation omitted) ("*MTBE*").

"[I]mpossibility occurs when state law penalizes what federal law requires, or when state law claims directly conflict with federal law." *Figueroa,* 864 F.3d at 234 (quotation marks and citation omitted). Impossibility is a "demanding defense, and [the Second Circuit] will not easily find a conflict that overcomes the presumption against preemption." *MTBE*, 725 F.3d at 97 (cleaned up). "If there was any available alternative for complying with both federal and state law—even if that alternative was not the most practical and cost-effective—there is no impossibility preemption." *Id.* at 99.

Obstacle preemption "precludes state law that poses an actual conflict with the overriding federal purpose and objective." *Id*. at 101 (quotation marks and citation omitted). "What constitutes a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects." *Id*. (same). The "mere fact of tension" is not sufficient for preemption; the conflict must be "so direct and positive that the

28

two acts cannot be reconciled or consistently stand together." *Id*. at 101–02 (same). Significantly, conflict preemption does not lie even where "it is possible, even likely, that a [state] restriction…could make it much less profitable" to operate in New York. *Seggos*, 121 F.4th at 436.

There is no evidence of impossibility or obstacle preemption here. Like field preemption, because New York has historic police powers over gaming, the court considers whether Congress manifested its intent to preempt through the scope, structure, and purpose of the CEA. *See, e.g.*, *Figueroa*, 86 F.3d at 232. For the reasons set forth *supra* at 24–29, the answer here is no. Plaintiffs have therefore failed to demonstrate how the Racing Law or Penal Law conflict with or stand as obstacles to achieving the CEA's purposes. *Schuler* and *Martin* also declined to find conflict preemption and are persuasive on this point. *Schuler*, 2026 WL 1295806, at *5–6; *Martin*, 793 F. Supp. 3d at 684–86.[14]

Plaintiffs have not shown, or even alleged, how complying with New York law would prevent DCMs from complying with federal law. Plaintiffs state that "[s]tate gambling laws often require local licensing, fees, enforcement, and specific hardware" (Mem. 18) but fail to establish any *actual* conflict created by compliance in these hypothetical categories. Indeed, state regulations permit an entity, with Gaming Commission approval, to acquire a current licensee. 9 NYCRR §§5330.3(c), 5330.5. Their claim that conflict preemption is satisfied because a DCM might have to comply with more than just federal law, resulting in a "patchwork," merely repeats their field preemption argument. It is belied by the fact that the DCMs are subject to state law in other areas. *Schuler*, 2026 WL 1295806, at *4–6.

---

[14] *Johnson*, 2026 WL 1223373, at *7–8, and *Flaherty*, 172 F.4th at 229–30, are wrong on this. *See id.* at 238–41 (Roth, J., dissenting).

Plaintiffs' claim that conducting sports wagering pursuant to Racing Law §1367(1)(b) directly conflicts with the CEA's requirement to provide "impartial access to its markets and services" under 17 C.F.R. §§38.151(b) and 38.150 was correctly rejected by *Schuler* and *Martin*. *Schuler*, 2026 WL 1295806, at \*6; *Martin*, 793 F. Supp. 3d at 686; *see also Flaherty*, 172 F.4th at 239 (Roth, J., dissenting). Regulatory history shows the "impartial access" rules mandate access for participants of all economic means, not geographic locations. *See, e.g., Schuler*, 2026 WL 1295806, at \*6*;* Core Principles and Other Requirements for Designated Contract Markets, 75 Fed. Reg. 80572, 80579 (proposed Dec. 22, 2010). Ceasing to offer sports, elections, and entertainment/social "event contracts" in New York would therefore not run afoul of this rule. *Id.* Plaintiffs also provide no evidence that DCMs operate or are required to operate in all 50 states.

Absent any conflict, Plaintiffs are left with the untenable argument that state laws are conflict preempted because CFTC has not yet taken action against Coinbase and Gemini's prohibited listings. *Cf. Fellner v. Tri-Union Seafoods,* 539 F.3d 237, 247 (3d Cir. 2008) ("mere deliberate agency inaction—an agency decision not to regulate an issue—will not alone preempt state law.").

There is no preemption here.

## II.    PLAINTIFF HAS NOT SHOWN A LIKELIHOOD OF IRREPARABLE HARM

"To establish irreparable harm, the moving party must show an injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages." *St. Joseph's Hosp. Health Ctr. v. Am. Anesthesiology of Syracuse, P.C.*, 131 F.4th 102, 106 (2d Cir. 2025) (cleaned up). Plaintiffs have failed to do so.

