**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| THE UNITED STATES OF AMERICA and COMMODITY FUTURES TRADING COMMISSION,<br><br>                  Plaintiffs,<br><br>             v.<br><br>STATE OF NEW YORK, *et al.*,<br><br>                  Defendants. | Case No. 1:26-cv-3404 |

**PLAINTIFFS' REPLY TO DEFENDANTS' MEMORANDUM OF LAW IN**
**<u>OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION</u>**

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT..............................................................................................................1

SCOPE OF LITIGATION.................................................................................................................2

ARGUMENT ...................................................................................................................................3

I.    Event contracts are "swaps" under the CEA............................................................................3

II.   New York's laws are preempted as applied ...........................................................................6

      A.    Express preemption...........................................................................................................6

      B.    Field preemption ..............................................................................................................8

      C.    Conflict preemption ..........................................................................................................10

III.  Plaintiffs will be irreparably harmed without a preliminary injunction.............................11

IV.   The equities favor a preliminary injunction...........................................................................12

CONCLUSION.................................................................................................................................13

i

**TABLE OF AUTHORITIES**

Cases

*Altria Grp., Inc. v. Good,*
  555 U.S. 70 (2008).........................................................................................................6

*American Agric. Movement v. Board of Trade of City of Chicago*,
  977 F.2d 1147 (7th Cir. 1992) ....................................................................................11

*Arizona v. United States,*
  567 U.S. 387 (2012).....................................................................................................10

*Chamber of Com. of U.S. v. Whiting*,
  563 U.S. 582 (2011).......................................................................................................6

*CSX Transp., Inc. v. Easterwood*,
  507 U.S. 658 (1993).......................................................................................................6

*KalshiEX, LLC v. Flaherty*,
  172 F.4th 220 (3d Cir. 2026) ....................................................1, 3–4, 5, 6, 9, 11, 13

*KalshiEX LLC v. Hendrick*,
  817 F. Supp. 3d 1014 (D. Nev. 2025)........................................................................4–5

*KalshiEX LLC v. Johnson*, No. CV-26-01715,
  __ F. Supp. 3d ___, 2026 WL 1223373 (D. Ariz. May 5, 2026)........................4, 7, 9, 10, 11, 13

*KalshiEX LLC v. Orgel*, No. 3:26-cv-00034,
  2026 WL 474869 (M.D. Tenn. Feb. 19, 2026) ........................................................4, 10

*Merrill Lynch, Pierce, Ferner & Smith, Inc. v. Curran*,
  456 U.S. 353 (1982)........................................................................................................8

*New York v. Coinbase*,
  No. 1:26-cv-03300 (S.D.N.Y.).............................................................................4–5, 10, 12

*New York v. Gemini Titan, LLC*,
  No. 1:26-cv-03318 (S.D.N.Y.).............................................................................4–5, 10, 12

*Rice v. Santa Fe Elevator Corp.*,
  331 U.S. 218 (1947).........................................................................................................9

*United States v. California*,
  173 F.4th 1060 (9th Cir. 2026)....................................................................................11, 12

*Weisshaus v. Cuomo*,
  512 F. Supp. 3d 379 (E.D.N.Y. 2021) .....................................................................11–12

Statutes

7 U.S.C. § 1a(47)(A)(ii), CEA § 1a(47)(A)(ii) .......................................................1, 3, 5

7 U.S.C. § 2(a)(1)(A), CEA § 2(a)(1)(A) ...................................................................1, 3, 7

7 U.S.C. § 2(d), CEA § 2(d) ......................................................................................7, 8

7 U.S.C. § 7a-2(c)(5)(C)(i), CEA § 7a-2(c)(5)(C)(i) .......................................................5

7 U.S.C. § 12(e)(2)(B), CEA § 12(e)(2)(B) .....................................................................8

7 U.S.C. § 16(e)(1)(B), CEA § 16(e)(1)(B) .....................................................................7

7 U.S.C. § 16(e)(2), CEA § 16(e)(2).............................................................................7–8

15 U.S.C. § 8302(d)(1) ...................................................................................................4

