**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

THE UNITED STATES OF AMERICA; and COMMODITY FUTURES TRADING COMMISSION,

*Plaintiffs*,

COINBASE FINANCIAL MARKETS, INC.,

*Proposed Intervenor-Plaintiff*,

GEMINI TITAN, LLC,

*Proposed Intervenor-Plaintiff,*

v.

STATE OF NEW YORK, *et al.*,

*Defendants*,

v.

AMERICAN GAMING ASSOCIATION,

*Proposed Intervenor-Defendant*.

Case No. 1:26-cv-3404-LGS

**MEMORANDUM OF LAW OF PROPOSED INTERVENOR AMERICAN GAMING ASSOCIATION IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES .......... ii

INTRODUCTION .......... 1

ARGUMENT .......... 2

I. AGA's Members Have a Significant Interest in New York's Gaming Market. .......... 2

II. The Balance of Equities and Public Interest Weigh Against an Injunction, Given the Harm It Would Cause to New York's Gaming Industry and Consumers. .......... 4

A. Prediction Markets Offer Sports Bets. .......... 4

B. The CFTC's Approach Would Upend the Longstanding Framework Governing Sports Betting. .......... 10

III. The CFTC's Arguments Conflict with a Substantial and Growing Body of Precedent. .......... 13

CONCLUSION .......... 14

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ah Sin v. Wittman*,
198 U.S. 500 (1905)....2

*Coinbase Fin. Mkts., Inc. v. Nessel*,
2026 WL 2295184 (E.D. Mich. Aug. 7, 2026)....13

*KalshiEX, LLC v. Assad*,
__ F.4th __, 2026 WL 2543846 (9th Cir. Aug. 28, 2026)....1, 2, 4, 5, 6, 7, 9, 10, 13

*KalshiEX LLC v. Cafferelli*,
2026 WL 2294589 (D. Conn. Aug. 10, 2026)....9, 13

*KalshiEX LLC v. Cox*,
2026 WL 2241564 (D. Utah Aug. 4, 2026)....13

*KalshiEX, LLC v. Flaherty*,
172 F.4th 220 (3d Cir. 2026)....5, 13

*KalshiEX, LLC v. Hendrick*,
817 F. Supp. 3d 1014 (D. Nev. 2025)....13

*KalshiEX LLC v. Martin*,
793 F. Supp. 3d 667 (D. Md. 2025)....13

*KalshiEX LLC v. Schuler*,
2026 WL 1295806 (6th Cir. Apr. 24, 2026)....13

*KalshiEX, LLC v. Schuler*,
2026 WL 657004 (S.D. Ohio Mar. 9, 2026)....11, 13

*KalshiEX, LLC v. Williams*,
2026 WL 2017466 (S.D.N.Y. July 13, 2026)....13

*Murphy v. NCAA*,
584 U.S. 453 (2018)....1, 2

*QCX LLC v. Nessel*,
2026 WL 1895958 (W.D. Mich. June 17, 2026)....10, 13

*SAM Party of N.Y. v. Kosinski*,
987 F.3d 267 (2d Cir. 2021)....4

*Utility Air Regul. Grp. v. EPA*,
573 U.S. 302 (2014) .......... 2

*Whitman v. Am. Trucking Ass'ns*,
531 U.S. 457 (2001) .......... 1

**Statutes**

N.Y. Rac. Pari-Mut. Wag. & Breed. § 1363 .......... 11

N.Y. Rac. Pari-Mut. Wag. & Breed. § 1367 .......... 12, 13

**Regulations**

9 NYCRR Part 5325 .......... 12

9 NYCRR Part 5327 .......... 12

9 NYCRR Part 5402 .......... 12

9 NYCRR § 5325.6 .......... 11

9 NYCRR § 5329.37 .......... 11, 12

9 NYCRR § 5330.8 .......... 11

9 NYCRR § 5330.34 .......... 11

**Other Authorities**

American Gaming Ass'n, *Our Membership* .......... 2

American Gaming Ass'n, *Commercial Gaming Revenue Hits $78.7 Billion in 2025, Driving Record $18.1 Billion in Gaming Taxes Nationwide* (Feb. 26, 2026) .......... 2

American Gaming Ass'n, *Gaming by the Numbers: New York* (Dec. 31, 2024) .......... 3

