**By ECF** September 23, 2026

The Hon. Lorna G. Schofield
United States District Court for the Southern District of New York
40 Foley Square
New York, NY 10007

Re: *United States v. State of New York*, 26-cv-03404 ("*U.S.*"); *N. Am. Derivatives Exchange, Inc. v. James*, 26-cv-04980 ("*Nadex*")

Dear Judge Schofield:

The defendants respectfully submit this response to plaintiffs' joint letter ("Ltr.") regarding *KalshiEX, LLC v. Assad*, 2026 WL 2543846 (9th Cir. 2026). *See U.S.*, ECF 157; *Nadex*, ECF 66.

***Assad*'s Express Preemption Analysis**. The plaintiffs assert, without elaboration, that *Assad*'s express preemption holding was correct. Ltr. at 1. However, *Assad* is unpersuasive on this point. First, *Assad* wrongly concluded that §2(a)(1)(A) is an express preemption clause. Although the provision confers upon the CFTC "exclusive jurisdiction" over certain financial instruments, it contains no language expressly displacing state law. *See KalshiEX LLC v. Schuler*, 2026 WL 1295806, at *4 (6th Cir. Apr. 24, 2026). This exclusive jurisdiction provision is thus different in kind and therefore in meaning from the CEA's other express preemption provisions, which use materially different, explicitly preemptive language. *See* §16(e)(2) ("...shall supersede and preempt the application of any State or local law that…"); §16(h)(2) ("A swap…may not be regulated as an insurance contract under the law of any State").

Second, even if §2(a)(1)(A) is an express preemption clause, that "'does not immediately end the inquiry because the question of the substance and scope of Congress' displacement of state law still remains.'" *KalshiEX, LLC v. Williams*, 2026 WL 2017466, at *5 (S.D.N.Y. July 13, 2026) (quoting *Altria Grp. v. Good*, 555 U.S. 70, 76 (2008)); *see also Yousefzadeh v. Johnson & Johnson Consumer Inc*., 184 F.4th 130, 145 (2d Cir. July 30, 2026) (same). Where an express preemption clause is "ambiguous or open to more than one plausible reading, courts have a duty to accept the reading that disfavors pre-emption." *Council for Responsible Nutrition v. James*, 159 F.4th 155, 171 (2d Cir. 2025) (cleaned up). It is far from clear that the substance and scope of §2(a)(1)(A) reaches the application of state gaming laws to sports, elections, or entertainment/culture bets just because those bets are effected on a DCM. Rather, §2(a)(1)(A) could readily be construed as preempting only a narrower set of state laws, *e.g.* a state securities or commodities law that creates a derivatives exchange licensing regime. As there are multiple plausible interpretations of the extent of any preemptive effect, the Court should conclude the laws at-issue are not preempted.

Regardless, there is no basis to conclude that "Congress's preemptive intent" (*Yousefzadeh*, 184 F.4th at 146) extended to state gaming laws. *Williams*, 2026 WL 2017466, at *6-9. *Assad* itself holds state gaming laws are neither field- nor conflict-preempted. 2026 WL 2543846, at *7, *16-17; *see also KalshiEX LLC v. Cafferelli*, 2026 WL 2294589, at *11-14 (D. Conn. Aug. 10, 2026).

***Assad*'s Interpretation of "Swap"**. The plaintiffs principally argue that the Special Rule undermines *Assad*'s holding that sports event contracts are not "swaps." Ltr. at 2-3. Against the

backdrop of contracts that are listed for trading via DCM self-certification, the Special Rule merely gives the CFTC a tool to take action on a contract that a DCM has improperly self-certified and that the CFTC determines to be contrary to the public interest based on enumerated categories. 7 U.S.C. §7a-2(c)(5)(C). This provision in no way addresses what may be included in the definition of "swap" nor otherwise has any preemptive effect. Moreover, although the Special Rule gave the concurring judge in *Assad* "pause" because the judge interpreted the provision as "appear[ing] to give the CFTC discretion whether to ban altogether gaming contracts," 2026 WL 2543846, at *19, no such concern is warranted. As the *Assad* majority aptly noted: "The Special Rule did not give the CFTC any more preemptive authority over gaming than it gave the CFTC authority over terrorism or assassination and the other underlying 'excluded commodities.'" *Id.* at *13.