### A.    Plaintiffs' Allegations Regarding a Supremacy Clause Violation Do Not

**Amount to Automatic Irreparable Harm.**

Plaintiffs argue that irreparable harm "necessarily results from the enforcement of an unconstitutional state law," citing *Goldie's Bookstore v. Superior Court of California*, 739 F.2d 466, 472 (9th Cir. 1984) and *United States v. Alabama*, 691 F.3d 1269, 1301 (11th Cir. 2012). (Mem. 19–21.)[15] But those cases presuppose that Plaintiffs have met their merits burden. Because Plaintiffs' claims are meritless, their asserted harm "is not of a constitutional dimension." *See We The Patriots*, 17 F.4th at 294

Moreover, mere injury is different than irreparable harm, which carries a far greater burden. Constitutional violations in this Circuit usually only amount to irreparable harm in cases "involving alleged infringements of free speech, association, privacy, or other rights as to which temporary deprivation is viewed of such qualitative importance as to be irremediable by any subsequent relief." *Barrett v. Harwood*, 967 F. Supp. 744, 746 (N.D.N.Y. 1997) (cleaned up), *aff'd*, 189 F.3d 297 (2d Cir. 1999); *see also Chan v. U.S. Dep't of Trans.*, 23-cv-10365, 2024 WL 5199945, at *45 (S.D.N.Y. Dec. 23, 2024). Irreparable harm is not presumed for violations of constitutional provisions that serve structural purposes and are not accompanied by some tangible harm such as physical harm or loss of liberty. *See Am. Petroleum Inst. v. Jorling*, 710 F. Supp. 421, 431 (N.D.N.Y. 1989); *see also Chan*, 2024 WL 5199945, at *46 (collecting cases). Plaintiffs' citation to *Goldie's* is unavailing because it both concerned such personal constitutional rights and found no irreparable harm. To the extent Plaintiffs' characterization of *Alabama* as collapsing the merits and irreparable harm analysis for such cases may reflect the law in the Eleventh Circuit, that is not the law in this Circuit as explained *supra*. Thus, Plaintiffs' allegations of a violation of the Supremacy Clause are not sufficient to support finding irreparable harm

---

[15] Plaintiffs also cite to *Crosby v. National Foreign Trade Council*, 530 U.S. 363 (2000) and *American Insurance Association v. Garamendi*, 539 U.S. 396 (2003), but those cases did not opine on irreparable harm, even in *dicta*.

31

### B.    Plaintiffs Cannot Impute DCMs' Harms to Themselves.

Plaintiffs cannot conflate alleged harm to DMCs with harm to the federal government. (Mem. at 20.)  "Generally, litigants in federal court are barred from asserting the constitutional and statutory rights of others in an effort to obtain relief for injury to themselves." *Kane v. Johns-Manville.*, 843 F.2d 636, 643 (2d Cir. 1988) (citations omitted).

Also unavailing is Plaintiffs' claim that their "ability to enforce its policies and achieve its objectives" are "undermined by the state's enforcement of statutes that interfere with federal law." (Mem 20.)  To assert this kind of injury, the government must show how the state law "imped[es] the operations or functions of the federal government."  *United States v. California*, 2026 WL 784514, at *3 (C.D. Cal. 2026).

Plaintiffs have not done so.  If CFTC means to argue it lacks the capacity to field inquiries from DCMs regarding the interplay between state and federal law (Mem. at 20; Beale Dec. ¶7), Defendants submit that this may have more to do with CFTC staffing levels than the volume of inquiries from DCMs.[16] *See Kilinc v. PMMUE Eduservices Private*, 2026 WL 601937, at *8 (S.D.N.Y. March 4, 2026) ("If the harm complained of is self-inflicted, it does not qualify as irreparable.") (citations omitted).

## III.    THE EQUITIES DO NOT FAVOR A PRELIMINARY INJUNCTION

The equities and public interest weigh heavily against enjoining Defendants.  New York has a significant interest in protecting the public's welfare through the challenged laws.  The effect of an injunction—preventing New York from policing illegal gambling by DCMs within the state or *even investigating it*—will allow these betting activities to continue their exponential growth

---

[16] *See* Marshall Cohen, *As prediction markets explode in popularity, the regulator that polices them has been shrinking*, CNN (April 26, 2026, 5:00 AM) https://www.cnn.com/2026/04/26/politics/commodity-futures-trading-commission-shrinking-prediction-markets (Decl. Ex. 16).

unchecked, resulting in ongoing public harm. *Hendrick*, 817 F. Supp. 3d at 1035 (strong interest in gambling regulation); *Schuler*, 2026 WL 1295806, at *7; *Nessel*, 2026 WL 1166362 at *4.

First, State regulations contain numerous consumer protections, implementing detailed measures for responsible gaming, age verification, and problem gambling prevention, among other things. For example, sports wagering is prohibited for individuals under 21. *See, e.g.,* 9 NYCRR §§5330.8, 5330.10(d)(5), 5330.19. New York also restricts advertising, marketing, and promoting mobile sports wagering to underage persons. Racing Law §1367-a(4)(e); 9 NYCRR §5330.45. Ads must display clear information about the risks of gaming and resources like 1-877-8-HOPENY. 9 NYCRR §5330.34 (responsible gaming).