18 U.S.C. § 1084(a) ........................................................................................................2

31 U.S.C. § 5362(1)(e)(2) ..............................................................................................9

Dodd-Frank Wall Street Reform and Consumer Protection Act,
   Pub. L. No. 111-203, 124 Stat. 1376 (2010)................................................................1

N.Y. Rac. Pari-Mut. Wag. & Breed. § 1367 .................................................................10

Regulations

17 C.F.R. § 38.151(b).....................................................................................................10

17 C.F.R. § 38.151(b)(1) ................................................................................................10

17 C.F.R. § 40.11 ...........................................................................................................12

17 C.F.R. § 40.2 .............................................................................................................12

Legislative Materials

120 Cong. Rec. S 30464 (daily ed. Sept. 9, 1974)
   (Statement of Sen. Curtis)............................................................................................7

H.R. Rep. No. 93-1383 (1974) (Conf. Rep.),
   reprinted in 1974 U.S.C.C.A.N. 5894, 5897 ................................................................8

S. Rep. No. 95-850, at 111-12 (1978),
   reprinted in 1978 U.S.C.C.A.N. 2087, 2110-11 ..........................................................8

S. Rep. No. 871, 67th Cong., 2d Sess. 3 (1922) ............................................................5

H.R. Rep. No. 97-565, at 44-45 & 102-103 (1982),
   reprinted in 1982 U.S.C.C.A.N. 3871, 3893-94, 3951-52.........................................8–9

Other Authorities

Barry Taylor-Brill,
  *Cracking the Preemption Code: The New Model for OTC Derivatives*,
  13 Va. L. & Bus. Rev. 1, 6 (2019)................................................................................................8

Celso Brunetti, *et al.*,
  *Speculators, Prices, and Market Volatility*, 51 J. of Fin. and Quantitative Analysis 1545 (2016),
  https://www.jstor.org/stable/44157831?seq=1 ...........................................................................5

## PRELIMINARY STATEMENT

In 2010, Congress amended the Commodity Exchange Act ("CEA") to give the CFTC exclusive jurisdiction over swaps. *See* Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010); 7 U.S.C. § 2(a)(1)(A). The CEA's definition of swaps has long included event contracts, including contracts where the underlying event relates to sports, politics, cultural events, or the weather. *KalshiEX, LLC v. Flaherty*, 172 F.4th 220, 228 (3d Cir. 2026). Despite the CEA's grant of "exclusive jurisdiction" to regulate event contracts to the CFTC, New York seeks to intrude on federal jurisdiction by expanding the scope of the State's gambling laws via civil lawsuits filed against CFTC-regulated Designated Contract Markets ("DCMs").

New York's entire theory requires reading extra-textual limitations on the CEA's definition of "swap." New York would have this Court designate some "event[s] or contingenc[ies]," 7 U.S.C. § 1a(47)(A)(ii), as within the scope of the CEA and others outside that scope without any textual basis whatsoever. And it seeks that delineation for the first time as a defendant in this action. Prior to the federal government's commencement of this action, New York sought to use its state law enforcement authority to expand the reach of its state gambling laws beyond the casinos and sportsbooks that the State already regulates to force state regulation of DCMs. New York asserts that it is "nonsensical" that the expanded jurisdiction it seeks would impede federal jurisdiction because event contracts on the weather, for example, "are not at issue in the State Enforcement Actions." Dkt. No. 56 ("NY Br.") 21. But New York's theory of the scope of the CEA has no limiting principle—even if the State seeks to shut down only *some* event contracts now, nothing about the State's logic would prevent it from further intruding on federal jurisdiction in the future. And New York offers no textual basis either for its current enforcement or for its

1

assurances that its current regulatory attempts represent the end of its power grab, rather than the beginning.