American Gaming Ass'n, *State of Play* .......... 2

American Gaming Ass'n, *State of the States 2026* (May 2026) .......... 3, 4

Ben Blatt & Amy Fan, *Is Sports Betting Illegal in Your State? Not If You Call It a 'Prediction Market.'*, N.Y. Times (Oct. 5, 2025) .......... 6

*Commercial Casinos*, New York State Gaming Commission .......... 3

Dustin Gouker, *The Cashout: Half of Kalshi Volume Is Now Parlays*,
The Closing Line (Aug. 31, 2026) .......... 9

Dustin Gouker, *Kalshi Is Advertising That 'Sports Betting' Is Legal in California, Texas*, Event Horizon (Sept. 17, 2025) ........ 5

Dustin Gouker, *Kalshi Says It's 'Kind of Addicting' in Instagram Post*, Event Horizon (Oct. 21, 2025) ........ 12

Dustin Gouker, *Kalshi Was Promoting a 30-Leg Parlay to Users on Tuesday*, Event Horizon (Apr. 1, 2026) ........ 8

Dustin Gouker, *Robinhood Cometh?*, Event Horizon (Sept. 2, 2026) ........ 6

Dustin Gouker, *Yes, Kalshi Is Still Marketing Itself as a Betting Platform*, Event Horizon (Aug. 27, 2025) ........ 5

Kalshi, *Signing Up as an Individual* (Mar. 10, 2026) ........ 11

Kalshi, *Voluntary Self-Exclusion* (Mar. 16, 2026) ........ 12

Letter from Xavier Sottile, Head of Markets, KalshiEX LLC, to CFTC (Jan. 16, 2026) ........ 7

Marshall Cohen, *Young adults under 21 traded $5 billion on Kalshi this year, amid prediction market frenzy*, CNN Business (Aug. 28, 2026) ........ 11

Nancy Walecki, *It's Not Gambling, It's 'Girl Math'*, The Atlantic (Apr. 1, 2026) ........ 12

S. Rep. No. 111-176 (2010) ........ 1

Sam McQuillan, *Kalshi Parlay Volume Surges, But Sports Prediction Economics Still Lag Sportsbooks*, Legal Sports Report (Mar. 24, 2026) ........ 9

*State Gaming Board gives final approval for all 3 NYC sites for casino licenses*, Eyewitness News (Dec. 15, 2025) ........ 3

*Three NYC casinos are expected to create thousands of quality union jobs*, The Hotel & Gaming Trades Council (Fall 2025) ........ 3

## INTRODUCTION

For decades, Congress and the States have worked together to establish a regulatory framework for gaming that elevates local policy choices and protects consumers. Licensed gaming operators, including American Gaming Association (AGA) members in New York, have built their businesses around this framework and partnered with states to make it effective. That model has delivered enormous benefits: capital investments, jobs, tax revenue, and a safe and transparent marketplace where every operator plays by the same rules.

The theory asserted by the Commodity Futures Trading Commission (CFTC) would eviscerate that longstanding regulatory structure. According to the CFTC, "sports-event contracts" on prediction markets are derivatives contracts governed exclusively by the Commodity Exchange Act (CEA). But as is obvious to "*everyone*" who visits a prediction market, these contracts are hardly novel financial instruments—they are sports bets. *KalshiEX, LLC v. Assad*, __ F.4th __, 2026 WL 2543846, at *10 (9th Cir. Aug. 28, 2026). Prediction markets offer point spreads, over/under bets, proposition bets, and parlays, all of which are standard sportsbook fare. Their own advertisements have marketed sports event contracts as "legal sports betting." *Id.* at *9.

The CFTC contends that Congress preempted state regulation when it enacted the Dodd-Frank Wall Street Reform and Consumer Protection Act in 2010. But Dodd-Frank authorized a "comprehensive response to the financial crisis that nearly crippled the U.S. economy beginning in 2008," S. Rep. No. 111-176, at 2, 29-30 (2010), not nationwide sports betting. As court after court has recognized, precedent forecloses the CFTC's audacious claim. Congress, the Supreme Court has emphasized, "does not … hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001). Enacting a national regulatory scheme for the "controversial subject" of sports betting, *Murphy v. NCAA*, 584 U.S. 453, 486 (2018), undeniably qualifies as an

elephant, yet the CFTC relies on obscure derivatives provisions that say nothing about overriding state gaming laws. Those statutory mouseholes are particularly inadequate because Congress must "speak clearly if it wishes to assign to an agency decisions of vast 'economic and political significance.'" *Utility Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014) (citation omitted); *see Assad*, 2026 WL 2543846, at *10.