The plaintiffs also claim that 15 U.S.C. §8302(d)(1) avoids a major-questions doctrine problem. Ltr. at 2. It does not. Section 8302(d)(1) provides that the CFTC and SEC, in consultation with the Board of Governors of the Federal Reserve System, may "further define" "swaps." That Congress arguably gave the CFTC *shared* authority to *further* define a swap does not in any way support the argument that Congress implicitly gave the CFTC *sole* authority to *redefine* and *expand* the CEA to reach the offerings at issue here, and to trample upon state gaming regulation. Thus, the plaintiffs' interpretation runs afoul of the major-questions doctrine and more. *Cf. QCX LLC v. Nessel*, 2026 WL 1895958, at *7 (W.D. Mich. June 17, 2026) (finding §8321(b) inapposite).

More broadly, the plaintiffs fail to respond to *Assad's* critiques of the *Flaherty* majority (which track Defendants' own arguments) or otherwise justify the plaintiffs' overly broad definition of swap.[1] Their definition has no limiting principle. As *Assad* correctly noted, the plaintiffs' reading would necessarily mean that sports bets currently placed on state licensed sports books are also "swaps," meaning that almost anyone who places such a bet also violates §2(e) of the CEA. *Assad*, 2026 WL 2543846, at *11. And while the plaintiffs refer to weather and other financial swaps, those products were specifically enumerated by Congress as swaps, relate directly to traditional commodity prices, are not at issue here, and are unlike the bets that are. *Id.*; *see also U.S.*, ECF 56 at 21-22; *Nadex*, ECF 50, at 15-16. The plaintiffs' claim that the Special Rule supplies a limiting principle in their favor is baseless because it has no bearing on the definition of swap. Their assertion that their definition of swap is somehow limited by the characterization that DCMs do not serve as the "house" is also meritless (*Nadex*, ECF 50, at 32) and was readily dispatched in *Assad*, 2026 WL 2543846, at *11. By contrast, *Assad* persuasively construed "associated" and "potential" to provide appropriate limiting principles for §1a(47)(A)(ii). *Id.* at *11-12, *16. *See also Cafferelli*, at *7-10; *U.S. v. Wisconsin*, 2026 WL 2474512, at *9-10 (E.D. Wis. July 29, 2026).

Finally, the plaintiffs try to justify their broad interpretation of §1a(47)(A)(ii) by hypothesizing financial consequences untethered to record evidence. Ltr. at 3. But "[c]hallengers bringing preenforcement as-applied challenges cannot rely on hypothetical situations." *Natl. Shooting Sports Found. v. James*, 144 F.4th 98, 107 (2d Cir. 2025). Even if this speculation could justify relief as to *one* particular event contract (it does not), it could not justify precluding *all* state enforcement as to *any* contract offered by *any* DCM or FCM. *Cf. Copeland v. Vance*, 893 F.3d 101, 111-13 (2d Cir. 2018) ("[s]weeping relief" sought rendered as-applied challenged facial in nature).

---

[1] *Flaherty*'s persuasive value is also limited by its review of whether sports event contracts are swaps for "clear error" as a finding of fact, not *de novo*. *KalshiEX, LLC v. Flaherty*, 172 F.4th 220, 225, 227-228 (3d Cir. 2026).

Respectfully submitted,

/s/ *Katherine Rhodes Janofsky* ______
KATHERINE RHODES JANOFSKY
Robert H. Arnay
Zachary Manley
Assistant Attorneys General
28 Liberty Street, New York, NY 10005

cc (by ECF): All counsel of record