These and other numerous regulatory mechanisms not listed exist for vital reasons. As of 2022, mobile sports betting surpassed casino gambling as the primary reason for gambling-related helpline calls made by New Yorkers.[17] There is evidence that those with gambling addictions are suffering relapses through their exposure to prediction markets.[18] Prediction markets even target ads to people in economic distress, offering gambling as a solution to pay rent.[19] The NCAA, NBA, and PGA have all raised significant concerns about underage participation.[20] Yet DCMs market themselves broadly to entice the public to participate in recreational gambling, and

---

[17] Rebecca Cooper et al., *Gambling Harms and Gambling Disorder Healthcare and Service Utilization in New York State*, Addiction Data Bulletin (No. 2025-06), (Apr. 2025) ("OASAS Report") (Decl. Ex. 17 at 2).

[18] Jay Cohen & Cora Lewis, *Prediction markets say they're different from sportsbooks. Gambling addicts say it's all the same*, The Associated Press (May 1, 2026, 9:02 AM) https://apnews.com/article/kalshi-polymarket-prediction-markets-45ffa90f68402461fcad768ce54caf6d (Decl. Ex. 18).

[19] *See* Caitlin Ostroff et al., *Why Almost Everyone Loses—Except a Few Sharks—on Prediction Markets*, Wall Street Journal (May 3, 2026, 9:00 PM) https://www.wsj.com/finance/investing/polymarket-kalshi-betting-profits-prediction-markets-eb23ac11 (Decl. Ex. 19).

[20] *See* Suzy Khimm, *NBA, PGA and NCAA push for higher age minimum for sports prediction markets*, NBC News (May 1, 2026) https://www.nbcnews.com/news/us-news/nba-pga-ncaa-want-higher-age-limits-prediction-markets-rcna343093 (Decl. Ex. 20).

individuals as young as 18 may use their platforms.[21]  The meme nature of many of these offerings is expressly targeted at young people, and was recently described as "Gen Z's Joe Camel" moment.[22]

Second, gambling on any New York-based college sports team is unlawful.  Racing Law §§1367(1)(s), 1367-a(4)(a)(xi); *see also* 9 NYCRR §5330.13.  Yet DCMs offer bets on New York college sports.[23]  In addition, over objections from the NCAA and others, "prediction markets have begun offering contracts that resemble prop bets [on college athletes], carrying the same risks of manipulation and corruption that the NCAA is actively seeking to address."[24]

Third, an injunction will *continue to flood* the state with more sports wagering without regulation aimed at retail customers or integrity controls.  Despite Plaintiffs' extolling the "important protections" CFTC provides (Mem. 4), they tellingly do not cite a single CFTC existing regulation that contains any gambling regulation equivalent to New York's.  The current status of the law dictates that Plaintiffs' requested injunction would leave people in New York unprotected.

Finally, the presence of the United States does not tip the balance even though it claims sovereign injury; states' interests in the health and safety of their citizens are not subservient to the federal government's interest in facilitating services devoid of economic purpose.  *Cf. United States v. Texas*, 97 F4th 268, 296 (5th Cir. 2024) (primacy of foreign treaty obligations).  The

---

[21]  Associated Press, *Gen Z's Joe Camel moment: how prediction markets learned to speak in memes*, Fortune (May 28, 2026) https://fortune.com/2026/05/28/prediction-markets-gen-z-joe-camel-memes-kalshi-polymarket/ (Decl. Ex. 21).

[22] *Id.*

[23] *See, e.g.*, Tomer Aff. ¶8.

[24] Jon Israel et al., *Ticking time bomb goes off: Seeing the impact of sports betting on college athletes and integrity*, Sports Business Journal (Apr. 22, 2026) https://www.sportsbusinessjournal.com/Articles/2026/04/22/ticking-time-bomb-goes-off-seeing-the-impact-of-sports-betting-on-college-athletes-and-integrity/ (Decl. Ex. 22).

equities strongly favor the interests over the interests of the billion-dollar corporations Plaintiffs are attempting to shield from longstanding state regulation.

## CONCLUSION

For the reasons set forth above, Defendants respectfully request that the Court deny Plaintiffs' motion for a preliminary injunction.

Dated: New York, New York
      June 4, 2026

                        Respectfully submitted,


                        LETITIA JAMES
                        Attorney General
                        State of New York
                          *Attorney for Defendants*

                        By: /s/*Katherine Rhodes Janofsky*

                        KATHERINE RHODES JANOFSKY
                        ZACHARY MANLEY
                        Assistant Attorneys General
                        28 Liberty Street, New York, NY 10005
                        (212) 416-8621
                        Katherine.Janofsky@ag.ny.gov

## WORD COUNT CERTIFICATION

In accordance with Rule 7.1 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York and the Court's Individual Practices, I hereby certify that the MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION contains 10,233 words (including footnotes), exclusive of cover page, tables of contents and authorities, and signature block, as established using the word count function of Microsoft Word.

By: /s/*Katherine Rhodes Janofsky*

KATHERINE RHODES JANOFSKY
Assistant Attorney General

36