New York's novel and aggressive application of its state gambling laws is preempted. State gambling laws may not be used to usurp the "exclusive jurisdiction" over DCMs that Congress conferred on the CFTC. And the federal plaintiffs are directly and irreparably harmed by New York's attempts to enforce its state gambling laws against federally regulated financial markets. To preserve the status quo and stop New York from irreparably damaging the federal plaintiffs' regulatory scheme and its registrants' business operations, the federal plaintiffs urge the Court to grant its proposed preliminary injunction.

## SCOPE OF LITIGATION

The federal plaintiffs seek preemption of New York's gambling regulations enforced against all types of event contracts offered by CFTC-regulated entities. Dkt. No. 1, Relief Requested (asking for relief against state laws "applied to transactions listed, offered, or executed on CFTC-Designated Contract Markets"). The Complaint seeks preemption of any state gambling laws being enforced against CFTC-regulated entities. Dkt No. 1, Relief Requested ¶ 1; 35-1 ¶¶ 1–2. New York asserts that the federal plaintiffs have not sought preemption of its enforcement of 18 U.S.C. § 1084(a), which bans the use of wire communications for interstate or foreign commerce to place bets or wagers or to assist in placing bets or wagers. NY Br. 2. But to pursue a Section 1084 claim, New York must first prove that the underlying activity is illegal under state law. *See* 18 U.S.C. § 1084(b) (exempting lawful activity from prosecution). Because New York's state gambling laws are preempted as applied to the markets at issue in this case, its Section 1084 claim necessarily also fails.

.

2

**ARGUMENT**

The federal plaintiffs are likely to prevail on the merits of their claim.[1] The CEA's definition of "swap" includes all event contracts predicated on the "the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). The event contracts that New York seeks to regulate via its enforcement suits are swaps under that definition and therefore within the CFTC's "exclusive jurisdiction." 7 U.S.C. § 2(a)(1)(A). Because New York seeks to regulate activity within the federal government's exclusive jurisdiction, its state laws are preempted as applied to markets subject to exclusive federal regulation. Even without the CEA's express preemption provision, New York's novel application of its gambling laws to DCMs conflicts with federal law and is therefore preempted. The constitutional violations resulting from New York's attempted enforcement of preempted law irreparably harm the federal plaintiffs by interfering with the uniform regulation of its regulated markets.

## I.    Event contracts are "swaps" under the CEA

In asserting that event contracts are not "swaps" under the CEA because they are not "associated with . . . potential financial, economic, or commercial consequence[s]," New York ignores not only the text of the CEA but also the two most recent decisions by federal courts on this issue, both of which held that the CEA confers exclusive jurisdiction to the CFTC to regulate these event contracts traded on DCMs.

In *KalshiEX, LLC v. Flaherty*, the only federal court of appeals decision to address this issue, even the dissent agreed that "sports-event contracts fit comfortably within the statutory

---

[1] On June 11, 2026, the federal plaintiffs voluntarily dismissed Governor Hochul from this case without prejudice under Fed. R. Civ. P. 41(a)(1)(A)(i). Dkt. No. 73. Therefore, the federal plaintiffs do not need to respond to the defendants' argument that Governor Hochul is not a proper party.

3

definition" of "swap" because they are associated with "financial, economic, or commercial consequence[s]." 172 F.4th 220, 233 (3d Cir. 2026) (Roth, J., dissenting). As the majority noted, there are "numerous affected stakeholders" who face positive or negative monetary consequences based on the outcome of an event contract. *Id.* at 227–28; *see also KalshiEX LLC v. Johnson*, No. CV-26-01715, __F. Supp. 3d ___, 2026 WL 1223373, at *5 (D. Ariz. May 5, 2026) ("Event contracts are associated with potential financial, economic, or commercial consequences because stakeholders have financial exposure to the underlying events' outcomes."). And as the District of Arizona observed in halting a similar state enforcement action against a DCM, the use of "associated" demonstrates that Congress intended for only the event contract and the consequences to be "connect[ed] together . . . in any of various intangible ways." *Johnson*, 2026 WL 1223373, at *5. Congress could have employed "a more stringent requirement" than "potential" or "omitted a qualifier altogether," but instead chose to use a broad term. *KalshiEX LLC v. Orgel*, No. 3:26-cv-00034, 2026 WL 474869, at *8 (M.D. Tenn. Feb. 19, 2026). To the extent the definition is unclear, Congress expressly delegated to the CFTC and the Securities and Exchange Commission the power to "further define" swaps. *Flaherty*, 172 F.4th at 228 (quoting 15 U.S.C. § 8302(d)(1)).