States have made "important policy choice[s]" to establish sports betting regimes tailored to their citizens' values and needs. *Murphy*, 584 U.S. at 486; *Ah Sin v. Wittman*, 198 U.S. 500, 505-06 (1905) (regulation "of gambling is concededly within the police powers of a state"). These state-regulated markets processed more than $166 billion in transactions in 2025, which created $3.71 billion in state tax revenue nationwide, including $1.32 billion in tax revenue for New York.[1] Congress cannot preempt laws so central to states' police powers—or delegate such a major question to the CFTC—without speaking far more clearly than it has here. This Court should deny the CFTC's motion.

## ARGUMENT

### I. AGA's Members Have a Significant Interest in New York's Gaming Market.

AGA is a non-profit trade association whose members represent the full spectrum of the legal, state-regulated gaming industry, from commercial casino owner-operators to equipment suppliers to online sportsbooks.[2] AGA members participate in gaming markets nationwide. In New York, MGM Resorts International operates the Empire City Casino in Yonkers; Genting Americas, Inc. operates Resorts World Catskills in Monticello; Delaware North operates Finger

[1] *See* American Gaming Ass'n, *Commercial Gaming Revenue Hits $78.7 Billion in 2025, Driving Record $18.1 Billion in Gaming Taxes Nationwide* (Feb. 26, 2026), https://perma.cc/67YZ-VMBN; American Gaming Ass'n, *State of Play*, https://www.americangaming.org/research/state-of-play-map/?state=new-york.

[2] *See* American Gaming Ass'n, *Our Membership*, https://perma.cc/T7WV-CHZ2.

Lakes Gaming & Racetrack in Farmington; and BetMGM, a joint venture of MGM and Entain, offers mobile sports betting statewide. Collectively, state-licensed gaming operators in New York generate more than $16 billion in annual economic impact and support more than 69,000 jobs.[3] Additionally, AGA members Hard Rock International,[4] Bally's Corporation, and Genting Americas were recently granted licenses to develop and operate three new casinos in New York City.[5] Governor Hochul explained that these facilities "will generate billions of dollars for the MTA and education,"[6] and the union for gaming workers across New York projects that the new facilities will create 14,000 "quality," "permanent" jobs.[7]

Sports betting is a significant component of AGA members' New York operations.[8] New York is "by far the largest market in the country" for sports betting, with annual revenue exceeding $2.5 billion in 2025.[9] Mobile sports betting "generated tax revenue of around $1.32 billion in 2025" in New York, with "the vast majority" going to the "Education Fund, which provides aid for local school districts across New York."[10] These funds are also used for "problem gambling education and treatment services and to fund a statewide grant program to support sports activities

---

[3] American Gaming Ass'n, *Gaming by the Numbers: New York* (Dec. 31, 2024), https://perma.cc/NLE9-MYPJ.

[4] Hard Rock International is owned by the Seminole Tribe of Florida.

[5] *Commercial Casinos*, New York State Gaming Commission, https://gaming.ny.gov/commercial-casinos; *State Gaming Board gives final approval for all 3 NYC sites for casino licenses*, Eyewitness News (Dec. 15, 2025), https://perma.cc/G23H-78GB.

[6] Eyewitness News, *supra*.

[7] *Three NYC casinos are expected to create thousands of quality union jobs*, The Hotel & Gaming Trades Council (Fall 2025), https://perma.cc/FJY5-Y4VU.

[8] American Gaming Ass'n, *State of the States 2026*, at 104-05 (May 2026), https://perma.cc/7APF-Y88F

[9] *Id.* at 10.

[10] *Id.* at 105.

for underserved youth."[11] AGA's members pay these gaming taxes; prediction market platforms offer the same sports wagers, but do not pay *any* New York gaming taxes or licensing fees, and claim to be exempt from state gaming laws.