New York argues that the federal plaintiffs' interpretation of "association" is far too broad and would impose no meaningful limits on what could be considered a swap. But even if that were true, this case is not the forum to determine the outer limits of what event contracts may or may not have potential financial, economic, or commercial consequences and are therefore swaps under the CEA. Here, New York swung for the fences and attempted—via civil enforcement actions filed against DCMs—to apply its state gambling regulations against *all* event contracts by asserting that *no* event contracts could be swaps under the CEA. *See, e.g., New York v. Coinbase*, No. 1:26-cv-3300 (S.D.N.Y.), Dkt. No. 1-2; *New York v. Gemini Titan, LLC*, No. 1:26-cv-3318 (S.D.N.Y.),

4

Dkt. No. 1-1. Not even the authority on which New York relies goes that far: as even the district court in *Hendrick* and the dissent in *Flaherty* recognized, "sports game[s] might be inherently associated with a potential financial consequence." *KalshiEX LLC v. Hendrick*, 817 F. Supp. 3d 1014, 1030–31 (D. Nev. 2025); *see also Flaherty*, 172 F.4th at 233 (Roth, J., dissenting) ("A plain reading of the [CEA's] text suggests that Kalshi's sports-event contracts fit comfortably within the statutory definition."). And the CEA expressly recognizes that event contracts might "involve . . . gaming," and sets out a "special rule" requiring the CFTC to conduct a public interest review of those contracts. 7 U.S.C. § 7a-2(c)(5)(C)(i).

Finally, New York asserts another extratextual limitation on the CEA's definition of swap, maintaining that the potential economic consequence must affect the parties trading on event contracts. NY Br. 19–20 (asserting that "customers" do not trade "for any economic purpose"). Nothing in the CEA requires the "potential financial, economic, or commercial consequence" to affect a party to a transaction—that qualifier instead applies to the "event or contingency" at issue in the contract. 7 U.S.C. § 1a(47)(A)(ii). The motivations of parties to the trade have nothing to do with whether the transaction is a "swap" under the CEA and, in any case, speculators are and always have been an important part of derivatives markets, just like in securities markets, providing price discovery and volatility-reducing functions.[2] *See, e.g.,* S. Rep. No. 871, 67th Cong., 2d Sess. 3 (1922) ("Transactions in grain  futures are utilized by the public for speculation and by the grain trade for the purpose of eliminating or reducing, as far as practicable, the hazards . . . due to price fluctuations. Public speculation helps to carry the risk for the producers, dealers, and millers who wish to hedge their cash grain transactions.").

---

[2] *See* Celso Brunetti, *et al.*, *Speculators, Prices, and Market Volatility*, 51 J. of Fin. and Quantitative Analysis 1545 (2016), https://www.jstor.org/stable/44157831?seq=1.

New York, not the federal plaintiffs, set the table for this preemption suit by enforcing state gambling regulations against all event contracts. Because the State's gambling enforcement efforts are so broad, they would almost certainly destabilize even long-recognized CFTC-regulated markets such as weather and crop production. Therefore, the Court need only conclude that at least some of the event contracts New York is targeting fall within the CFTC's exclusive jurisdiction over swaps for the federal plaintiffs to prevail in their as-applied preemption challenge.