## II. The Balance of Equities and Public Interest Weigh Against an Injunction, Given the Harm It Would Cause to New York's Gaming Industry and Consumers.

In addition to the reasons in New York's briefing, the CFTC's preliminary injunction motion fails because the balance of the equities and public interest weigh against prohibiting New York from enforcing its gaming laws. *See SAM Party of N.Y. v. Kosinski*, 987 F.3d 267, 273-74 (2d Cir. 2021). The "sports event contracts" offered by prediction markets are, in substance, no different from the wagers offered by traditional sportsbooks. A preliminary injunction would thus create a two-tier system, in which prediction markets and state-licensed gaming operators offer the same wagers subject to vastly differing legal regimes—only one of which includes the tax and consumer-protection provisions adopted by New Yorkers and their elected representatives. That outcome would undermine the public policies that New York's sports betting laws are designed to serve, upend the longstanding regulatory framework governing gaming, and expose state-licensed gaming operators to a torrent of unfair, unlicensed competition.

### A. Prediction Markets Offer Sports Bets.

The CFTC's arguments attempt to obfuscate a simple truth: prediction markets offer sports betting. As courts across the country have observed, "[t]he substance of the sports event contracts offered on [prediction markets] is sports gambling, regardless of whether [they] cal[l] them swaps." *Assad*, 2026 WL 2543846, at *10.

[11] *Id.*

Prediction markets know that they offer sports bets. For example, Kalshi has "market[ed] its sports event contracts … as 'legal sports betting'" and "advertised itself as 'the first app for legal sports betting in all 50 states.'" *Id.* at *9-10. And while Kalshi employs sanitized terms like "trading" in its court papers, its advertisements have repeatedly described its offerings as "sports betting":[12]







*See KalshiEX, LLC v. Flaherty*, 172 F.4th 220, 235 (3d Cir. 2026) (Roth, J., dissenting) (additional advertisements). The data confirms what the marketing makes clear: In 2025, sports betting accounted for "[o]ver 90% of Kalshi's trades" and "95% of its revenue." *Assad*, 2026 WL 2543846, at *4.

---

[12] Dustin Gouker, *Kalshi Is Advertising That 'Sports Betting' Is Legal in California, Texas*, Event Horizon (Sept. 17, 2025), https://perma.cc/8NJ4-HFUR; Dustin Gouker, *Yes, Kalshi Is Still Marketing Itself as a Betting Platform*, Event Horizon (Aug. 27, 2025), https://perma.cc/QEH6-YA3L.

A customer at a traditional sportsbook "can place a sports bet on the Las Vegas Raiders winning a game by over 7.5 points," and on a prediction market, "that same customer can buy an event contract based on the Las Vegas Raiders winning a game by over 7.5 points"—each with the same payout. *Id.* at *10. The graphic below—published in a *New York Times* article regarding prediction markets' sports betting expansion—illustrates this approach.[13] The first image shows betting options for an NFL game on a state-regulated sportsbook; the second shows betting options on Kalshi for the same game. Both use the same format, offer bets on the same point spread, and offer bets on the same over/under for the number of points scored.[14]

**Licensed Sportsbook**




**Prediction Market**




[13] Ben Blatt & Amy Fan, *Is Sports Betting Illegal in Your State? Not If You Call It a 'Prediction Market.'*, N.Y. Times (Oct. 5, 2025), https://perma.cc/JZ9K-7HX8.

[14] Although Kalshi recently discontinued "American" pricing (e.g., "-106" in the example above), it explained that "[n]othing about the markets themselves has changed" and "[t]his change only affects how prices are shown on screen." Dustin Gouker, *Robinhood Cometh?*, Event Horizon (Sept. 2, 2026), https://perma.cc/6XHR-F432.

Prediction markets also offer bets that have long been standard sportsbook fare, such as "prop[osition] bets" which are "bets based on outcomes within a game." *Assad*, 2026 WL 2543846, at *4. For example, Kalshi offers bets on the speed of the fastest serve in tennis matches,[15] as well as the total number of corner kicks in English Premier League soccer matches:[16]




Prediction markets also allow users to make parlay bets, which combine several different wagers and pay off only if *all* the listed outcomes occur, with the payout "depend[ing] on the performance of a sports team or a player." *Assad*, 2026 WL 2543846, at *10. For example, a parlay based on the NFL game shown on the preceding page could wager that Dallas will win by more than 2.5 points *and* that the teams will collectively score more than 47.5 points. Prediction

---

[15] Letter from Xavier Sottile, Head of Markets, KalshiEX LLC, to CFTC, *Notification Regarding the Initial Listing of the "Will the fastest serve in <tennis match> be <above/below/exactly/at least/between><count><speed>?" Contract* (Jan. 16, 2026), https://perma.cc/SGE5-NT5N.