## II.    New York's laws are preempted as applied

New York's gambling regulations are preempted as applied to CFTC-regulated DCMs under express, field, and conflict preemption. New York's counterarguments rely on a false premise: that the federal plaintiffs assert that "Congress wanted to preempt all state gaming law through the CEA." NY Br. 24; *see also id.* at 18 (casting the federal plaintiffs' arguments as seeking "to curtail or preempt . . . state laws in substantial part"). That is not what the federal plaintiffs argue—the existing scope of New York's gambling laws are not at all implicated by this action. New York's argument elides that this case is not about Congress reaching into traditional state gambling—*e.g.*, casino gambling, sports books, or lotteries—but about New York extending its gambling laws to capture federally-regulated derivatives markets. *See Flaherty*, 172 F.4th at 225–26 (explaining that the "issue" is not whether the CEA "regulat[es] all sports gambling" but rather when the CEA "regulat[es] trading on federally designated contract markets"). That novel application of New York law is preempted.

### A.  Express Preemption

When analyzing an express preemption clause, courts "focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' preemptive intent." *Chamber of Comm. of U.S. v. Whiting*, 563 U.S. 582, 594 (2011) (quoting *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993)). The scope of Congress' "pre-emptive intent" may be inferred "through

6

a statute's express language or its structure and purpose." *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76 (2008) (internal citations omitted).

Section 2(a)(1)(A) of the CEA establishes the CFTC's exclusive jurisdiction over swaps. *See* Dkt. No. 35 at 14–16. The statute also states that "[e]xcept as hereinabove provided, nothing contained in this section shall . . . supersede or limit the jurisdiction at any time conferred on . . . regulatory authorities under the laws of the United States or of any State." 7 U.S.C. § 2(a)(1)(A). The inclusion of "the laws of . . . any State" in the savings clause does two things. First, it makes clear that through "hereinabove provided" in Section 2, Congress in fact intended to "supersede or limit the jurisdiction . . . of . . . State[s]." *See Johnson*, 2026 WL 1223373, at *6. Second, Congress's express contemplation that jurisdiction would be stripped not just from the SEC but also from States, highlights that the purpose of conferring on the CFTC "exclusive jurisdiction" over "transactions involving swaps," 7 U.S.C. § 2(a)(1)(A), was "to assure that Federal preemption is complete," 120 Cong. Rec. S 30464 (daily ed. Sept. 9, 1974) (Statement of Sen. Curtis).

New York correctly observes that another savings clause, this time in Section 16(e)(1), "does not apply to swaps." NY Br. 24; *see* 7 U.S.C. § 2(d) ("Nothing in this chapter," other than certain specified provisions, which do not include Section 16(e)(1), "governs or applies to a swap.") But the State ignores the effect of that section. Section 16(e)(1) states that "[n]othing in this chapter shall supersede or preempt . . . the application of any . . . State statute (except as provided in paragraph (2)) . . . to any transaction . . . that is *not* conducted on or subject to the rules of a registered entity," like a DCM. 7 U.S.C. § 16(e)(1)(B) (emphasis added). If that savings clause is to mean anything at all, then it must mean that transactions that *are* conducted on a registered entity, *e.g.*, a DCM, are subject to federal law only, per Section 2(a)(1)(A). That Section 16(e)(1) does not apply to swaps means that even *off-DCM* swap transactions are not subject to state law,

7

further bolstering the inference that on-DCM swap transactions are not subject to state law. Furthermore, the second half of the same subsection, Section 16(e)(2), "supersede[s] and preempt[s] the application of any State or local law that prohibits or regulates gaming or the operation of bucket shops (other than antifraud provisions of general applicability)" as to off-DCM transactions. 7 U.S.C. § 16(e)(2); *see also id.* § 2(d) (applying this paragraph to swaps). The net effect of Section 16 is to preserve (1) some state law, but not gambling law, (2) with respect to non-swap transactions, (3) that are not conducted on DCMs. Obviously, (1) state gambling law, (2) with respect to swap transactions, (3) conducted on DCMs falls in the heartland of the preemption provisions.[3]