[16] AGA's counsel took a screenshot of this page on the Kalshi mobile application on May 20, 2026.

markets do not restrict these parlay bets to a single game, or even to matchups within a single sport. Kalshi promotes parlays that rely on 30 different outcomes across multiple games in different cities.[17] Earlier this year, Crypto.com offered a bet that (1) the Dallas Mavericks would defeat the Brooklyn Nets by 6.5 points or more in an NBA game, *and* (2) the University of Louisiana-Lafayette and Troy University would combine for 134 points or fewer in a basketball game, *and* (3) Brighton & Hove Albion F.C. and Nottingham Forest F.C. would tie in a soccer match, *and* (4) Curaçao would defeat Germany in the FIFA World Cup:[18]




[17] Dustin Gouker, *Kalshi Was Promoting a 30-Leg Parlay to Users on Tuesday*, Event Horizon (Apr. 1, 2026), https://perma.cc/V34F-4WAU.

[18] AGA's counsel took a screenshot of this page on the Crypto.com mobile application on February 23, 2026.

The CFTC makes no effort to show that these parlays—which are "surging"[19] on prediction markets and make up nearly *half* of Kalshi's betting volume[20]—are anything other than sports bets. Nor could they, as there is "no principled reason for why a combo on both the Giants and Broncos winning" has any economic consequence "apart from its significance to participants … who have wagered on that particular combination of outcomes." *KalshiEX LLC v. Cafferelli*, 2026 WL 2294589, at *8 (D. Conn. Aug. 10, 2026) (cleaned up).

The CFTC argues that sports event contracts are "fundamentally different products" than traditional sports bets. Dkt. 35 at 11 (Mot.). Although the CFTC does not describe these purported differences, the Ninth Circuit rejected a similar argument, explaining that the claimed "distinctions" are "without differences" and lack "any connection to the statutory definition[s]" at issue. *Assad*, 2026 WL 2543846, at *11. Nor can the CFTC distinguish sports contracts because "stakeholders to a sport event may wish to hedge against a team's or participant's performance." Mot. 13. Prediction markets' "sports event contracts do not help institutions or investors hedge against risk; they *create* risk, largely for ordinary consumers, where none previously existed." *Assad*, 2026 WL 2543846, at *10. The hedging argument is particularly nonsensical regarding parlays like those above. And reading the CEA "so expansively as to include any conceivable downstream economic consequence" for anyone, as the CFTC urges, would "render the definition of swap so broad as to be meaningless." *Id.* at *12. Indeed, under the CFTC's reading, "every person placing a sports bet" with a traditional sportsbook "is violating the CEA" because "the CEA

[19] Sam McQuillan, *Kalshi Parlay Volume Surges, But Sports Prediction Economics Still Lag Sportsbooks*, Legal Sports Report (Mar. 24, 2026), https://perma.cc/XF4N-RGRZ.

[20] Dustin Gouker, *The Cashout: Half of Kalshi Volume Is Now Parlays*, The Closing Line (Aug. 31, 2026), https://perma.cc/PL7K-MV93.

makes it unlawful to enter into 'swaps' outside of" a federal exchange." *Id.* at *11 (citing 7 U.S.C. § 2(e)). That cannot be right. *See id.*

In short, the CFTC's interpretation "has a gambling problem." *Id*. at *10. "[P]lacing sports bets, even when called by another name, is still gambling." *Id.* at *10. Moreover, the CFTC lacks "clear congressional authorization" for its assertion of authority because Congress has not enacted "a direct (or indirect) regulation of sport gambling" or authorized the CFTC to serve as "a national gambling regulator." *Id.* at *14; *see QCX LLC v. Nessel*, 2026 WL 1895958, at *4 (W.D. Mich. June 17, 2026) ("The primary issue [Congress] set out to solve" in Dodd-Frank "had nothing to do with sports-related contracts."). Instead, Congress has designed federal statutes to incorporate and reinforce state gaming laws. *See Assad*, 2026 WL 2543846, at *14.