### B. Field Preemption

"The [CEA] has been aptly characterized [as] a comprehensive regulatory structure to oversee the volatile and esoteric futures trading complex." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 355–56 (1982) (internal citation and quotation marks omitted). Because Congress implemented such a comprehensive scheme, one of its goals was to "preempt the field insofar as futures regulation is concerned" such that "if any substantive State law regulating futures trading was contrary to or inconsistent with Federal law, the Federal law would govern." H.R. Rep. No. 93-1383 (1974) (Conf. Rep.), *reprinted in* 1974 U.S.C.C.A.N. 5894, 5897; Opening Br. 23–24. Congress recognized that maintaining the CFTC's exclusive jurisdiction over futures trading would avoid "costly duplication and possible conflict of regulation or over-regulation." S. Rep. No. 95-850, at 111-12 (1978), *reprinted in* 1978 U.S.C.C.A.N. 2087, 2110-

---

[3] *See* Barry Taylor-Brill, *Cracking the Preemption Code: The New Model for OTC Derivatives*, 13 Va. L. & Bus. Rev. 1, 6 (2019) ("Exclusive jurisdiction under section 2(a)(1)(A) is also preemptive jurisdiction; it has a much broader preemptive reach than gaming and bucket shop law-style preemption under section 12(e)(2)(B), which covers only excluded or exempt contracts over which the CFTC would [generally] have no jurisdiction.").

11. Even when given the opportunity to narrow the field of the CFTC's regulatory powers, Congress has rejected such initiatives and "continue[d] to support the idea of a single unified program of regulation and exclusive CFTC jurisdiction over exchange-traded futures." H.R. Rep. No. 97-565, at 44-45 & 102-103, *reprinted in* 1982 U.S.C.C.A.N. at 3893-94, 3951-52.

As the most recent federal court decisions on this issue have held, "the scope of field preemption" can be "properly defined . . . as the regulation of trading on a DCM (a form of futures trading) rather than as gambling." *Flaherty*, 172 F.4th at 229; *see also Johnson*, 2026 WL 1223373, at *6 ("[T]he CEA occupies the field of swaps and futures traded on DCMs."). And within that field, "[t]he framework for regulating swaps traded on DCMs is 'so pervasive . . . that [Congress] left no room for the States to supplement it." *Johnson*, 2026 WL 1223373, at *6 (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)).

What's more, Congress had an opportunity to alter the CFTC's jurisdiction over futures trading when it passed the Unlawful Internet Gambling Enforcement Act of 2006 ("UIGEA"). But Congress reinforced its understanding of the CFTC's regulatory field by expressly excluding transactions that are within the CFTC's exclusive jurisdiction as set forth in the CEA. 31 U.S.C. § 5362(1)(e)(ii).

New York attempts to lean on the presumption against preemption, arguing that, because New York has longstanding authority to regulate gambling within its borders, then a higher bar for preemption must apply. NY Br. 25. But New York again miscasts the status quo in this case: nothing about the CEA or the CFTC's exercise of its jurisdiction affects New York's longstanding regulation of gambling activities within its borders. Rather, New York is attempting to apply its existing gambling regulations to derivatives markets that have been exclusively regulated by the federal government for decades. It is New York, not the federal government, that seeks to expand

9

beyond its traditional powers, and there is no presumption against preemption for novel applications of state law.

### C.  Conflict Preemption

A state law may be preempted either because compliance with the state and federal law is impossible or because the state law stands as an obstacle to the accomplishment of the purposes of federal law. *Arizona v. United States*, 567 U.S. 387, 399 (2012). New York offers no convincing arguments that the State's extension of its gambling laws to CFTC-regulated markets does not conflict with federal law.