**B. The CFTC's Approach Would Upend the Longstanding Framework Governing Sports Betting.**

States have made different choices about whether and how to allow sports betting. Some States prohibit sports betting altogether, while others, like New York, permit licensed operators to offer sports betting subject to stringent regulations. Gaming operators, including AGA's members, have invested accordingly, building state-specific systems for licensing, geolocation, account controls, vendor relationships, and permissible bet offerings. And they work closely with state regulators to ensure that consumers can enjoy gaming as a safe, responsible form of entertainment.

There is a bargain at the heart of this framework. Operators are licensed and investigated by the States in which they operate; their systems are audited; and their platforms are built to incorporate geolocation, identity verification, and reporting requirements. They provide state and local governments with revenue, infrastructure investments, and compliance functions designed to protect consumers. In return, the States provide markets in which all competitors are subject to

the same rules. That level playing field has created settled expectations for regulators and operators alike.

The CFTC's legal theory would allow prediction markets to circumvent state restrictions on a broad range of important issues.

***Age Limits.*** Like most states, New York prohibits persons under age 21 from placing sports wagers. *See* 9 NYCRR § 5330.8(c)(4). Yet many prediction markets offer sports bets to users 18 or older.[21] The CFTC's regime would thus allow individuals as young as high school students to bet on sports, despite New York's judgment that such wagers present unacceptable risks. *See KalshiEX, LLC v. Schuler*, 2026 WL 657004, at *10 n.9 (S.D. Ohio Mar. 9, 2026) (*Schuler I*) (individuals ages 18-20 "have unrestricted access to sports-event contracts" on prediction markets and are left "unprotected by Ohio's responsible gaming laws"). This is a serious issue because "[y]oung adults between 18 and 21 … have traded an estimated $5.4 billion so far this year on the Kalshi prediction market."[22]

***Advertising.*** States, including New York, also regulate gaming advertisements. State-licensed operators must ensure that individuals who have self-excluded from gaming do not receive solicitations, include prominent responsible gaming messages in their advertisements (including the phone number for the State's free problem-gambling hotline), and refrain from depicting or targeting persons under 21. N.Y. Rac. Pari-Mut. Wag. & Breed. § 1363; 9 NYCRR §§ 5325.6, 5329.37, 5330.34. These rules also forbid advertisements that "suggest that betting is a means of solving" financial problems or that "social, financial or personal success is guaranteed" from sports wagering. 9 NYCRR § 5329.37(b)(2).

---

[21] *See, e.g.*, Kalshi, *Signing Up as an Individual* (Mar. 10, 2026), https://perma.cc/GA9G-8PRW.

[22] Marshall Cohen, *Young adults under 21 traded $5 billion on Kalshi this year, amid prediction market frenzy*, CNN Business (Aug. 28, 2026), https://perma.cc/JX6L-LREH.

Prediction markets' advertising is not similarly tailored. One advertisement described prediction market wagers as "'kind of addicting,'"[23] and another depicted "a woman anxiously checking a Kalshi bet with her friends, with the caption, 'I was about to be unable to pay my rent, but I got two years of rent through Kalshi's prediction. It's amazing!'"[24]

***Responsible Gaming.*** New York also requires robust responsible-gaming protections, including programs allowing customers to voluntarily self-exclude themselves from all licensed gaming operations and advertising, as well as mechanisms to identify risky play. *See* 9 NYCRR Parts 5325, 5327, 5402. Prediction markets, in contrast, are not required to offer self-exclusion programs or to monitor for signs of problem gaming. Some, such as Polymarket, do not offer any responsible gaming tools. Others maintain narrowly drawn programs that offer self-exclusion only from particular betting applications, in contrast to the comprehensive self-exclusion program provided under New York law.[25]

***Gaming Taxes.*** State-regulated sports betting generated $1.32 billion in tax payments to New York in 2025, which the State used to support education, problem gambling education, and underserved youth programs. N.Y. Rac. Pari-Mut. Wag. & Breed. § 1367(8). Prediction markets offer sports bets without paying these taxes, costing the State substantial revenue.