First, compliance with both state gambling laws and federal laws regulating swaps traded on DCMs is impossible. As the District of Arizona observed, "CFTC regulations require every DCM to 'provide its members . . . with impartial access to its markets and services,' including '[a]ccess criteria that are impartial, transparent, and applied in a non-discriminatory manner.'" *Johnson*, 2026 WL 1223373, at \*8 (quoting 17 C.F.R. § 38.151(b), (b)(1)). For example, New York Racing Law § 1367(1)(s), cited by New York in its suits against Coinbase and Gemini, prohibits "wagering" on any "events in which New York college teams participate." *See New York v. Coinbase*, No. 1:26-cv-3300 (S.D.N.Y.), Dkt. No. 1-2 ¶ 28; *New York v. Gemini Titan, LLC*, No. 1:26-cv-3318 (S.D.N.Y.), Dkt. No. 1-1 ¶ 28. That law requires DCMs to remove not just event contracts that are offered for trading in New York, but all event contracts involving New York collegiate teams across the country, even in States that do not contest the CFTC's jurisdiction. The effect of that application of state law would be two-fold: (1) New York's law would become a de-facto national regulation, displacing the national regulator established by Congress and (2) it would be impossible for the DCMs to provide interstate impartial market access to traders. As the Middle District of Tennessee observed, even the most minimal state gambling regulations, such as requiring users to be at least 21 years old and being "physically located" in a state, prevent DCMs

10

from providing the "impartial [nationwide] access" its users are entitled to under the CEA. *Orgel*, 2026 WL 474868, at *9.

New York's enforcement of state gambling regulations against DCMs also "stands as an obstacle" to Congress's intent to bestow the CFTC with exclusive regulatory authority over these markets. *Flaherty*, 172 F.4th at 229–30; *see also Johnson*, 2026 WL 1223373, at *8 ("The State's enforcement of its gambling laws would also frustrate Congress's objectives in creating a unified regulatory regime that oversees DCMs and ensuring that DCMs operate as national markets."). The DCMs would undoubtedly need to alter their operations to comply with any additional regulation New York imposes on top of (or in direct contradiction to) the CEA. *See American Agric. Movement v. Board of Trade of City of Chicago*, 977 F.2d 1147, 1156–57 (7th Cir. 1992) (internal citations omitted) ("When application of state law would directly affect trading on or the operation of a futures market, it would stand, 'as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress,'. . . , and hence is preempted."). This in turn requires the CFTC to alter its operations to effectively regulate a shifting legal landscape and market across the country. The application of New York's laws thus make enforcing and complying with Congress's regulatory scheme substantially more difficult.

### III.   Plaintiffs will be irreparably harmed without a preliminary injunction

In challenging the federal plaintiffs' showing of irreparable harm, New York disregards extensive case law finding "that a likely constitutional violation causes irreparable harm." *See*, *e.g.*, *KalshiEX LLC v. Johnson*, No. CV-26-01715, __ F. Supp. 3d ___, 2026 WL 1223373, at *8. Less than two months ago, the Ninth Circuit held that a plaintiff seeking a preliminary injunction to stop an alleged constitutional violation will "almost always" demonstrate irreparable harm. *United States v. California*, 173 F.4th 1060, 1069 (9th Cir. 2026) (internal citations omitted). New

11

York's implication "that an alleged constitutional violation is irreparable harm only when a case involve[s] the First Amendment and 'related rights'. . . is too broad a statement." *Weisshaus v. Cuomo*, 512 F. Supp. 3d 379, 390 n.13 (E.D.N.Y. 2021). Indeed, the Ninth Circuit's holding came in the context of a similar Supremacy Clause claim. *See California*, 173 F.4th at 1069. That is particularly so here: New York's invasion of the Commission's exclusive jurisdiction inflicts an immediate injury to the federal government's sovereign interests, and there is no way to rectify that injury after final judgment.

New York is threatening to criminally prosecute DCMs and seeks an unclear scope of monetary relief. *See New York v. Coinbase*, No. 1:26-cv-3300 (S.D.N.Y.), Dkt. No. 1-2 ¶ 88; *New York v. Gemini Titan, LLC*, No. 1:26-cv-3318 (S.D.N.Y.), Dkt. No. 1-1 ¶ 99. New York's enforcement of preempted gambling laws against DCMs unjustifiably skews the risk profiles of federally regulated markets and disrupts their operations, thereby hampering the CFTC's exclusive regulatory work. *See* Dkt. No. 36 ¶ 7 (Declaration of CFTC Acting Director of the Division of Market Oversight Joshua Beale).