***College Sports.*** New York also prohibits wagers on sporting events involving New York-based college sports teams. N.Y. Rac. Pari-Mut. Wag. & Breed. § 1367(1)(s). Although licensed gaming operators abide by this restriction, prediction markets offer these types of bets—again

---

[23] Dustin Gouker, *Kalshi Says It's 'Kind of Addicting' in Instagram Post*, Event Horizon (Oct. 21, 2025), https://perma.cc/5W6T-5UZK.

[24] Nancy Walecki, *It's Not Gambling, It's 'Girl Math'*, The Atlantic (Apr. 1, 2026), https://perma.cc/7CCJ-FN7M.

[25] Kalshi, *Voluntary Self-Exclusion* (Mar. 16, 2026), https://help.kalshi.com/en/articles/13823789-voluntary-self-exclusion.

undermining the judgments of New York policymakers. *See KalshiEX, LLC v. Williams*, 2026 WL 2017466, at *10 (S.D.N.Y. July 13, 2026).

**III. The CFTC's Arguments Conflict with a Substantial and Growing Body of Precedent.**

The CFTC's motion raises many issues, including interpretation of the CEA, application of preemption doctrines, and considerations of irreparable harm and the balance of equities. More than a dozen courts have considered these issues, and the overwhelming majority have concluded that the arguments asserted by the CFTC are meritless. The following decisions have persuasively analyzed the questions presented here:

- "Swap" definition: *Assad*, 2026 WL 2543846, at *8-15; *QCX*, 2026 WL 1895958, at *2-9; *Cafferelli*, 2026 WL 2294589, at *6-10; *Schuler I*, 2026 WL 657004, at *5-7.

- Express preemption: *KalshiEX LLC v. Schuler*, 2026 WL 1295806, at *4 (6th Cir. Apr. 24, 2026) (*Schuler II*); *KalshiEX LLC v. Cox*, 2026 WL 2241564, at *7-8 (D. Utah Aug. 4, 2026).

- Field preemption: *Assad*, 2026 WL 2543846, at *17; *Coinbase Fin. Mkts., Inc. v. Nessel*, 2026 WL 2295184, at *11-14 (E.D. Mich. Aug. 7, 2026); *Williams*, 2026 WL 2017466, at *7; *KalshiEX LLC v. Martin*, 793 F. Supp. 3d 667, 676-84 (D. Md. 2025); *Flaherty*, 172 F.4th at 236-38 (Roth, J., dissenting).

- Conflict preemption: *Schuler II*, 2026 WL 1295806, at *5-6; *Assad*, 2026 WL 2543846, at *16; *Williams*, 2026 WL 2017466, at *8-9; *Martin*, 793 F. Supp. 3d at 684-86.

- Balance of equities: *Williams*, 2026 WL 2017466, at *10; *Cafferelli*, 2026 WL 2294589, at *16-17; *KalshiEX, LLC v. Hendrick*, 817 F. Supp. 3d 1014, 1035-37 (D. Nev. 2025); *Schuler I*, 2026 WL 657004, at *10.

## CONCLUSION

This Court should reject the CFTC's brazen attempt to override state gaming laws and deny its preliminary injunction motion.

Respectfully submitted,

*/s/ Kevin F. King*

David A. Luttinger, Jr.
Kevin F. King (*pro hac vice*)
Matthew J. Glover (*pro hac vice* forthcoming)
Scott J. Garfing (*pro hac vice*)
Sameer Aggarwal (*pro hac vice*)
COVINGTON & BURLING LLP
850 10th Street NW
Washington, DC 20001
(202) 662-6000
kking@cov.com

*Counsel for the American Gaming Association*

September 7, 2026

**CERTIFICATE OF COMPLIANCE**

I hereby certify that this Memorandum of Law complies with the length restriction in the Court's August 27, 2026 Endorsement (Dkt. 149) because it contains 3,498 words, as counted by the Microsoft Word processing program used to prepare this document. This word count includes the 209 words in the images on pages 5-8, but excludes the caption, table of contents, table of authorities, signature block, and certificates as provided for by Local Civil Rule 7.1(c).

*/s/ Kevin F. King*
Kevin F. King

*Counsel for the American Gaming Association*