The State also challenges the harm the federal plaintiffs directly face and disparagingly implies that any difficulties in regulating DCMs stems from the CFTC's inability to keep up with its workload. On the contrary, it is conflicting gambling enforcement from New York and other States that has forced the CFTC to divert resources from its core functions. *Id.* While New York is allowed to threaten DCMs with improper enforcement of state gambling laws, the CFTC's oversight of its regulated markets is continually hampered and undermined. *Id.*

### IV.   The equities favor a preliminary injunction

New York spends much of its opposition harping on the dangers of gambling and the lack of protections its residents face. But New York never discusses the safeguards the CFTC employs to protect consumers for improper events contracts. *See* 17 C.F.R. §§ 40.11, 40.2. The CFTC is

12

empowered to prohibit contracts that it determines are contrary to the public interest, and requires DCMs to self-certify compliance with CFTC regulations before listing a contract. *Id.* It is not in the public interest for New York to enforce preempted gambling laws against DCMs that are operating in compliance with CFTC regulations. *KalshiEX, LLC v. Flaherty*, 172 F.4th 220, 232 (3d Cir. 2026). Rather, the public interest favors "enforcement of valid federal law," and "a state has no legitimate interest in enforcing a preempted law." *KalshiEX LLC v. Johnson*, No. CV-26-01715, __ F. Supp. 3d ____, 2026 WL 1223373, at *9 (D. Ariz. May 5, 2026).

## CONCLUSION

Thus, for the reasons stated above and in their motion, the United States and the CFTC respectfully ask this court to enter a preliminary injunction prohibiting New York from applying its laws against CFTC-regulated DCMs.

Dated: June 11, 2026                    Respectfully submitted,


By: ***/s/ Andrew J. Weisberg***
ANDREW J. WEISBERG
Senior Assistant General Counsel
U.S. Commodity Futures Trading Commission
Three Lafayette Center
1155 21st Street, NW
Washington, DC 20581
Tel. 202-418-5574
aweisberg@cftc.gov

13

*Attorneys for the United States of America*

*Attorneys for the Commodity Futures Trading Commission*

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

YAAKOV M. ROTH
Principal Deputy Assistant Attorney General

TIBERIUS DAVIS
Counsel to the Assistant Attorney General
450 5th St. NW,
Washington, DC 20001
Tiberius.davis@usdoj.gov
202-860-8970

ALEXANDRA McTAGUE SCHULTE
Senior Litigation Counsel
Alexandra.schulte@usdoj.gov
202-718-0483

Tyler S. Badgley
        General Counsel
M. Jordan Minot
        Deputy General Counsel
Anne Stukes
        Senior Assistant General Counsel
Carlin Metzger
        Senior Assistant General Counsel
Andrew J. Weisberg
        Senior Assistant General Counsel

U.S. Commodity Futures Trading Commission
Three Lafayette Centre
1155 21st Street, NW
Washington, DC 20581
Tel:  (202) 209-1087
Fax:  (202) 418-5567
tbadgley@cftc.gov
jminot@cftc.gov
astukes@cftc.gov
cmetzger@cftc.gov
aweisberg@cftc.gov

14

## Certification Pursuant to S.D.N.Y. Local Civil Rule 7.1

I, Andrew J. Weisberg, hereby certify that this document was prepared on a computer

using Microsoft Word, and the word count for this reply brief is **4,070**, inclusive of all footnotes,

and exclusive of the caption, table of contents, table of authorities, and signature block.

Dated: June 11, 2026

>                */s/ Andrew J. Weisberg*
>                ANDREW J. WEISBERG
>                Senior Assistant General Counsel
>                Commodity Futures Trading Commission

## CERTIFICATE OF SERVICE

I hereby certify that on June 11, 2026, I filed a copy of the foregoing reply brief using the

Court's CM/ECF system, which will serve all registered counsel of record.

Dated: June 11, 2026

>                */s/ Andrew J. Weisberg*
>                ANDREW J. WEISBERG
>                Senior Assistant General Counsel
>                Commodity Futures Trading Commission